# **Exhibit B**

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 25-10006 (TMH)
 4   LIGADO NETWORKS LLC,        .
     et al.,                     .  (Jointly Administered)
 5                               .
                                 .  Courtroom No. 7
 6                               .  824 Market Street
              Debtors.          .  Wilmington, Delaware 19801
 7                               .
                                 .  Wednesday, January 14, 2026
 8   . . . . . . . . . . . . .  .  11:35 a.m.

 9                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE THOMAS M. HORAN
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Andrew M. Leblanc, Esquire
                                 MILBANK, LLP
13                               1101 New York Avenue, NW
                                 Washington, DC 20005
14
     For Inmarsat Global
15   Limited:                   Benjamin I. Finestone, Esquire
                                 QUINN EMANUEL URQUHART
16                                 & SULLIVAN, LLP
                                 295 5th Avenue
17                               9th Floor
                                 New York, New York 10016
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Ian Willoughby, ECRO

21   Transcription Company:     Reliable
                                 The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1    <u>APPEARANCES (CONTINUED)</u>:

2    For AST & Science, LLC:    Madlyn Gleich Primoff, Esquire
                                FRESHFIELDS US, LLP
3                               3 World Trade Center
                                175 Greenwich Street
4                               51st Floor
                                New York, New York 10007
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2    MOTIONS:                                              PAGE

 3    Agenda
      Item 1:    Debtors' Motion for an Order (I) Enforcing the     4
 4               Automatic Stay, (II) Enforcing the Mediated
                 Agreement, and (III) Granting Related Relief
 5               [Docket No. 1220; filed January 2, 2026]

 6               Court's Ruling:                           68

 7    Agenda
      Item 2:    Emergency Motion by AST & Science LLC for       4
 8               Entry of an Order Enforcing the Mediated
                 Agreement and Related Orders of this Court
 9               Against Inmarsat Global Limited
                 [Docket No. 1221; filed January 2, 2026]
10
                 Court's Ruling:                           68
11

12    Transcriptionists' Certificate                       70

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings commence at 11:35 a.m.)

 2                   THE COURT:  Good morning.  Please be seated.

 3                   Okay.  Let's start with the debtors.  Mr. Leblanc,

 4    good to see you.

 5                   MR. LEBLANC:  Good morning, Your Honor.  Andrew

 6    Leblanc of Milbank on behalf of Ligado.

 7                   Your Honor, I'm happy to just get right into the

 8    argument, if that pleases --

 9                   THE COURT:  Yeah --

10                   MR. LEBLANC:  -- the Court --

11                   THE COURT:  -- please do.

12                   MR. LEBLANC:  -- unless, Your Honor, you had any

13    preliminary statements.

14                   We do have a slide deck, Your Honor.

15                   THE COURT:  Okay.

16                   MR. LEBLANC:  If I may approach?  And if the Court

17    could grant sharing authority to Elizabeth Fly, who's on the

18    Zoom and she's here in the courtroom, and she'll project for

19    us.

20              (Participants confer)

21                   MR. LEBLANC:  May I approach, Your Honor?

22                   THE COURT:  Yes, please.  Yeah, yeah.  No, this is

23    perfect.  Thank you, Mr. Leblanc.

24                   MR. LEBLANC:  We do have a handful of copies for

25    people here in the courtroom, Your Honor.
```

1              THE COURT:  Thank you.  Okay.

2              MR. LEBLANC:  And Your Honor, even before we crack

3    the slide deck, I -- we're -- to be clear, and I think Your

4    Honor probably got this from us last week when we were before

5    Your Honor on the motion to shorten notice -- we are very,

6    very frustrated to be here.

7              I've been practicing a long time, Your Honor.

8    I've never even contemplated suing a debtor in a state court

9    proceeding while they're a debtor, particularly suing them --

10   seeking an injunction to cause the debtor to take some

11   action, and to do so with respect to an agreement that was

12   entered pursuant to Your Honor's direction.

13             The "termsheet," as they've defined it in their

14   complaint, that is the subject of their litigation, is the

15   mediated agreement, which was the subject of a dispute before

16   Your Honor on August 29th, in which Your Honor gave a clear

17   direction to the parties to do something with respect to

18   that.

19             I -- it's unbelievable to me, frankly, that we are

20   here with respect to this issue.  And to have Inmarsat allege

21   to a court in a pleading that my client misrepresented

22   something to the FCC is very troubling, Your Honor,

23   particularly in light of what this case was all about.

24             Your Honor will recall the most important thing in

25   this case for Ligado was reaching an agreement with AST,

1    which is our counterparty moving forward, our partner using

2    forward, using our spectrum and providing us with a

3    significant amount of revenue share.

4            The second most important thing was taking that

5    agreement into the bankruptcy and consummating an agreement

6    with Inmarsat, pursuant to which we could emerge from

7    bankruptcy and operate, and we did that, Your Honor.

8            And the crux of that agreement -- and Your Honor

9    is as familiar with this as anybody.  The crux of that

10   agreement was, I think, a trade that we were going to enter

11   into the agreement with AST and pay Inmarsat over half a

12   billion dollars, dismiss litigation claims that we had

13   against them that we thought were a complete offset to any

14   amounts owing to them.  And in return, the one thing we were

15   going to get from Inmarsat was their support for our

16   regulatory application.

17           Literally days after we paid them half a billion

18   dollars or close to it, $420 million, 45 days later, we got

19   sued Inmarsat alleging we lied to our regulator and

20   expressing the statement that they were not going to -- not

21   only were they not going to support the application, but that

22   they were going to actively oppose the application.

23           Your Honor, I -- it's hard for me to imagine

24   something that is more violative of the stay than that and

25   more inconsistent with the agreement that we entered.

1          And I think it's important, Your Honor, to walk

2    through both of those, and I'll do it as briefly as I can.

3    But I do want to highlight some of the issues that we think

4    are just unbelievably troubling.

5          Your Honor, we honed exactly to the words of the

6    agreement that we entered into, and Inmarsat sued us saying

7    we lied about that.  They are wrong.  And we need our

8    bankruptcy court to step in and protect us from them, Your

9    Honor.  That's why we've sought the relief that we sought.

10   We think it's procedurally proper.  Your Honor always has the

11   inherent authority to enforce your orders, and we need the

12   Court to enforce this order.

13         We have complied in every respect with what we

14   agreed to do in the mediated agreement, both in terms of what

15   the application to the FCC would say and paying $420 million.

16   And the one thing that Inmarsat was obligated to do, they

17   have expressed their intention to do the exact opposite.

18         So let me just turn to some of the slides, Your

19   Honor, and I'll -- there's a number of slides that are

20   background.

21         But if we can turn to Slide 4, Your Honor.  Your

22   Honor will recall, on August 29th, we had a dispute.  And

23   just to refresh the Court on what the context of that dispute

24   is:  We entered into a mediated agreement on June 10th, and

25   we endeavored, from that point forward, to come up with

1    additional words beyond the mediated agreement that we could

2    put into the amended cooperation agreement.  We couldn't come

3    to a conclusion on that, we reached an impasse.

4             Your Honor will recall that that impasse centered

5    around whether AST should be limited in its ability to

6    operate in the L-band outside the United States.  We had a

7    disagreement about that.  We do not believe any such

8    limitation exists, either in the mediated agreement or in the

9    cooperation agreement, but that was the crux of that dispute.

10            And both parties came to this Court, and Your

11   Honor may recall you came and took the bench and you said I'm

12   inclined to do what Inmarsat has suggested, which is to just

13   incorporate the exact language from the mediated agreement

14   into the amended cooperation agreement.  And Your Honor,

15   you -- I think you were surprised when I said to you let's

16   look at my slides, Your Honor, that's the first thing we

17   suggest, is let's just put that language in, we are fully

18   prepared to do that.  And we did that.

19            THE COURT:  Uh-huh.

20            MR. LEBLANC:  That's exactly what we did.

21            Those exact words say -- and this is the bottom

22   bullet -- that, in our application to the FCC, we will:

23            "-- request the FCC recognize that the operations

24   of the proposed NGSO system have been coordinated subject to

25   the terms of the amended Inmarsat cooperation agreement and

1  the Inmarsat AST agreement."

2            That's what we agreed to do.  Those are literally

3  the words we used with the FCC.  And we are accused, today,

4  of misrepresenting something to the FCC.

5            Now, Your Honor knows -- and I'm jumping ahead to

6  Slide 6 -- on December 19th, Inmarsat filed the lawsuit, no

7  warning, no request for relief from this Court, no argument

8  that we had violated the mediated agreement, in any respect,

9  to this Court.  But instead, they sued us in New York State

10  Court and, in that complaint, asked for injunctive relief to

11  force us, a debtor before -- under this Court's supervision,

12  to take an action, to withdraw our FCC application and

13  restate it.

14            And they've asked for damages in that Court, not

15  for violation of the technical limitations of the coop

16  agreement, not for AST operating outside the United States in

17  a way they think is inconsistent with that agreement, but,

18  instead, for us filing an application that exactly mirrors

19  the words that Your Honor said we had to put into that

20  agreement.

21            I do think -- and I'm skipping ahead to Page 8,

22  Your Honor -- this all relates to just a fundamental

23  commercial disagreement where Ligado is really caught in the

24  middle between AST and Inmarsat.  They disagree about whether

25  there is an anti-competitive restriction on AST's ability to

1   operate in the L-band outside of North America.  That really

2   has virtually nothing to do with us, other than the fact that

3   we are caught in the middle.

4          Your Honor knows we can't emerge from bankruptcy

5   unless we get FCC approval.  We have built in -- and in fact,

6   we had to deal with an objection from the United States

7   Trustee, which I think Your Honor viewed was a good faith

8   objection from the U.S. Trustee, and I don't disagree with

9   it, that the idea that it's going to take us years to get FCC

10  approval is concerning.

11         But the fact that the one thing we got from

12  Inmarsat, their non-objection they're not complying with, is

13  going to make this even more difficult for us.  And we are --

14  we, the debtor, Ligado, are the entity, the party caught in

15  the middle of this fight over whether there's some anti-

16  competitive restriction on AST's ability to operate in the

17  rest of the world.  That -- it shouldn't be part of this.

18         So, Your Honor, on -- and I'm jumping ahead to

19  Slide 10.  On January 2nd, we filed our motion to enforce,

20  AST filed a parallel motion to enforce, and Ms. Primoff can

21  talk to that, and we've asked for two things:

22         We've asked for Your Honor to enforce the

23  automatic stay.

24         We've asked Your Honor to enforce the mediated

25  agreement as it is written.

1           Now, Your Honor, just to be clear -- and I don't

2   want to hide the ball -- we are going to remove the New York

3   State Court action to Federal Court.  Our time to do that

4   is -- expires next week.  We will do that and we will ask for

5   it to be transferred to this -- to Your Honor, to be decided.

6   We think it has to be here, whether through enforcement of

7   the automatic stay and a requirement that they dismiss it

8   there, which I think is the right answer, or through removal

9   and transfer of venue.  We think it's coming here under any

10  circumstance.

11          THE COURT:  Uh-huh.

12          MR. LEBLANC:  But we think this is the right place

13  for this to happen.

14          Now, as I mentioned at the outset, Your Honor,

15  it's a little shocking to see what their allegations are in

16  the complaint.  If you look at Page 11, we've exempt --

17  excerpted from their complaint.  Their complaint, in the

18  cause of action, sole cause of action, is an allegation of

19  breach of contract, and what they've alleged to be breached

20  is the termsheet.  The termsheet is the mediated agreement.

21          THE COURT:  That I ordered approved.

22          MR. LEBLANC:  The -- that's exactly right, Your

23  Honor.  That is the same thing, one and the same.

24          THE COURT:  And that's incorporated into the plan.

25          MR. LEBLANC:  That is incorporated into the plan,

1 | Your Honor, exactly right.

2 | And you can see -- and I do want to talk the

3 | substance of it because it's hard to describe just how wrong

4 | they are in the substance of it, and I think it's important.

5 | That may be for another day, but I think it's for today.  I

6 | think it's really important that Your Honor appreciate how

7 | wrong it is.

8 | They allege two violations or two breaches.  One

9 | is that the termsheet obligated use to do something more than

10 | what we did, which is to agree to the geographic, technical,

11 | and other limitations of the cooperation agreement and to so

12 | state to the FCC, that it required some future negotiation.

13 | That is simply wrong.

14 | And the second allegation is that the termsheet

15 | further requires that both AST and Ligado would jointly file

16 | the applications, not Ligado alone.

17 | Now I think they concede that language appears

18 | nowhere in the mediated agreement that is incorporated into

19 | the plan, it doesn't appear there.  It's -- they contend it

20 | arises from the circumstances, and I'll show Your Honor why

21 | that's just wrong.

22 | If there's any dispute about whether Your Honor

23 | continues to have jurisdiction, your order with respect to

24 | the mediated agreement was crystal clear that you continue to

25 | maintain jurisdiction with respect to these issues.  And I

1  think, under any -- even if Your Honor didn't have that

2  language in your mediated order -- in the order requiring it,

3  Your Honor would have that inherent authority under any

4  agreement.

5          So let me talk about the mediated agreement.  And

6  this is the substance of those two allegations, that we were

7  somehow in violation.  Your Honor, I'm starting on Page 16.

8      (Pause in proceedings)

9          MR. LEBLANC:  Your Honor, on Page 16, because we

10  knew we had difficulties in coming to commercial negotiations

11  with Inmarsat and Viasat, we have a very specific set of

12  directions to the parties with respect to what the

13  applications will say and what the parties will do.

14          Your Honor will recall, at the first day, I told

15  you we had years of negotiations to try to come to some

16  resolution with Viasat, and we couldn't.  So we have -- it's

17  a very particular document.  And Your Honor also knows that,

18  subsequent to signing the mediated agreement, we tried to

19  come to some further agreement and we were unable to do so.

20          But -- so the mediated agreement itself says, very

21  specifically, that the applications, one -- will expressly --

22  I'm sorry.

23          "(1) State that the operations of all AST and

24  Ligado spacecraft, individually and taken as a whole, and

25  regardless of orbit, will be consistent with and remain

1  within the technical, geographic, and other limitations in

2  the amended Inmarsat cooperation agreement, which is the

3  agreement as modified by the mediated agreement; and,

4  "(2) Request that the FCC and ISED recognize that

5  the operations of the proposed NGSO system have been

6  coordinated, subject to the terms of the amended Inmarsat

7  cooperation agreement."

8  That's what we agreed in the mediated agreement.

9  And Your Honor, I'm actually going to jump ahead

10  in the slide deck to Slide 26 because I think it's important

11  to remember that what Inmarsat asked you to do when we were

12  here on August 28th -- 29th, was to enter an order putting

13  that specific language into the agreement.  So I'm on

14  Page 26, Your Honor.

15  What Inmarsat urged the Court to do and what you

16  agreed to do and we agreed with, as well, they said all the

17  Court needs to do is to move to -- I'm sorry.

18  "All the Court to do to move matters forward is to

19  make clear that, under the plain language of the mediated

20  agreement, both Ligado and AST are bound to honor the

21  existing geographic and other limits of the cooperation

22  agreement, whatever they may be, and be bound to sign

23  definitive documents reflecting that commitment.

24  "The existing limits in Exhibit L or elsewhere in

25  the cooperation agreement do not need to change or to be

1  interpreted" -- "or be interpreted.  Indeed, the parties

2  expressly agreed in the mediated agreement that the technical

3  and geographic requirements, quote, 'will not change.'"

4  That was their argument.  Your Honor, that is

5  coordination.  That's what we agreed to in the mediated

6  agreement and that's what they asked Your Honor to order us

7  to enter into in the amended cooperation agreement, and

8  that's what -- exactly what we did.  And when we did that,

9  they told the FCC we lied -- I'm sorry -- they told the New

10  York State Court that we lied to the FCC.

11  Now, Your Honor, to the extent there's any

12  confusion -- and I'm back now on Slide 16 -- about whether we

13  do more in cooperation or coordination prior to filing the

14  FCC application, the language of the agreement is clear on

15  that.

16  Footnote 8, which is nowhere addressed in

17  Inmarsat's opposition, says, quote:

18  "The applications will not be more granular in

19  respect of Prong two."

20  Prong two being the recognition that we have

21  coordinated pursuant to the amended cooperation agreement.

22  And then on the next page, Your Honor, the

23  agreement -- this is the mediated agreement -- goes on to

24  say:

25  "Provided that the applications meet the two

1    conditions" --

2            And those are the two conditions we were looking

3    at on the prior page.

4            "-- Inmarsat shall affirmatively support, before

5    the FCC, the" --

6            And I'll -- the applications.

7            And Your Honor, we don't highlight it on this

8    page, but if you actually look at the list of things that

9    such affirmative support shall be limited to, which

10   necessarily means it includes, if you look at the bottom one

11   or -- I'm sorry -- the penultimate one:

12           "Working cooperatively for NGSO and GSO systems

13   for the debtors, including the proposed NGSO system, and

14   Inmarsat/Viasat to coexist in accordance with the amended

15   Inmarsat cooperation agreement."

16           So what that says is that's the support that

17   they're supposed to give us if we meet those two conditions.

18   They have now said to the FCC we lied to them about being

19   coordinated, and that this was something that had to happen

20   before we filed the FCC applications.  They are flatly wrong.

21           And I'll even point the Court, while we're here,

22   just to the breach, the direct breach by them of their

23   obligations as the last bullet.  They're refraining from:

24           "-- taking any public or private action contrary

25   to any of the following" --

1          They have taken the most public action imaginable

2    in suing us.

3          So, Your Honor, if you turn -- I'm going to jump

4    ahead now to Slide 20, and I'm not going to read all of this

5    because it's literally exactly what I just read.

6          THE COURT:  Uh-huh.

7          MR. LEBLANC:  On the lefthand side of the page

8    here, this is -- that's another cut-and-paste of the

9    agreement that we reached and the termsheet that was

10   incorporated into the plan, exactly what we'd say.  And if

11   you look to the right, Your Honor, that's what we filed, this

12   application for modification of space station license.  That

13   is our FCC application.  Those are verbatim.  I will point

14   out the one -- and I'm -- and I -- I think it's two changes

15   that are reflected here:

16         One, in the second highlighted sentence of the

17   right, we say "the commission," as opposed to the FCC and

18   ISED because we're applying to the FCC, and it's defined in

19   our application as "the commission," but that is the same

20   thing."

21         And instead of using the phrase "the proposed NGSO

22   system," we used the defined term "SkyTerra Next system."

23         But it, otherwise, is verbatim, Your Honor.  We --

24         THE COURT:  And sky --

25         MR. LEBLANC:  -- said --

1          THE COURT:  "SkyTerra Next system" is the proposed

2   NGSO system.

3          MR. LEBLANC:  That is exactly correct, Your Honor.

4          THE COURT:  Okay.

5          MR. LEBLANC:  So we did exactly what we had agreed

6   to do, Your Honor, and they have accused us of breach and

7   accused us of lying.

8          Now, Your Honor, if you turn to Page 21, this

9   is -- now I want to turn to the second argument that they

10  make.  They contend that, under the mediated agreement, that

11  AST somehow obligated itself to be a co-applicant or an

12  applicant to the FCC.  That doesn't appear anywhere in the

13  mediated agreement.  One would think that sophisticated

14  parties would have put in a phrase similar to "AST shall

15  apply for this application" or something along those lines.

16  Nothing like that.

17         And in fact, it doesn't make any sense.  The

18  application is a modification of Ligado's license.  We are

19  authorized to use Spectrum, licensed from the FCC.  We are

20  seeking a modification of that with respect to the

21  application.  That's the application.  It is our application.

22  Nothing in the agreement suggests that AST would be a co-

23  applicant.  The best they can point to is something that says

24  that AST and Ligado will provide them with a draft of the

25  application; that's the closest they get.

1          But in point of fact, Your Honor -- and this is

2  not in our brief, we identified it subsequent to filing last

3  night -- if you look at -- Footnote 13 is in the mediated

4  agreement.  Footnote 13 says -- and this is referring to the

5  circumstances in which we -- our release of Inmarsat can be

6  withdrawn:

7          "An 'Inmarsat-caused FCC non-approval' means

8  denial of Ligado's FCC application."

9          This language, in the same agreement, clearly

10  contemplates that Ligado is going to be the applicant, not

11  that AST is.  And yet, Your Honor, they have sued us again,

12  arguing that we violated the mediated agreement incorporated

13  into the plan because AST was not a co-applicant, when they

14  didn't ask for that.

15          AST has filed a letter in support of our

16  application, never was required to be a co-applicant, and

17  there is no breach.  The only breach is by them.

18          THE COURT:  I'm not sure that the answer to this

19  question is all that important.  But does the licensee have

20  to be the applicant?  Could -- like could AST have been the

21  applicant, or would FCC say you don't have standing to --

22          MR. LEBLANC:  They certainly couldn't have been

23  the applicant.  I mean, I -- under any circumstance, Ligado

24  has to be the applicant.  It is our spectrum.

25          THE COURT:  Yeah.

1      MR. LEBLANC:  I don't know, from an FCC

2   perspective, if AST could have been on the application.  They

3   certainly weren't required to under the mediated agreement.

4   And it couldn't have been only an AST application because

5   it's -- Ligado has the license to use the spectrum, it's a

6   modification sought of that spectrum.  It -- this is

7   something -- I -- it's not -- obviously, not what I -- well,

8   not -- I think it's not obvious, it is not what I do.

9      But I rely on our FCC experts and they filed the

10  application that they thought was required under -- by the

11  FCC.  And we certainly didn't believe anything else was

12  necessary whatsoever under the mediated agreement.  And if

13  somebody thought that it was, I would have thought that they

14  would have put it into the mediated agreement.  A simple

15  thing to say, that AST shall be an applicant, and that's not

16  part of it.

17     So, Your Honor, we think both of the substantive

18  arguments that are made are fundamentally flawed.  They also

19  should have just been -- if they wanted to make this argue --

20  if they wanted a declaration from Your Honor that we didn't

21  comply, they should have come here, alleged that, not alleged

22  in the New York State Court that we were misrepresenting

23  things to the FCC, and not repudiated their obligations to --

24  not repudiated their obligations to support, after having

25  been paid $420 million.

1           Your Honor, there -- I suspect you will hear from

2    the other side that, on August 29th, Your Honor said well,

3    there's a mechanisms in your mediated agreement for

4    resolution of disputes.  And I want to be clear about that,

5    there is.  But Your Honor those are coordination disputes.

6    That's what we agreed to in the mediated agreement.  We have

7    that on Page 24.

8           The mediated agreement has a mechanism by which we

9    will resolve coordination disputes.  And Your Honor referred

10   to this, I think this is on our next page, 25.  And I'll come

11   back to 24 in a second.  But Your Honor recognized this.

12          "If there is a dispute in the future, if there is

13   a dispute in concrete and practical terms" --

14          What we understood that to mean, Your Honor, is

15   that -- the easiest example is the one that we were before

16   the Court, where, you know, both sides were taking a

17   different position with respect to operations outside North

18   America.  If, in the future, AST gets authority to use L-band

19   spectrum outside of North America and they want to contend

20   that that's inconsistent with what they and we have agreed to

21   in the amended cooperation agreement, that's a dispute that

22   arises under the mediated agreement and under the dispute

23   recollect -- the dispute mechanism provided for in the

24   agreement.  This, what is at issue here, is not.

25          And Your Honor, it actually says in the dispute

1  mechanism that is quoted on Page 24 that:

2          "The amended Inmarsat cooperation agreement shall

3  include a process for resolving any disputes about compliance

4  with the" -- "its technical, geographic, and other

5  limitations, or any claims of interference."

6          So, in other words, the -- again, we have a

7  dispute about whether or not there's a geographic limitation

8  that applies outside the -- North America.  We think it

9  doesn't; they think it does.  If that comes up, I think Your

10 Honor was referring to a concrete dispute with respect to

11 that issue, that we have a mechanism for resolution.

12         We would not be alleging a violation of the stay

13 with respect -- if that were the issue.  We would not be --

14 it depend -- obviously, depends on when it happens.  But

15 if -- that it's contemplated that that -- because AST can't

16 operate under our license until we are licensed.

17 Necessarily, that's going to be after we are licensed.  If

18 that arises, that's where that should be resolved.

19         The issue here is not that level of technical

20 compliance, not the coordination that we've agreed to and

21 that we reported to the FCC, truthfully and accurately, that

22 we have coordinated.  That's not the dispute here.  The

23 dispute is about the interpretation of the mediated

24 agreement, Your Honor.

25         So, Your Honor, I think -- I obviously want to --

1  I'll, obviously, save some time for Ms. Primoff, and I want

2  the opportunity to reply.  But we need the Court's assistance

3  to enforce the stay.  We shouldn't have to face this

4  litigation in New York State Court.  We should -- to the

5  extent there is litigation over this issue, which we think

6  they're fundamentally wrong about, it has to happen here, and

7  it -- and it, frankly, has to happen quickly, Your Honor.

8          Our application is with the FCC.  The comment

9  period could open at any time.  And if Inmarsat,

10  notwithstanding their agreement and their -- and the payment

11  by us of -- to them of $420 million -- and we owe them

12  another $100 million, Your Honor, in March of this year,

13  that, if they're in breach of our agreement, we are not going

14  to be paying, and we'll come to the Court with respect to

15  that issue.

16          But to be clear, if they're not doing the one

17  thing that we negotiated for them to do, which is to support

18  our application and, in fact, they are opposing our

19  application, we're going to need relief from this Court

20  because they're in violation of the plan, the mediated

21  agreement, and Your Honor's orders with respect to that.

22          So we appreciate Your Honor taking this on

23  shortened notice, and I'm happy to answer any questions the

24  Court has.  But we would encourage the Court to provide us

25  with relief with respect to these issues and to do so

1  quickly.

2          THE COURT:  Okay.  I understand the argument.

3  Thank you.

4          MR. LEBLANC:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Ms. Primoff, welcome back.  It's good to see you.

7          MS. GLEICH PRIMOFF:  Thank you.  Good afternoon,

8  Your Honor.

9          THE COURT:  That clock is wrong, so don't look up

10 there.

11         MS. GLEICH PRIMOFF:  Oh --

12         THE COURT:  That's okay.

13         MS. GLEICH PRIMOFF:  -- okay.  It's one minute

14 past 12.  So good afternoon, Your Honor.

15         THE COURT:  We'll do "good afternoon."

16         MS. GLEICH PRIMOFF:  With your permission, I'll

17 approach with a deck.

18         THE COURT:  Thank you very much.

19     (Participants confer)

20         MS. GLEICH PRIMOFF:  Madeline Primoff of

21 Freshfields on behalf of AST.

22         And in addition to my Freshfields colleagues and

23 my Potter Anderson colleagues in attendance today, we also

24 have Andrew Johnson, who is the Chief Legal Officer, the

25 Chief Financial Officer, and a representative of AST's Board

1    of Directors.

2              THE COURT:  Okay.

3              MS. GLEICH PRIMOFF:  I -- we join in all of

4    Mr. Leblanc's arguments and comments today, and we'll try

5    and -- there's $420 million and a significant business at

6    stake, so this is very important.

7              I'll begin with the question that Your Honor

8    posed, which is:  Could AST have been the applicant?  And the

9    answer to that is no for several reasons:

10             One is we certainly weren't required to be the

11   applicant under the mediated agreement.  But if you look at

12   Page 18 of the deck that we just provided you, that speaks to

13   certain provisions of the Code of Federal Regulations.  And

14   it's very clear, if we look at the second one, for example,

15   2547 C.F.R. 25.114, it says:

16             "The following information shall be filed on the

17   FCC form" --

18             And it's the name, address, and telephone number

19   of "the applicant."  It's one applicant.  And the FCC doesn't

20   contemplate or take multiple applicants.  And the reason for

21   this is the FCC needs to know who to call if there is a

22   problem.  It's not going to be calling multiple applicants

23   and multiple people to say hey, there's a problem.  So that

24   addresses the -- I think that addresses Your Honor's

25   question.

1        We believe this is now the third time that we are

2   before Your Honor on the mediated agreement.  And we believe

3   that the Court really already decided the issues that are

4   before Your Honor today back at the August 29th hearing, and

5   the parties reflected that resolution in the direct

6   agreements that the parties entered into with Inmarsat.  So

7   the debtors entered into an amended cooperation agreement and

8   AST entered into a direct agreement with Inmarsat.  So they

9   have, already, what they need.

10        From the outset -- and let's level-set as to how

11  we got here today, Your Honor.  From the outset, Inmarsat was

12  focused on getting paid.  Their objection to the AST

13  transaction, back when they filed that in April, was that

14  they didn't want to wait for regulatory approval to get paid.

15  And they also didn't want to risk that they wouldn't be paid

16  if there was no regulatory approval.

17        So, if we look at Page 2 of the debt, that's the

18  excerpt from their objection to the AST transaction.  And

19  they say:

20        "Ligado cannot force Inmarsat to provide a free

21  option by waiting years for approval and payment."

22        So the parties went to mediation.  And because the

23  debtors didn't have the money to pay Inmarsat, AST stepped up

24  and agreed to pay $535 million, and that's the crux of the

25  mediated agreement.  And AST paid the money, paid the four

1    hundred -- it's not the debtors' money; it's AST's money that

2    was paid on October 31.

3            And Inmarsat is not on the hook to reimburse AST

4    if regulatory approval is not obtained.  And if you look at

5    Page 3 of the deck, Your Honor, we've excerpted Section 4 of

6    the mediated agreement, which refers, in multiple places, to

7    the payments to Inmarsat being indefeasible.  So, if there is

8    no FCC approval forthcoming, AST turns around to Ligado and

9    says pay me back.

10           And then, if you look at Page 5 of the deck -- no,

11   no, I'm sorry -- Page 4 of the deck, the consequences of the

12   approval condition failure is that AST goes to Ligado and

13   says pay me back, and Ligado turns to its DIP lenders and

14   draws, under the DIP facility, with the backstop commitment

15   to get paid back.

16           But Inmarsat is going to contend that it does not

17   have to pay back the money.  So, normally, a party like AST,

18   who's putting up $420 million, says what are we getting in

19   response for that from Inmarsat.  What we were getting in

20   response for that from Inmarsat was their commitment to

21   support the regulatory process.

22           And as my colleague Mr. LeBlanc has said -- and

23   this is Page 5 of our deck -- Inmarsat promised it would

24   support the FCC application if the application has the two

25   specific statements, and those are the statements on Page 5.

1            On Slide 6, no other conditions need to be met, so
2   long as those statements are contained in the application.
3   They are and they're true.  And the last line of Page 6 is
4   they cannot refrain from taking any public or private action
5   contrary to their regulatory support obligation.

6            Your Honor has already decided the scope of
7   coordination required under the mediated agreement.  We got
8   the mediated agreement approved.  The parties had numerous
9   disputes following the June approval, and we all landed here
10  in August because we reached an impasse.

11           And the Court focused -- and I'm looking at Page 7
12  of the deck -- back in August, on interpreting the plain
13  words of the mediated agreement.  You said, multiple times,
14  let's just look at the express language.  And that's what we
15  did.

16           The Court delineated the scope of the parties'
17  obligations by ordering the parties to incorporate the exact
18  words of the mediated agreement into their direct agreements,
19  so they have the direct agreement from AST.  The Court said
20  that further modifications could be done with the consent of
21  each of the parties, but the Court plainly did not require
22  anything further.

23           So the import of the August 29 hearing and the
24  Court's September 2 ruling was that the parties were simply
25  directed to live within the metes and bounds of the

1    cooperation agreement as it currently exists.

2            Inmarsat was focused on AST making the payments

3    that it had to make.  But likewise, Inmarsat has to live up

4    to its obligations.  Everybody agreed, once consummation of

5    the plan, which rests on regulatory approval, occurs, then,

6    if there's a dispute under the applicable agreements, the

7    parties can resolve the dispute at the appropriate time in

8    accordance with the mediated agreements.

9            And it -- we'll turn to Page 10.  And the Court

10   said, if there is a concrete factual dispute that can be

11   addressed after approval and launch of the satellite system,

12   then we would do it then.

13           Page 11.  There has to be a dispute about what it

14   means in concrete and practical terms.  That's just not where

15   we are today.

16           And if you look at Page 12, on the cooperation

17   agreement limits, this is the coordination provision, the

18   coordination breach, it says:

19           "-- be caused by the operations of the proposed

20   NGO system."

21           Where we're standing today, there is no operating,

22   proposed NGO system, nor can there be because we don't have

23   FCC approval.

24           So what we get to is Inmarsat just doesn't get to

25   invent a theoretical dispute today to hold up the regulatory

1  approval that it's contractually bound to support.

2          I mean, if we look at the time line, we left here

3  on August 29th.  The parties signed up the agreements.  The

4  debtors went to confirmation.  We paid the money.  They filed

5  the FCC application and, eight days later, Inmarsat sues us.

6          We didn't give them an option, they didn't want an

7  option from us and we didn't give them an option, either,

8  about whether to perform.  They have to perform.  We don't

9  want the money back.  Mr. Johnson didn't come today with a

10  tractor trailer to take back $420 million.

11          We are entitled to specific performance.  This

12  is -- these are unique assets.  As set forth in our papers,

13  we amply meet the test, whether it's New York law or Delaware

14  law, for specific performance.  And we think that the Court

15  has everything you need before Your Honor to make a decision

16  on this very important issue today.  Thank you, Your Honor.

17          THE COURT:  One issue I'd like you to address,

18  please, Ms. Primoff, is Inmarsat's argument, which is really

19  important to them, that the automatic stay does not apply to

20  this under 28 U.S.C. 959.

21          MS. GLEICH PRIMOFF:  Well, it -- the mediated

22  agreement is certainly an asset of the debtor.  And the

23  disputes over the mediated agreement are a core proceeding,

24  and Your Honor determined that in both orders concerning the

25  mediated agreement.  Your June order concerning the mediated

1   agreement makes that finding, and your September 2 order

2   makes that finding, as well, and Your Honor retained

3   jurisdiction.

4         So it -- we flatly disagree with that position.

5   And as we cited in our papers, a nondebtor party has standing

6   to insist on application of the automatic stay when the

7   issues affecting the nondebtor are so integral to the success

8   of the Chapter 11 case.

9         THE COURT:  Okay.  Thank you, Ms. Primoff.

10        MS. GLEICH PRIMOFF:  Thank you, Your Honor.

11        THE COURT:  All right.  Mr. Finestone, welcome

12   back.  Good to see you.

13        MR. FINESTONE:  Good afternoon, Your Honor.  Ben

14   Finestone, Quinn Emanuel, on behalf of Inmarsat.  It's also,

15   of course, good to see Your Honor.

16        THE COURT:  Thank you.

17        MR. FINESTONE:  Judge, I was thinking about

18   whether or not to start with the procedural issues -- and I'm

19   using "procedural" sort of broadly -- or the substantive

20   issues and -- because we do think in -- as we said in our

21   papers, that the issues that are teed up for the Court today

22   are procedurally deficient.

23        And usually, those kind of arguments probably

24   should go first because they are threshold in nature.  But I

25   do want to start a little bit on substance and then return to

1    procedural issues like the application of the automatic stay

2    and the Federal Bankruptcy Rules of Procedure, and then I'll

3    return to substance.  And obviously, Your Honor, interrupt me

4    whenever you want.

5            THE COURT:  Okay.

6            MR. FINESTONE:  Your Honor, in terms of

7    substance -- and again, I won't keep caveating this.  But in

8    terms of substance -- which is an issue that I don't think is

9    properly before the Court.  But in terms of substance, the

10   issue of coordination is a massively important and

11   substantive issue.  It's not one that we made up.

12           So, if just start on the termsheet -- and the

13   termsheet -- there's like a lot of different labels flying

14   around because of how this agreement evolved.  But I'm not

15   putting, really, weight on the labels, I'm talking about the

16   substance because, of course, first, it was a termsheet.

17   Your Honor approved the termsheet.  And then it became the

18   agreements.  And those agreements are post-petition

19   agreements and they're approved.  But I'm talking about the

20   substance of them.

21           And one provision, if nothing else, Your Honor, as

22   both of my adversaries said, requires my adversaries to

23   represent to the FCC that the systems have been coordinated.

24   And I don't think either of them would argue that there

25   isn't, at a minimum, an implicit obligation within that

1   sentence to actually have coordinated the satellites.  They

2   have different arguments as to why, as a legal matter, maybe

3   the satellites are coordinated, that we disagree with them.

4          But I think all parties do agree that there is an

5   obligation to coordinate.  And I also think all parties

6   agree, Your Honor, that they wouldn't say it to the FCC,

7   if -- they wouldn't say that the satellites have been

8   coordinated if they weren't, in fact, coordinated.  In fact,

9   we've heard from counsel some offense taken that we accused

10  them of, quote, "lying."  I don't think it's lying or

11  allegations either way, Your Honor.

12         And this sort of touches upon one of the

13  procedural issues.  But whether or not these satellites have

14  been coordinated or not is not something that Mr. Leblanc, a

15  very good lawyer, Ms. Primoff, a very good lawyer,

16  Mr. Finestone, not quite as good of a lawyer, but I can

17  argue, too, Your Honor, it's not something that the lawyers

18  can argue about and resolve.  It's something that requires

19  fact testimony, maybe expert testimony.

20         But let me just say this, Your Honor.  The --

21  it -- this is undisputed.  The cooperation agreement, as it

22  existed prior to the filing of this voluntary petition for

23  bankruptcy relief, between Inmarsat and between the debtors,

24  it concerned coordination of two state -- two sets of

25  stationary satellites.

1              And an analogy I got from my client was

2    coordinating the two sets of stationary satellites is

3    coordinating cars parked in a parking lot.  You park over

4    there on the left.  You see those parking lots that are

5    painted with yellow paint, and our satellites will stay in

6    the spots that are parked -- that are painted with white

7    paint.

8              The debtors' very creative use of Title 11, very

9    good lawyers, they went out and got AST and came with a plan

10   to your court that said I'm going to use my powers under 365

11   to assume and assign, basically, and I found somebody who

12   wants to do something a little different than me, but my

13   contract is worth something, my contract with Inmarsat, and

14   they want to do something -- they want to use that L-band

15   spectrum.

16             Now the party I found isn't going to do what I was

17   planning on doing, which is park cars in a parking lot, but

18   they're going to be driving their cars throughout the parking

19   lot and maybe on the highway.  They have 96 satellites that

20   they want to launch, AST.  And those satellites, Your Honor,

21   each one of them transports -- makes it all the way around

22   the globe in 90 minutes, every single one of those 96.  That

23   has to be coordinated with our parked cars.  That's a

24   completely different exercise.

25             And I really don't think, if this were any sort of

1  evidentiary hearing, if this were in an adversary proceeding,

2  I really don't think that, if they accept that legal

3  definition of "coordination" -- and they can disagree with me

4  about whether or not that's what "coordination" means -- but

5  I really don't think you have a witness from the debtors or

6  AST saying that these satellites have been coordinated.

7         And Your Honor, you don't have to take my word for

8  it.  We've cited -- we've put in a lot of extrinsic evidence,

9  Your Honor, the parties' practice under the contract.  And

10 Exhibits, Your Honor, 5 to 10, just high level, we don't have

11 to dive into the substance of the.  But Exhibits 5 to 10 show

12 that the parties, prior to coming to Your Honor on or around

13 Labor Day, were trying to coordinate, and they were passing

14 drafts of the documents back and forth, including adding the

15 new satellites to the all-important exhibits to the

16 cooperation agreement, Exhibit I and Exhibit J.

17        And Your Honor, those negotiations, they actually

18 didn't really hit a halt.  What happened was we hit a halt

19 with them on the geographic issue about whether or not AST is

20 allowed to operate their satellites outside of North America.

21 That was the factual issue that caused us all to come running

22 to your court on Labor Day.  This coordination issue, I think

23 there was more optimism that we would be able to resolve it.

24        And Your Honor, after Labor Day, we emailed them

25 again and said we have to do this coordination.  Can you

1  please just come to us, so we can finish coordinating.  I

2  didn't think we were going to resolve North America.  I agree

3  with my adversary, that's a real dispute.  But that's not

4  what we sued in New York Supreme about; we sued about

5  coordination.

6          And Your Honor, so, not only did the parties try

7  to resolve coordination, not only do I think there's tech --

8  the obligation is in the agreement that the parties have to

9  coordinate, I also just -- if you just take a second and

10  think about AST's legal argument, they basically said --

11  they're not saying there was no obligation to coordinate;

12  they're saying Your Honor resolved it on or around Labor Day.

13          And Your Honor expressly didn't resolve it.  Your

14  Honor didn't resolve anything.  And I don't mean that in any

15  disparagingly way -- disparaging way.  Your Honor didn't

16  shirk its obligations.  Your Honor just said, if there are

17  disputes under this post-petition contract that I'm

18  approving, you can take it to the courts that have -- that

19  the parties agreed should have exclusive jurisdiction over

20  it.

21          The trigger to come here was the geographic issue.

22  The coordination issue still existed.  So all we want to do

23  is coordinate these satellites.  We would love to support the

24  application.  They won't come to the table and finish

25  coordinating.

1              And Your Honor, this New York Supreme complaint

2    that we filed, that people are so hurt about, if you read the

3    complaint, Your Honor, it doesn't say you owe us billions of

4    dollars of damages for not coordinating.  It actually says

5    you have to coordinate, the same thing that I'm arguing

6    today, and the parties must coordinate, the parties must

7    perform.  All we want is for this thing to be coordinated.

8              Before I get to the -- and Your Honor, we've

9    been -- this -- my company -- my client has been operating

10   satellites since 1979.  We are not -- we are not a new

11   upstart company with -- to operate satellites.  We've been

12   operating since 1979.  And the people that use our satellites

13   are emergency providers.  It's important to planes, it's

14   important to maritime ships who can -- if there's

15   interference, lives are at stake.  So this is something that

16   is important to us.

17             Your Honor, coordination is an obligation under

18   the contract.  I think the parties agree.  Ms. Primoff argues

19   that it was resolved on Labor Day.  I think the last

20   paragraph of Your Honor's order clearly says nothing is

21   resolved.  And we filed that complaint in order to get it

22   resolved.

23             I want to just switch, Your Honor --

24             THE COURT:  You've also --

25             MR. FINESTONE:  Yes, Your Honor.

1     THE COURT:  -- but you've sued them for breach of

2   the mediated agreement.

3     MR. FINESTONE:  Yeah, the post-petition contract

4   that -- yes, Your Honor.

5     THE COURT:  No, you sued them for breach of the

6   agreement that I approved.

7     MR. FINESTONE:  Yes, Your Honor.

8     THE COURT:  Yeah.

9     MR. FINESTONE:  And, Your Honor, if -- I'll just

10  put it this way, Your Honor, in many Chapter 11 cases, the

11  debtor assumes contracts during its stay in bankruptcy and

12  sometimes under a plan, it assumes a series of contracts

13  under its stay in bankruptcy.  If the Bankruptcy Court

14  approves it, no doubt, the debtor is authorized to enter into

15  it.

16     But the parties, they can have disputes under that

17  contract.  They do.  We do have a dispute under

18  coordination -- we do have a coordination dispute and we have

19  the geographic dispute.  And, Your Honor, there's also been a

20  lot of suggestion that we were -- that we played games with

21  the dollar amount and I can't tell with -- (indiscernible)

22  trying to get the money and I can't stress to Your Honor how

23  misplaced it is.

24     And I just want to make two points here, Your

25  Honor.  One, Your Honor's exactly right; we sued them.  We

1    filed something publicly in front of a very serious court

2    saying, You're breaching your obligation to coordinate with

3    us.  We didn't -- this isn't a creditor that approached the

4    debtor in the dark of night to take -- to self-help or

5    something like that.  We openly and forthright sought

6    judicial resolution of it from the Court that we thought Your

7    Honor would have, really, directed us to go to.

8              And, Your Honor, that --

9              THE COURT:  Okay.  So you're -- what you're

10   telling me is that you decided what I would think and what I

11   would decide and you went ahead and took an action that is

12   like, it's pretty wild to sue a debtor.  I mean, I don't

13   know.  The way I was raised was, if you're going to sue a

14   debtor, you're going to do it in the Bankruptcy Court or

15   you're going to get stay relief.

16             But you're not going to -- it's foolhardy to make

17   the unilateral determination that the stay doesn't really

18   apply or the judge would grant a stay relief anyway or the

19   judge would probably tell us, Go file there, so we're just

20   going to do it.  That, to me, is a pretty wild choice.

21             MR. FINESTONE:  Well, let me just argue in defense

22   of the allegation that we violated the automatic stay, Your

23   Honor.  Section 362(a)(1), it concerns prepetition claims.

24   This is not a prepetition claim; nobody argues to the

25   contrary.

1          Section 362(a)(3), exercise and control over

2   property of the estate.  We're not trying to exercise any

3   control over property of the estate.  We're not trying to

4   obtain, we're not trying to take any assets.

5          All we are doing, Your Honor, is seeking to --

6   we're alleging a breach of contract as the Court said and

7   they have their response to it.  They've alleged a breach of

8   contract against us.

9          This is a post-petition contract that was

10  approved.  I don't think there's a textual argument, Your

11  Honor, that 362 applies.  Now, Your Honor, that's my legal

12  argument.

13         Taking a step back and responding to what you said

14  about the practice of bankruptcy lawyers, because there's no

15  doubt that Section 362 is broad.  I understand that and I

16  gather that and that's the beginning of any discussion about

17  whether or not Section 362 applies.

18         And so it needs to be given careful consideration

19  and we gave it careful consideration.  And my practical point

20  is just that, Your Honor, in addition to (a)(1) not textually

21  applying, in addition to (a)(3) not textually applying, in

22  addition to Section 959 under Title 28 applying, it says if

23  you're suing them about their business, you don't -- you're

24  carved out from the automatic stay even if it does apply.

25         And this is post-confirmation.  They're done

1  negotiating the plan.  This is really only about their

2  business.

3            In addition to those three things, Your Honor, in

4  terms of what was the bankruptcy judge thinking; I was before

5  you in late August, Your Honor, and Your Honor came out and

6  I'll just -- look, Your Honor knows what Your Honor says.

7  I'm not going to argue what Your Honor says.

8            But we certainly interpreted it as, I'm approving

9  the post-petition contract.  The parties agreed that a New

10  York Court can resolve the disputes and to the -- and that's

11  what the bankruptcy judge was thinking.

12            And at the end of that hearing, Your Honor, I

13  wasn't -- I came up to this podium.  We were, of course, on

14  the third floor of the courthouse; we weren't on the fifth

15  floor.  But when I came up to the podium, Your Honor, and I

16  said, Your Honor, I want clarification of this ruling,

17  because I'm sensitive to what the Court is saying.  As I

18  said, 362 starts from a broad place.  I said, I would like

19  clarification from this ruling, because I was forth -- I'm

20  being -- I think I've been forthright with the Court today,

21  back in Labor Day, that the parties do have a dispute.

22            When that -- when we -- when there's a breach, the

23  parties will go to the Court that has the jurisdiction.  And

24  I even said -- this isn't what I was thinking; I said it on

25  the transcript -- I said, I'm really asking, not just to the

1  Court, but I'm asking for if either of these parties

2  disagrees with me, I want them to stand up.

3          I have complete respect for 11 U.S.C. 362, Your

4  Honor, and that's why I stood up and I asked for that

5  clarification.  And so, between the fact that the text of the

6  statute doesn't apply, I have the text of a different statute

7  from the same body of lawmaking Congress that says you don't

8  sue them in the Bankruptcy Court.  And I had a discussion,

9  the discussion with the Court:  who approved the contract,

10  Your Honor, that says go elsewhere?

11          There wasn't any thought that we were violating

12  the automatic stay and I don't think that we have in any

13  respect.  I don't think that in any respect there's a

14  meritorious argument that we violated the automatic stay,

15  Your Honor.  I really don't.  It's (h)(a)(1), (a)(3), 959.

16          And, Your Honor, just taking a step back.  A

17  different bankruptcy case, let's assume a different -- retail

18  bankruptcy case.  They assume 50 leases, 50 contracts; those

19  are all Byzantine state law contracts; they're assumed post-

20  petition.  There's going to be business disputes between some

21  of them; there are just going to be.

22          They don't -- the provisions in those post-

23  petition approved contracts, only because Your Honor approved

24  them, they control, Your Honor.  They control.  It's about

25  the business and you go to New York State -- you go to New

 1  York Supreme Court or whatever that provision says, Your

 2  Honor.

 3          So, yes, we sued a debtor.  Yes, we 100 percent

 4  believed we were doing the right thing and, yes, I do think

 5  we were doing the right thing, Your Honor.

 6          In terms of assuming, Your Honor, assuming --

 7  putting stay relief aside for a second -- the relief that has

 8  been requested via the motion, is as extraordinary as it

 9  gets, Your Honor, and I really think --

10          THE COURT:  Enforce your order, Judge --

11          MR. FINESTONE:  No.

12          THE COURT:  -- enforce the automatic stay is

13  extraordinary?

14          MR. FINESTONE:  Well, automatic stay, procedurally

15  fair, Your Honor.  I'm not talking about that.

16          First of all, they're conflating order versus

17  contract.  Your Honor's order said take the term sheet and

18  put it into a final contract.  The parties performed under

19  that.

20          We're, of course, going to comply with Your

21  Honor's order.  There's a post-petition contract now.

22  There's a state law dispute in that contract.  We said they

23  breached because they haven't coordinated.  They said that we

24  breached or that we are prospectively breaching because we're

25  not going to support something that has a false statement to

1  the FCC.  That's a dispute under a post-petition contract.

2  That -- Your Honor, that's not violating Your Honor's

3  contract.  It's not violating the plan.  It is a legitimate,

4  commercial dispute, Your Honor.

5         I'm certainly -- there's certainly no order that

6  says, No matter what the debtor says under this contract that

7  I, the Bankruptcy Court for the District of Delaware, have

8  approved, you need to bow down to their interpretation of the

9  contract and whatever they say is good.  And if you assert

10  your rights in is response to that or if you proactively

11  assert it by taking it to the very Court that they all agreed

12  was the right court to go to, that I'm violating the stay;

13  that's expansive interpretation of staying in bankruptcy.

14         And if there's any case in which that kind of

15  expansion should be accepted, it's certainly not this one

16  where they confirm a plan and then sit here for two years.

17  Every -- I mean, they really don't happen to have a business,

18  other than this brokering of a deal between us and AST.  But

19  if this --

20         THE COURT:  That's a really, really important part

21  of what they're here for and what they're doing.

22         MR. FINESTONE:  That's why they're upset.

23         THE COURT:  Appropriate use of the bankruptcy

24  process.

25         MR. FINESTONE:  I didn't object to confirmation of

1  the plan, Your Honor.  I didn't object to confirmation of the

2  plan.

3           But the fact that it's very important to them

4  doesn't change the fact that we have a post-petition contract

5  and the parties agreed we're disputes should be resolved.  It

6  doesn't.

7           They could have gone to the New York Supreme and

8  asked for injunctive relief, Your Honor.  They could have and

9  we would have defended the merits.  And it would be a lot

10 better than having lawyers come up here today and say that

11 things have been coordinated when their client representative

12 know -- they're 96 satellites, Your Honor.  I can't say it

13 firmly enough.  This is a miss -- no one is going to testify

14 those 96 contracts have been -- 96 satellites have been

15 coordinated.

16          They can argue, legally, that there's no

17 obligation to coordinate.  I don't actually think that you're

18 going to hear that argument.  AST argues that Your Honor

19 resolved it on Labor Day.  We didn't resolve any substance on

20 Labor Day, Your Honor.

21          This is a commercial dispute.  The stay doesn't

22 apply.  The mandatory relief that they're asking for, Your

23 Honor, for us -- to force us to perform under their

24 interpretation of the contract, requires a resolution of the

25 merits of the action that's pending in State Court.  It

1    requires -- it's a -- it's a -- not just a prohibitory

2    injunction; it's a mandatory injunction, which is

3    extraordinary.

4           Your Honor, we're post-confirmation.  Related-to

5    jurisdiction, we didn't argue in our papers, but it is, at

6    least, more limited.  And the Bankruptcy Rule 7001, I think,

7    resolves the whole thing.  I get my due process, Your Honor.

8           I didn't run to New York State Court and say, You

9    need to coordinate in seven days and listen to me, the

10   lawyer, argue; no, I set it up for due process and they can

11   file an answer.  They can file.  They can sue me back if they

12   believe I breached, and then we'll have due process, as in --

13          THE COURT:  Well, the relief that they have asked

14   for is that I enforce the mediated agreement.  That does not

15   require a complaint.  You can come here and seek enforcement

16   of an order that I entered, whether it's a mediated agreement

17   or the plan, without filing a complaint.  You do not need to

18   file a complaint.

19          MR. FINESTONE:  I disagree, Your Honor, because --

20   and let me just break it down.  Sometimes we disagree.

21          They can -- I agree, they can file a motion and

22   say, Comply with this order.  And what does that order say?

23   We have to take the term sheet and put it into an agreement.

24   That's not the allegation; we've done that.

25          There's now an agreement between the parties.

1    It's a three-way agreement, Your Honor.  These are commercial

2    documents and they're saying I breached those approved, post-

3    petition contracts and they want Your Honor to enjoin my

4    performance under that contract.

5           They're wrong, Your Honor.  I can't stress enough

6    that they're wrong on the merits.  But, procedurally, they're

7    even more wrong.

8           There's no way that, merely, because the Court --

9    think about this, Your Honor.  Every bankruptcy plan approves

10   entry into contracts; in fact, a debtor can't enter into a

11   contract without Your Honor's approval.  It doesn't mean that

12   the entire contract is Your Honor's order; it just doesn't

13   say that.  That's not how it works.

14          We have a contract now.  That's why 959 says we

15   bring it to other courts.

16          And, Your Honor, I mean, I'm just being honest;

17   that's reversible error to interpret this contract that Your

18   Honor approved -- Your Honor approved their entry into it

19   because they're a debtor -- but to interpret it on the

20   merits; it offends comity; it violates 7001; and due process

21   completely, all in the context of a mandatory injunction,

22   Your Honor.  It really couldn't be more wrong, what they

23   asked for.

24          They're upset about it.  AST is upset about it

25   because they cut a check for $420 million.

1          I just want to make a point to make Your Honor

2    feel good.  Your Honor, do you know how much -- there's 80

3    years left under this contract.  They agreed to pay us $60

4    million a year.  That's like 60 times 80; it's $4.8 billion

5    of future cash flows.

6          I told you we've been around since 1979 and we

7    take our operation of our satellites very seriously.  This

8    isn't some game for us to get $420 million and spite the $4.8

9    billion of future cash flows.

10          They don't think coordination was important.  They

11   thought it was fine to tell the FCC that we were coordinated.

12   We're the ones that stood up, Your Honor; we stood up for

13   satellite coordination.  If we're wrong, Your Honor, that the

14   term sheet, which is now the agreement, has no obligation to

15   coordinate, then we're wrong on the merits.

16          But the language says there needed to be

17   coordination and it's super, super important.  If that

18   obligation isn't there, I don't know what's going to happen.

19   I don't know if satellites are going to be crashing into each

20   other.  I don't know, but they needed to be coordinated.

21          I think -- look, AST doesn't really think there

22   doesn't need to be coordination here.  I think they're just

23   saying, We'll deal with it in the future.  We'll deal with it

24   in the future.

25          The problem is the contract says they told the

1  F -- that they were going to tell the FCC that it's

2  coordinated, and they did tell the FCC that.  I don't

3  disagree with my adversary, Your Honor; yes, the contract

4  says you have to have this language in there and, yes, they

5  put the language in there, but it's not true in substance.

6  And then he cited to language that said it doesn't have to be

7  more granular than that.

8            That is true, Your Honor; the statement to the FCC

9  doesn't have to be granular.  The satellites need to be

10 coordinated.

11           I'm super proud of my client for standing up and

12 saying these satellites are not coordinated; again, 96

13 satellites that move around the globe in 90 minutes -- 90

14 minutes each, Your Honor.

15           This can be resolved by a Court and, maybe, Your

16 Honor, we don't have -- if they remove it and they file a

17 motion to transfer, we'll consider that motion to transfer in

18 due course with our client.  At least, if it's before Your

19 Honor, if it's before New York Supreme, there's civil

20 process, due process, Your Honor.  And Your Honor can hear

21 about what coordination really means; not from three lawyers,

22 three bankruptcy lawyers who barely even know what they're

23 talking about.

24           But Your Honor can hear about coordination and

25 Your Honor can decide who breached.  Did we breach, because

1    we told the FCC it hasn't been coordinated or did they breach

2    because they told the FCC it has been coordinated when there

3    hasn't been a drop of coordination.

4            And, honestly, Your Honor, I'm just coming back to

5    where I started.  It's very hard for them to argue that it

6    had been coordinated when the parties exchanged documents

7    saying, Here's the new satellites, here's how they're going

8    to be coordinated, and then that broke down.  That was an

9    obligation in the term sheet.

10           On or around Labor Day, Your Honor did not remove

11   that obligation.  Your Honor didn't touch that obligation.

12   If it's there, it survives.  If it's not there, it didn't.

13           Your Honor, they're a debtor -- I understand that,

14   we took 362 very seriously, Your Honor -- there's no textual

15   argument, other than it will impact their potentially going

16   effective.  Every lawsuit against the debtor potentially

17   impacts the debtor.  That doesn't satisfy 362(a)(3), Your

18   Honor.

19           And I just -- we take your orders very seriously;

20   the parties all do.  After Labor Day -- I'm using that as a

21   messy defined term; the order was entered 9/01, which was the

22   day before Labor Day -- but after Labor Day, Your Honor said,

23   Make it the final documents, and the three of us stood at

24   attention, immediately, and came together and made it the

25   final documents.

1          Now, if those documents have an obligation to

2   coordinate; we haven't satisfied that obligation, Your Honor.

3   And we went to New York State Court in order to induce, tell

4   them to come so we can coordinate.  These satellites have to

5   be coordinated, Your Honor.

6          Thank you for the opportunity.

7          THE COURT:  All right.  Thank you, Mr. Finestone.

8          Mr. Leblanc?

9          MR. LEBLANC:  Your Honor, Andrew Leblanc of

10  Milbank, on behalf of Ligado.  I will try to be brief and I

11  think I can be.

12         Let me just say at the outset that I couldn't

13  disagree more with Mr. Finestone about whether we believe or,

14  frankly, anyone could credibly believe that there was

15  something more to do under this agreement to be coordinated.

16  And you don't have to take my word for it; you can take their

17  word for it.

18         They -- Your Honor will recall, I showed you this

19  slide -- and it's our Slide 26 -- of what they asked the

20  Court to do the last time we were here on this issue.  They

21  asked the Court to require the parties to enter into the

22  mediated agreement; indeed, the parties expressly agreed in

23  the mediated agreement that the technical and geographic

24  requirements will not change.  That, Your Honor, is

25  coordination.

1                And it's not just me saying that.  If you look at

2    their complaint in paragraph 26, they define what they

3    contend cooperation -- coordination to be, Your Honor.

4    Paragraph 26 says:

5                "Coordination refers to the process of exchanging

6    technical information and agreeing on technical parameters

7    and limitations so that the operation of satellite systems do

8    not interfere with one another.  Coordination is complete or

9    effected only when the coordinating parties have agreed to

10   the appropriate technical parameters and limitations and

11   other relevant terms."

12               That is what they forced us or imposed on us --

13   argued to you, you should impose on us, in the mediated

14   agreement.  That's what it is.

15               This is not -- this is with respect to Spectrum

16   assets, right.  This is with respect to interference between

17   our spectrum and theirs.

18               What does a cooperation agreement do?  Your Honor

19   looked at it previously.  It -- we -- we both have a license

20   to operate in the L-band.  It allocates, the coordination

21   agreement allocates which portions of the L-band we will

22   operate in; which portions of the L-band they will operate

23   in; and it approves for parameters with respect to

24   interference, meaning, will our signal in our spectrum

25   interfere with their signal in their spectrum and how is that

1  resolved.  That's what it does.  That is coordination, Your

2  Honor.  That's what we agreed to.

3          And what we agreed to the mediated agreement is

4  we're going to live by the terms of the mediated agreement.

5  And he is right, we tried to do more than that.  We found a

6  counterparty who was unwilling to reach agreement on it and

7  we both came to the Court and asked Your Honor to impose the

8  very specific terms of the mediated agreement and you did

9  that.

10          And then they turn around and say, We expected

11  something more.  There's nothing in the agreement that called

12  for anything more.  And then, Your Honor, they sued us.

13          And I don't -- I wasn't quite sure what he was

14  trying to say.  They, in their complaint, Your Honor, they

15  accuse us of making false statements to the FCC in

16  paragraph 6, in paragraph 9, in paragraph 58, in

17  paragraph 10, and paragraph 53.  Mr. Finestone just did it,

18  here, today.  They're accusing us of lying to our regulator

19  because we said what Your Honor had said, which is we're

20  going to live with the technical limitations of the

21  cooperation agreement that we've been operating under for 18

22  years.

23          And they're now saying, Well, something more.  We

24  tried -- I think Mr. Finestone just said that the purpose of

25  them going to the New York State Court and suing us -- not

1   coming here, but going to New York State Court and suing us

2   and telling the FCC and the world that we lied to the FCC,

3   was to induce us to talk to them.  Really?

4           Your Honor, with respect to the stay violation,

5   this is not -- couldn't be more clear that this is a stay

6   violation.  This is -- this could not have been more central

7   to our case.  I can't imagine something more core than this.

8   It was incorporated in the plan.

9           This is not like we're operating a milk-delivery

10  company and we hit a pedestrian and they sue us in State

11  Court.  That is not this -- post-petition -- that's not this

12  issue.  This is -- it could not be more fundamental.  This is

13  like an exit lender being ordered, being -- having an exit

14  facility approved by the Court and then simply just not

15  funding.

16          Do you think that that dispute wouldn't come

17  before Your Honor?  Of course it would.  That's exactly the

18  same thing.

19          And Mr. Finestone may think $420 million is not a

20  lot of money; I do, Your Honor.  They have $420 million from

21  AST, but -- on which we are on the hook for, Your Honor.  We

22  don't think there's any question, but that the Court can

23  enforce its order and require them to comply with the terms

24  that Your Honor ordered us to put into this agreement.

25          And it's not that Your Honor imposed these terms

1  on us; we agreed to them in the mediation.  We just couldn't

2  agree to more, which was unfortunate.

3          But we think that should be the end of this, Your

4  Honor, and whatever appellate risk Mr. Finestone is

5  threatening, we'll take that up, Your Honor.  But what's

6  important to us is we can't let this linger and have our FCC

7  process messed up because they are objecting to our

8  application in breach of their agreement.

9          So, I think there's a couple of solutions I will

10  suggest to you.  I think Your Honor should do what we're

11  asking, which is to enforce the stay; make them dismiss their

12  complaint in New York State Court; have it -- if they want to

13  file something else here, they can, but Your Honor should

14  enforce the agreements that Your Honor entered and imposed

15  and we agreed to and were put into the plan.

16          Your Honor also has the inherent authority to

17  impose penalties and sanctions for violations of the

18  automatic stay.  This is, the $420 million that was paid to

19  them shouldn't be going to them if they're going to oppose

20  our application; it really shouldn't.  And I think Your Honor

21  has this wide discretion in what to do with respect to that.

22          The notion -- I forgot to mention this before,

23  Your Honor -- but if you look at those two provisions that we

24  pointed to that had to be in the FCC application, they're not

25  just -- Mr. Finestone says this is all about, like,

1   satellites hitting each other.  That's not what it is.

2   Because the provision, the first one actually says that it

3   states that we're going to comply with the -- remain within

4   the technical, geographic, and other limitations of the

5   amended cooperation agreement, and it says, "regardless of

6   orbit."

7              So the parties understood at the time we mediated

8   that one was an NGSO System; that is what the proposal was.

9   That system, today, doesn't exist.

10             And so I think one last point before I conclude,

11  Your Honor.  Mr. Finestone suggested that they're not trying

12  to exercise control over assets of the estate, but that's

13  exactly what they're doing.  They're, one, they're trying to

14  get an injunction.  They asked the Court for an injunction.

15  They're trying to get damages.

16             And even if you leave that aside, they're trying

17  to force us to coordinate with them when we believe we've

18  already done it.  That is clearly exercising control over the

19  assets of the estate, so it's clearly a violation of the

20  stay.  Your Honor, we --

21             THE COURT:  What's their remedy if they believe

22  there hasn't been coordination?

23             MR. LEBLANC:  Your Honor, they, I think they could

24  come to this Court and say that we've not complied with our

25  obligations.  They're wrong, with respect to that, but that

1  would be an option there.

2          But what they cannot do, what they cannot do is

3  not comply with the obligations that they took on.  And I

4  think that's it, Your Honor; I think that really is.

5          But, Your Honor, as to that issue, the question of

6  whether -- this is the fundamental issue that I think Your

7  Honor should decide, and that is there was nothing more to be

8  done.  We put into the FCC application, the exact things that

9  we said that we were going to put into the FCC application;

10  there's nothing more to be done.  And that's the end of the

11  dispute.  And then, they have to comply with the things that

12  they said they would do.  I think it's that simple.

13          THE COURT:  But, you know, Mr. Finestone's

14  response to that is, okay, you put them in the application,

15  but we have a disagreement.  I'm probably saying it more

16  gently than he would, but we disagree about whether there's

17  actually -- whether those statements reflect the truth on the

18  ground and that's why he's saying we need this relief.

19          MR. LEBLANC:  Then they should sue us for

20  breach --

21          THE COURT:  Which they did.

22          MR. LEBLANC:  -- but they have to comply with

23  their obligations.

24          THE COURT:  Well, they sued you for breach.

25          MR. LEBLANC:  They should sue us for breach before

1    Your Honor, where the contract was entered, where it's

2    pursuant to an order.  But they have to comply with their

3    obligations.

4          They've exercised self-help in two different ways,

5    Your Honor.  They breached their obligations, repudiated the

6    obligation, the fundamental obligation they had to support

7    our application, and they sued us exercising self-help.  Just

8    chose to go to New York State Court.

9          Your Honor, I -- we think it's crystal clear that

10   we need relief here and that we'd ask the Court to act

11   expeditiously, given the importance of this, because as soon

12   as the comment period opens, if there, instead of support,

13   goes in as an objection, then we may not emerge in two years

14   as we -- in two or three years, as we had hoped.  And then,

15   we'll continue to be a debtor before the Court and none of

16   this will be on the road to an effective date here.

17         And I wanted to say one thing.  Mr. Finestone

18   suggested, like, we want to get the $60 million.  They would

19   love for us to liquidate, Your Honor, because, then, they're

20   the only other licensee in the L-band.  That's been clear.

21   We said that at the outset of the case.

22         That's been our problem with them is they benefit

23   if we fail, and that's what's fundamental to this, Your

24   Honor, is they benefit if we fail.  And that's what we'd urge

25   the Court to help us and protect us from as a debtor.

1          THE COURT:  When does the comment period open?

2          MR. LEBLANC:  We don't know, Your Honor.  The FCC

3     has discretion in that.  We anticipate it'll open at any

4     point in time.  We filed the application, I believe, on

5     December 8th and I think, we hope and expect that it will

6     open soon.  But we don't -- I don't think there's -- I don't

7     think there's a deadline, with respect to that, Your Honor --

8          THE COURT:  Okay.

9          MR. LEBLANC:  -- but what I understand from our

10    FCC counsel is that that should happen soon.

11         THE COURT:  Okay.

12         MR. LEBLANC:  Thank you, Your Honor.

13         THE COURT:  Ms. Primoff?

14         MS. GLEICH PRIMOFF:  Thank you, Your Honor.

15         I'll be brief and I think I can point you to

16    provisions of the mediated agreement that resolve this issue

17    and show why it's just not an issue for today.

18         And if I could ask Your Honor to look at page 12

19    of the deck I provided you earlier; that excerpt is Section 3

20    of the mediated agreement.  So the parties have committed to

21    adhere to the technical, geographic, and other limitations of

22    the cooperation agreement.  That's already in Section 2.

23         But then Section 3 says:

24         "The amended Inmarsat cooperation agreement has a

25    process for resolving disputes about compliance with

1    technical, geographic, and other limitations, or any claims

2    of interference."

3              And then it talks about "The cooperation agreement

4    limits," and then it says, "if the breach is alleged to be

5    caused by Inmarsat's operations," and then it says, "or be

6    caused by the operations of the proposed NGSO System."

7              And the word "operations," Your Honor, determines

8    the outcome of this dispute.  We don't have any operations

9    until the FCC approves the system.  So there is nothing more

10   for the parties to do today; we simply don't have a ripe

11   dispute.

12             We have done, and Ligado has done everything

13   that's required under the mediated agreement to meet the

14   conditions for their regulatory support obligation.  Once the

15   FCC approves, then it may be that the parties need to

16   coordinate in practice, but there is nothing more to be done

17   today.  We have met all of our obligations under these

18   agreements.

19             This is simply a shakedown over the North America

20   issue on the L-band.

21             THE COURT:  If the -- if they sit quietly --

22             MS. GLEICH PRIMOFF:  Yes.

23             THE COURT:  -- and the FCC considers the

24   application, approves it, and then it immediately appears

25   that there are going to be all sorts of problems caused by

1    the NGSO System --

2              MS. GLEICH PRIMOFF:  That's right.

3              THE COURT:  -- are they required to say nothing,

4    even if they believe that, look, all the FCC is doing is

5    approving something under a premise that we don't believe to

6    be correct and that, ultimately, is going to lead to failure

7    or lead to problems.

8              What latitude do they have if they don't believe

9    that the application in the absence of their agreement to

10   support it would be meritorious, it would be something the

11   FCC could approve.

12             MS. GLEICH PRIMOFF:  Yeah, the way this unfolds,

13   Your Honor, is -- and the parties all intended it would

14   unfold -- is the next step in the process is the FCC approves

15   the application.  And then, if they want to contend that

16   there's been a coordination breach or if we want to contend

17   or Ligado wants to contend that there's been a coordination

18   breach, all of the parties have their rights under Section 3

19   of the mediated agreement.  But they do not get to hold up

20   regulatory approval.

21             The regulatory approval has nothing to do --

22   Ligado's regulatory approval has nothing to do with

23   satellites spinning around the globe.  The application

24   relates to the L-band, its spectrum, and it's just misleading

25   for counsel to suggest otherwise.

1          But there is a process that's built in for

2    coordination and we have said that we will comply with it,

3    but it was never -- there's nothing in this agreement that

4    says it's a condition to their regulatory support.  It says

5    just the opposite.

6          THE COURT:  So, if the FCC approves -- I think

7    what you're telling me is the next day, 96 satellites don't

8    go up into the sky somewhere and start doing their thing and

9    bumping into other satellites; that there's actually more

10   that has to happen from that point.  Like, how does this

11   work?  I have no -- I know nothing about how the FCC works

12   and how satellites get deployed.

13          I mean, help me with that, because I think the

14   concern that Mr. Finestone is expressing is that if the

15   application is approved, that there is going to be -- there's

16   going to be conflict as between the satellites that the two

17   companies have deployed and that's going to lead to bad

18   outcomes.

19          MS. GLEICH PRIMOFF:  But the conflict isn't with

20   the satellites that are spinning around the globe; it's with

21   the use of the satellites --

22          THE COURT:  It's the L-band.

23          MS. GLEICH PRIMOFF:  -- and how it affects the L-

24   band, which is, basically, you know, spectrum waves.

25          THE COURT:  Right.

1              MS. GLEICH PRIMOFF:  So it's spectrum waves, and

2    in order for it to work, the parties need to be coordinated.

3    That coordination -- we need to know what the FCC is going to

4    approve before that granular coordination can take effect,

5    and they know that.

6              And we have agreed, all the parties have agreed

7    we're going to honor the coordination obligations in the

8    agreements, but that's not a basis for them to withhold

9    support for the FCC application; it's just not.

10             THE COURT:  Okay.  Thank you, Ms. Primoff.

11             MR. FINESTONE:  Briefly, Your Honor?

12             THE COURT:  Mr. Finestone, yeah, please.

13             MR. FINESTONE:  For the record, Ben Finestone,

14   Quinn Emanuel, on behalf of Inmarsat, Your Honor.

15             I want to address the ripeness issue.  AST argued

16   that the issue wasn't ripe and there's a substantive

17   distinction here.  It is our interpretation that the contract

18   requires the parties to coordinate before anything happens

19   and that hasn't been done.

20             And I'll just call out Exhibit 5, because

21   Exhibit 5 is something that was sent to us from Ligado, which

22   I think clearly resolved the issue about whether or not these

23   satellites are being --

24             THE COURT:  What's Exhibit 5, first?

25             MR. FINESTONE:  It is at Docket 1250, Your Honor.

1              It is a -- we put into evidence -- well, we didn't

2    put it --

3              THE COURT:  Exhibit 5 to your object -- I'm just

4    not clear.  What --

5              MR. FINESTONE:  It's Exhibit 5 to our exhibit list

6    at Docket 1250.

7              THE COURT:  Oh, your exhibit?

8              MR. FINESTONE:  Yeah.

9              THE COURT:  Okay.

10             MR. FINESTONE:  Sorry, Your Honor.

11             THE COURT:  I apologize.

12             MR. LEBLANC:  Your Honor, those exhibits weren't

13   offered; if they were, we would have objected to them.

14             This is an email.  There's no witness to

15   authenticate it.  It's also captioned "Rule 408."

16             I don't know what the specific point is, but we

17   object to the use of this exhibit, dated May 7th of 2025, so

18   four months before the ruling that we're talking about, Your

19   Honor.

20             THE COURT:  Mr. Finestone, any response?

21             MR. FINESTONE:  I can respond to relevance and

22   hearsay, Your Honor.

23             THE COURT:  Please.

24             MR. FINESTONE:  First, in terms of hearsay; it's

25   an admission by my party-opponent, Ligado.  This is something

1  sent from Ligado to Inmarsat.

2          In terms of relevance, Your Honor, this is

3  evidence that the satellites have not been coordinated

4  because the argument that I'm hearing from my adversaries is

5  that they are coordinated under the pre-existing agreements.

6  All of the parties knew and their conduct reflects that these

7  new 96 satellites required work to get the coordination done.

8          And this exhibit shows that Ligado understood that

9  Exhibits I and J were going to be updated to add the new,

10 non-stationary network; that's at I.  And L, working needs to

11 be updated.  M, to be provided by Ligado.  None of that

12 finished, Your Honor.

13          So, I think the disagreement between us and AST,

14 AST read Your Honor some language about what to do in the

15 amended agreement if the parties breach the coordination, and

16 that is a dispute that could happen in the future if we map

17 out where people are supposed to say -- are supposed to stay

18 and somebody drives over the yellow lanes; well, yeah, that

19 would be a so-called coordination breach.

20          What we sued them in New York for is that we

21 haven't even mapped out the highway.  We haven't even mapped

22 out where the satellites are going to go.  There's an

23 obligation to coordinate and then there's a potential future

24 breach if the parties cross over the line.

25          So, just, we think it's ripe because they have not

1  coordinated with us.  All the parties were trying to

2  coordinate -- this was before Labor Day, during the summer --

3  and that's the document that I showed Your Honor, and it's

4  not done; it's just not.  And for some reason, they don't

5  care about finishing it.

6            So that's the breach that we went to New York

7  State Court for.  It's live for two reasons, Your Honor,

8  because they -- the parties -- there's an obligation to

9  coordinate; they haven't coordinated.  There is an obligation

10 to draw out the map, and we haven't done the map, even though

11 a lot of work was done.  It's also extra live because they're

12 telling the FCC that they have been coordinated.

13           Now, lie or not, we believe it's a misstatement.

14 We believe it's a misstatement.

15           And so, we have a private contract claim that they

16 haven't if I should their obligation to coordinate with us

17 and we also have a feeling of duty, Your Honor, to the FCC to

18 tell them that the system that they're asking for approval

19 from, it's not coordinated.  So we spoke up for two reasons

20 and we think it's clearly ripe.

21           Your Honor, in terms of our procedural objections,

22 I just want to say the best example of why we -- the best

23 example of why whoever is going to resolve this breach of

24 contract dispute needs to do so on something more than 10

25 days' notice, Your Honor, are statements like, We would love

1  for Ligado to liquidate --

2         THE COURT:  I'm not --

3         MR. FINESTONE:  -- and it's ridiculous.

4         THE COURT:  -- I'm not focused on that.

5         MR. FINESTONE:  Yeah.

6         THE COURT:  I'm focused on the documents.  I'm

7  focused on the arguments the parties are making --

8         MR. FINESTONE:  Yeah, okay.

9         THE COURT:  -- other than --

10         MR. FINESTONE:  Fair enough, Your Honor.

11         I think that I -- what I wanted to explain to Your

12  Honor is coordination was very serious to us.  We believed it

13  was an obligation in the contract.  And I will say this, Your

14  Honor, what happened to all of the parties as a matter of

15  this process is we had a term sheet that became the final

16  agreement.

17         And I think as a byproduct of that is that all

18  three parties probably wish the contract was done with more

19  specificity.  That is why, Your Honor, that the parties have

20  planned on doing these amended agreements.  So we lost that

21  in the process and maybe that's making it even more difficult

22  for Your Honor or whatever fact-finder and conclusion-of-

23  lawer [sic] gets to the merits.

24         But that is not -- that, really, does not impact

25  it.  There's a binding agreement.  We never took issue with

1   Your Honor's order.  We believe there's a coordination

2   obligation.  It hasn't been satisfied; it's been breached.

3   And not only has it been breached, but they told the FCC that

4   they performed with it.

5          If they're right, they're right.  We believe

6   they're wrong and we sued them for it, Your Honor, and we

7   need resolution of that.  And I really don't think it's a

8   violation of the automatic stay both, on the text of 362,

9   accepted by 959, and, frankly, Your Honor approved the post-

10  petition contract; we have to perform with it.  And it said

11  exclusive provision in New York.  So, thank you, Your Honor.

12          THE COURT:  Thank you.

13          Okay.  I'm going to take it under advisement, but

14  I'm going to do so for a very short period of time.  And just

15  to give you an idea of what the expectations would be, I

16  think taking the time to write on this will take a lot longer

17  than the parties need or want.  So, what I would expect to do

18  would be to advise the parties that I'll provide an oral

19  ruling; we'll do it by Zoom.  You don't have to come here.

20  But that's what I expect to do and it is something that I'll

21  do in very short order, okay.

22          MR. LEBLANC:  Thank you, Your Honor.

23          THE COURT:  Anything else?

24          MR. LEBLANC:  Nothing from Ligado, Your Honor,

25  thank you.

1          THE COURT:  Okay.

2          Okay, Mr. Finestone?

3          MR. FINESTONE:  Yeah, nothing further.  Thank you.

4          THE COURT:  And Ms. Primoff?

5          MS. GLEICH PRIMOFF:  Thank you, Your Honor.

6          THE COURT:  Okay.  Well, look, I appreciate you

7   all -- look, you know, one of the things I'm comfortable with

8   in this job is that I don't know what's going on, other than

9   what the parties tell me, but -- so, maybe this is totally

10  off-base, but I'm wondering if maybe there are people who

11  should be talking to each other that just haven't really done

12  it yet, because some of this seems like it's imminently

13  solvable, but maybe I'm wrong.

14          I'm not faulting the parties for the fact that

15  there's a dispute here, but it just strikes me that, perhaps,

16  there are conversations that should happen and, you know, I

17  intend to rule very quickly.  I don't know if -- I think it

18  was Judge Drain -- would be of any further assistance to you.

19  I'm not telling you to go back to him, but this seems to cry

20  out for an agreed solution, instead of decisions by courts,

21  but you all know that anyway.  I'll leave it there, okay.

22          But thank you very much for the excellent argument

23  and presentations; I appreciate it, okay.

24          COUNSEL:  Thank you, Your Honor.

25          (Proceedings concluded at 1:01 p.m.)

1

## CERTIFICATION

2

3          We certify that the foregoing is a correct

transcript from the electronic sound recording of the
4
proceedings in the above-entitled matter to the best of our
5
knowledge and ability.
6

7

/s/ William J. Garling                    January 15, 2026
8
William J. Garling, CET-543
9
Certified Court Transcriptionist
10
For Reliable
11

12

/s/ Coleen Rand                           January 15, 2026
13
Coleen Rand, CET-341
14
Certified Court Transcriptionist
15
For Reliable
16

17

18

19

20

21

22

23

24

25