# **Exhibit E**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |
| | **Docket Ref. Nos. 1220 and 1221** |

## INMARSAT GLOBAL LIMITED'S OMNIBUS OBJECTION TO (A) DEBTORS' MOTION FOR AN ORDER (I) ENFORCING THE AUTOMATIC STAY, (II) ENFORCING THE MEDIATED AGREEMENT, AND (III) GRANTING RELATED RELIEF AND (B) EMERGENCY MOTION BY AST & SCIENCE LLC FOR ENTRY OF AN ORDER ENFORCING THE MEDIATED AGREEMENT AND RELATED ORDERS

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

# **TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT .................................................................. 1

II.  RELEVANT FACTUAL BACKGROUND .................................................. 5

    A.   Spectrum Coordination .......................................................... 5

    B.   The Cooperation Agreement .................................................. 6

    C.   The AST Transaction .............................................................. 7

    D.   The Term Sheet ...................................................................... 7

    E.   The Parties' Negotiations ....................................................... 9

    F.   The Motions to Enforce ........................................................ 13

    G.   Inmarsat Repeatedly Informed Ligado And AST That Coordination Is Not Complete ............................................................................... 15

    H.   Ligado's Non-Compliant FCC Application ............................. 17

III. OBJECTION ........................................................................................ 18

    A.   Inmarsat Did Not Violate The Automatic Stay When It Filed The Complaint In Accordance With The Post-Petition Contracts' Exclusive Jurisdiction Provision And This Court's Prior Instructions................................... 18

        1.   The Automatic Stay Does Not Apply To Inmarsat's Enforcement Of Its Rights Under The Post-Petition Contracts................................... 18

        2.   Even If The Stay Otherwise Applied, Inmarsat Understood That This Court Instructed The Parties To Litigate Future Disputes In New York........................... 21

    B.   This Court Lacks The Power To Grant The Requested Relief. ............................. 23

    C.   In Any Event, Inmarsat's Complaint Is Meritorious And Should Proceed. .......... 25

        1.   Ligado And AST Breached The Term Sheet And Failed To Satisfy A Material Condition To Inmarsat's Support Obligation. ........................ 26

        2.   Ligado And AST Are Required To Actually Coordinate The Proposed NGSO System, Not Merely State That Coordination Has Occurred........................... 28

        3.   The Existing Contract Terms Do Not Coordinate The Proposed NGSO System. ................................................................. 31

        4.   This Court Has Not Already Addressed The Issues In Inmarsat's Complaint........................................................................... 32

IV.  CONCLUSION.................................................................................... 34

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bd. of Educ. of Appoquinimink School Dist. v. Appoquinimink Educ. Ass'n*,
1999 WL 826492 (Del. Ch. Oct. 6, 1999) ...............................................................30

*In re BYJU's Alpha, Inc.*,
661 B.R. 109 (D. Del. 2024) ...................................................................................3

*In re Chester*,
2025 WL 2816599 (Bankr. D.N.J. Oct. 2, 2025) ...................................................18

*In re City of San Bernardino*,
558 B.R. 321 (C.D. Cal. 2016) ...............................................................................20

*In re Colo. Altitude Training LLC*,
2012 WL 993530 (Bankr. D. Colo. Mar. 23, 2012).................................................20

*Doe v. Del. State Univ. Bd. of Trs.*,
2021 WL 2036670 (D. Del. May 21, 2021).............................................................25

*Edwards v. Prudential Prop & Cas. Co.*,
814 A.2d 1115 (N.J. Super. Ct. App. Div. 2003).....................................................30

*In re Globe Bldg. Materials, Inc.*,
345 B.R. 619 (Bankr. N.D. Ind. 2006)....................................................................19

*H&R Block, Inc. v. Block, Inc.*,
58 F.4th 939 (8th Cir. 2023) ...................................................................................25

*Haberern v. Lehigh & N. E. Ry. Co.*,
554 F.2d 581 (3d Cir. 1977)....................................................................................19

*In re Henderson*,
560 B.R. 365 (Bankr. D.N.M. 2016) .......................................................................18

*IBJ Schroder Bank & Tr. Co. v. Resol. Tr. Corp.*,
26 F.3d 370 (2d Cir. 1995).......................................................................................30

*Iron City Indus. Cleaning Corp. v. Loc. 141, Laundry & Dry Cleaners Int'l Union*,
1970 WL 686 (W.D. Pa. Sept. 22, 1970).................................................................25

*In re James*,
940 F.2d 46 (3d Cir. 1991)...................................................................................3, 24

*In re Jefferson Cnty., Ala*,
  484 B.R. 427 (Bankr. N.D. Ala. 2012) ................................................................20

*Jordan v. State of Washington (In re Prehired, LLC)*,
  2025 WL 2661765 (D. Del. Sept. 17, 2025) ....................................................3, 23

*In re Kish*,
  41 B.R. 620 (Bankr. E.D. Mich. 1984) ...............................................................20

*Larami Ltd. v. Yes! Ent. Corp.*,
  244 B.R. 56 (D.N.J. 2000) ...................................................................................20

*In re Lengacher*,
  485 B.R. 380 (Bankr. N.D. Ind. 2012) ................................................................23

*Matter of M. Frenville Co., Inc.*,
  744 F.2d 332 (3d Cir. 1984), *overruled on other grounds by In re Grossman's
  Inc.*, 607 F.3d 114 (3d Cir. 2010) ......................................................................18

*In re Manire*,
  1992 WL 219811 (Bankr. E.D. Ark. July 28, 1992) ...........................................24

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008) ...............................................................................23

*Paradise Valley Country Club v. Sun Valley Dev. Co. (In re Paradise Valley
  Country Club)*,
  26 B.R. 990 (Bankr. D. Colo. 1983) ...................................................................21

*Matter of Perkins*,
  902 F.2d 1254 (7th Cir. 1990) .........................................................................3, 23

*In re Prime Motor Inns, Inc.*,
  166 B.R. 993 (Bankr. S.D. Fla. 1994) ................................................................21

*In re Raphael*,
  238 B.R. 69 (D.N.J. 1999) ...................................................................................24

*In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*,
  626 B.R. 278 (Bankr. S.D. Tex. 2021) ...............................................................24

*In re Rhodes*,
  2022 WL 18285078 (Bankr. W.D. La. Dec. 14, 2022) ........................................24

*In re Rodriguez*,
  629 F.3d 136 (3d Cir. 2010) .................................................................................1

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ...................................................................... 25

*In re Steward*,
338 B.R. 654 (Bankr. D.N.J. 2006) ............................................................ 19

*In re Summit Metals, Inc.*,
477 B.R. 484 (Bankr. D. Del. 2012) ........................................................... 19

*Sutton v. E. River Sav. Bank*,
435 N.E.2d 1075 (N.Y. 1982) ..................................................................... 29

*Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*,
735 F.3d 131 (3d Cir. 2013) ........................................................................ 25

*W & G Sea-ford Assocs., L.P. v. Eastern Shore Mkts., Inc.*,
714 F. Supp. 1336 (D. Del. 1989) .............................................................. 29

*Weeks v. Rector of Trinity Church in N.Y.*,
67 N.Y.S. 670 (N.Y. App. Div. 1900) ................................................... 29, 30

*In re Welded Constr., L.P.*,
605 B.R. 35 (Bankr. D. Del. 2019) ............................................................. 29

## Rules / Statutes

11 U.S.C. § 362 ............................................................................... 1, 19, 20

11 U.S.C. § 922 ..................................................................................... 20

28 U.S.C. § 959 ............................................................................... 1, 19, 20

Fed. R. Bankr. P. 7001 ............................................................................ 3, 23

## Other Authorities

22 N.Y. Jur. 2d Contracts § 316 ................................................................ 29

Restatement (Second) of Contracts § 202 ................................................... 30

23 Williston on Contracts § 63:21 ............................................................. 29

Inmarsat Global Limited ("Inmarsat") hereby objects to (A) *Debtors' Motion for an Order (I) Enforcing the Automatic Stay, (II) Enforcing the Mediated Agreement, and (III) Granting Related Relief* (Dkt. 1220) (the "Stay Motion") and (B) *Emergency Motion by AST & Science LLC For Entry of an Order Enforcing the Mediated Agreement and Related Orders* (Dkt. 1221) (the "AST Motion" and with the Stay Motion, the "Motions"), and respectfully states as follows:

## I.  PRELIMINARY STATEMENT[2]

1.      Ligado and AST seek extraordinary relief, but they are the ones proceeding in the wrong court.  Indeed, this Court lacks the power to award the relief sought.  And even if the Motions were not fatally flawed as a procedural matter, they are also fundamentally wrong on the merits.

2.      ***No Violation Of The Automatic Stay***.  Under section 362(a)(1) of the Bankruptcy Code, the "automatic stay is applicable only to claims that arise pre-petition, and not to claims that arise post-petition."  *In re Rodriguez*, 629 F.3d 136, 138 (3d Cir. 2010) (citation omitted).  Here, Inmarsat alleges that AST and Ligado breached two post-petition contracts approved by this Court—contracts that ***require*** all disputes (other than a certain inapplicable exception) be adjudicated in the New York courts.  Where a bankruptcy court approves a debtor's post-petition contract and that post-petition contract provides that disputes will be resolved elsewhere, a party that complies with that provision does not violate the automatic stay.

3.      Nor does section 362(a)(3) change the outcome.  The Motions are incorrect that Inmarsat seeks to obtain possession or control of any estate property.  Inmarsat seeks to ensure that Ligado complies with its post-petition contractual obligations.  Instead, 28 U.S.C. § 959 governs

---

[2]     Capitalized terms not otherwise defined in the Preliminary Statement have the meanings given to them below.  All emphasis herein is added, unless otherwise indicated.

here, which permits claims against debtors in possession "with respect to any of their acts or transactions in carrying on business."

4. More fundamentally, and even if the stay otherwise might apply, Inmarsat believes this Court has already blessed litigation in a New York court. At the August 29 Hearing on the parties' cross-motions to enforce, the Court stated multiple times that if there were a dispute about the post-petition contracts "then there is a way in that settlement term sheet to deal with that. *It provides where you go if you have a disagreement and you can deal with it there*." Aug. 29, 2025 Hr'g Tr. at 30:7-14.

5. Indeed, the Court specifically remarked upon the automatic stay and expressed its contemplation that, "if there is a dispute, Inmarsat, to the extent they need it, *they have stay relief* and they can go pursue it wherever they need to pursue it." *Id.* at 28:20-22. Inmarsat responded to the Court's comments by informing the Court that it believed the parties already had a live dispute, and sought confirmation that "if the parties do have the dispute that I've been forthright with the Court I do think we [] have, then the parties will be able to go to whatever court has the appropriate jurisdiction to resolve that dispute." *Id.* at 35:21-24. Inmarsat then stated that "if either [Ligado or AST] disagrees with [that], they should say so now." *Id.* at 36:1-3. The Court confirmed Inmarsat's understanding that future disputes would be litigated in New York and neither Ligado nor AST voiced any disagreement. *Id.* at 36:5. Thus, even assuming the automatic stay applied in the first instance, Inmarsat understood that this Court modified that stay and filed suit in New York pursuant to this Court's directive and orders.

6. ***This Court Cannot Grant Injunctive Relief By Motion***. The Motions seek extraordinary mandatory injunctive relief—that Inmarsat's New York Complaint be dismissed with prejudice and Inmarsat ordered to affirmatively support Ligado's FCC application. Never

mind that a "party seeking a mandatory injunction bears a particularly heavy burden in demonstrating its necessity," a burden the Motions do not carry. *In re BYJU's Alpha, Inc.*, 661 B.R. 109, 123 (D. Del. 2024) (citation omitted). The Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") are clear—the Court cannot grant injunctive or equitable relief by motion; such relief requires filing an adversary proceeding. Fed. R. Bankr. P. 7001(g); *see also Jordan v. State of Washington (In re Prehired, LLC)*, 2025 WL 2661765, at *4 (D. Del. Sept. 17, 2025) (holding bankruptcy court "properly denied the Motion as procedurally improper because it sought [injunctive] relief that the Bankruptcy Court may not grant by motion."); *Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) (noting that an adversary proceeding "commenced by motion rather than by complaint will be dismissed" and that any order entered in such an "action commenced by motion will be vacated."). The Court can *and indeed must* deny the Motions in their entirety on this ground alone.

7. And even if Rule 7001(g) did not entirely deprive this Court of the power to grant the Motions, principles of comity further prohibit this Court from dismissing Inmarsat's New York Complaint. Again, Ligado and AST do not ask this Court merely to stay Inmarsat's Complaint, but to order its dismissal, with prejudice. Put differently, Ligado and AST ask this Court to summarily and finally adjudicate a state court action on the merits without appropriate process or a trial. This Court cannot do so. *See In re James*, 940 F.2d 46, 52-53 (3d Cir. 1991) ("federal collateral review of [the merits] of a state proceeding is inappropriate.").

8. ***Inmarsat Is Correct On The Merits.*** Because the Court lacks the power to grant the relief requested by the Motions even if they had substantive merit, this Court should not even consider the merits. But if the Court nevertheless chooses to do so, Inmarsat will show that it is Ligado and AST—not Inmarsat—who are in breach of the relevant post-petition contracts.

9.     At its simplest, the parties' contracts provide that Ligado's and AST's FCC application must affirmatively state that "the operations of the Proposed NGSO System **have been coordinated** subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, and give effect to such agreements by licensing the Proposed NGSO System to operate in accordance with the terms of such agreements."[3]  But despite months of negotiations over the terms of such coordination—and the exchange of numerous substantive drafts—the parties never reached final agreement and the Proposed NGSO System was not coordinated.  In its New York Action, Inmarsat alleges that Ligado's contrary contention to the FCC is false, thereby breaching the parties' agreements and relieving Inmarsat of its obligation to support the application.

10.     Inmarsat would have preferred not to have been forced to sue to enforce its coordination rights.  To the contrary, Inmarsat would prefer to actually complete the coordination process so it can support an FCC application by Ligado and AST.  But Ligado and AST terminated coordination negotiations and then falsely told the FCC that their proposed satellite network was already coordinated.  Inmarsat had no choice but to seek judicial relief.  Still, Inmarsat remains hopeful that Ligado and AST will re-engage and complete the coordination process.  If that happens, Inmarsat is ready to support the FCC application.  Unfortunately, filing these procedurally and substantively deficient Motions achieves nothing but delay and distraction.  They should be swiftly denied.

---

[3]     *See Declaration of Kate Scherling in Support of Inmarsat Global Limited's Omnibus Objection to (A) Debtors' Motion for an Order (I) Enforcing the Automatic Stay, (II) Enforcing the Mediated Agreement, and (III) Granting Related Relief and (B) Emergency Motion by AST & Science LLC for Entry of an Order Enforcing the Mediated Agreement and Related Orders* (the "Scherling Decl."), filed contemporaneously herewith, Ex. 12, at Ex. 1 § 2; Ex. 13, at Ex. 1 § 2.

## II.     RELEVANT FACTUAL BACKGROUND

11.     The Motions were filed in response to the action Inmarsat commenced in New York state court on December 19, 2025. (The "New York Action").  In its complaint (the "New York Complaint" or the "Complaint"), Inmarsat alleges that Ligado Networks LLC and Ligado Networks (Canada) Inc. (together "Ligado") and AST SpaceMobile, Inc. and AST & Science LLC, (together "AST") breached their contractual obligation to "coordinate" a new proposed satellite system with Inmarsat's satellites before filing an FCC application seeking approval for the system. Inmarsat alleges that the application falsely states that the coordination is complete when, in fact, it is not.  Scherling Decl. Ex. 1.

### A.     Spectrum Coordination

12.     Satellites transmit signals wirelessly for a wide range of applications, including data transmissions, internet access, and voice communications.  Satellite signals travel via electromagnetic radio frequencies.  A range of frequencies is referred to as "spectrum," and slices of spectrum are commonly grouped together in "bands."  This case concerns spectrum in the highly valuable "L band."

13.     As explained in the Complaint, "coordination" refers to satellite operators making detailed technical and operational arrangements to ensure that they can operate in overlapping (or adjacent) spectrum without their satellite services interfering with one another.  It is critically important to Inmarsat that Ligado and AST complete the necessary satellite coordination; otherwise, there is a serious risk of interference to Inmarsat's satellite services that would irreparably harm Inmarsat and its customers.

14.     National governments generally regulate and allocate spectrum within their borders. To minimize interference and optimize the efficient use of spectrum, the responsible national governments generally require that satellites they license be "coordinated" with other satellites.

Because satellite signals usually traverse national borders, coordination is typically done either directly on a government-to-government basis or indirectly on a satellite operator-to-satellite operator basis.

15.     As Ligado reminded the FCC just last week, the "North American L-band presents a unique coordination environment" and "Ligado and other operators in the North American L-band have spent decades negotiating a series of multilateral operating agreements with governmental administrations and one another to coordinate use of the spectrum and avoid harmful interference." *Id.* Ex. 2 at 3.  As Ligado notes, the FCC is itself a signatory to this decades-old coordination arrangement between the national governments and satellite operators from the United States, Canada, Mexico, the United Kingdom, and Russia, referred to as the "Mexico City MoU."

### B.     The Cooperation Agreement

16.     In the early 2000s, Ligado's predecessors and Inmarsat had certain disputes related to the implementation of the Mexico City MoU.  In addition, Ligado wanted access to greater and more contiguous spectrum to pursue its business plan of building a satellite network that would integrate satellite signals with terrestrial transmissions over the traditional land-based infrastructure.  At the time (and still today), Ligado was licensed by the United States and Canada, while Inmarsat's L-band satellites were licensed by the United Kingdom.

17.     In 2007, Inmarsat and Ligado signed a 100-year "Cooperation Agreement" that, among other things, resolved the parties' disputes.  *Id.* Ex. 3.  The Cooperation Agreement also provided Ligado with access to greater and more contiguous spectrum over North America in return for a series of cash payments and certain commitments regarding Inmarsat's exclusive spectrum rights both in North America and the rest of the world.  A key function of the Cooperation Agreement was to reflect coordination between Inmarsat and Ligado.  Most notably, "Exhibit L,"

entitled "L-Band **Coordination Plan**," sets forth details about (among other things) which party may operate in what frequencies, at what power levels, and in which geographic regions. In addition, "Exhibit I" and "Exhibit J" list the satellites that the parties have coordinated, and the Cooperation Agreement sets forth a process for adding "Future Satellites" to the coordination by mutual agreement. Because Inmarsat and Ligado only deployed geostationary ("GSO") satellites, the Cooperation Agreement only coordinated the parties' GSO operations and only GSO satellites are listed in the relevant exhibits.

18.     The Cooperation Agreement has been ratified by regulators in the United States (FCC), the United Kingdom (Ofcom), and Canada (Innovation, Science and Economic Development Canada). *Id.* Ex. 4.

### C.     The AST Transaction

19.     AST aspires to build a network of non-geostationary ("NGSO") satellites that would provide "direct to device" connectivity to smartphones. To power that future network, AST struck a deal to essentially sublease Ligado's spectrum under the Cooperation Agreement. Inmarsat objected to the AST transaction because it would have forced Inmarsat, without its consent, to cooperate extensively for the next 80 years with Ligado's new partner, AST—the actual owner and operator of the new satellite network—while remaining in privity solely with Ligado. *See* Dkt. 462.

### D.     The Term Sheet

20.     Inmarsat, Ligado, and AST participated in a Court-ordered mediation before Hon. Judge Robert Drain (Ret.) that ultimately resulted in the binding Term Sheet, which was approved by the Court on June 23, 2025 (the "Mediation Order"). Dkt. 1221-3. The Term Sheet obligated the parties to draft and execute two further, definitive contracts: (i) an "Amended Inmarsat Cooperation Agreement," and (ii) an "Inmarsat-AST Agreement." Dkt. 692-1. The Amended

Inmarsat Cooperation Agreement would coordinate potentially hundreds of new AST NGSO satellites, defined as the "Proposed NGSO System." The Inmarsat-AST Agreement would then give Inmarsat and AST the right to enforce directly against one another the new coordination terms ultimately agreed in the Amended Inmarsat Cooperation Agreement. At that point, the Term Sheet contemplates that Ligado and AST could apply for FCC approval of the new system with Inmarsat's support.

21.     One key reason the Term Sheet requires amending the Cooperation Agreement is that the original Cooperation Agreement was not drafted for NGSO satellites like the ones AST proposes to operate. From 2007 through today, the Cooperation Agreement has addressed only the coordination of GSO satellites. These satellites sit in a single orbital "slot" tens of thousands of kilometers away and maintain the same fixed position relative to the Earth. Only *one* operational Ligado GSO satellite is covered by the current coordination agreement. But AST seeks to operate a network of at least 96 NSGO satellites in the L-band spectrum at issue. These contemplated satellites will constantly move in relation to the Earth, from a position only a few hundred kilometers away, and thus present much more difficult coordination challenges.

22.     The process and parameters for coordination are considerably different for an NGSO system than for a GSO satellite. Because GSO satellites always remain in the same relative position to one another, the potential interference from one particular GSO satellite into another is limited only to those satellites within a certain proximity, and the interference environment is static. By contrast, NGSO satellites, like those in AST's contemplated system travel so fast they circle the globe every 90 minutes—16 times a day—passing right through the service area of every Inmarsat GSO satellite around the world. Each AST satellite is a potential source of interference

into Inmarsat operations many times a day and the interference from multiple NGSO satellites is aggregated through complex geometries.

### E.    The Parties' Negotiations

23.    The parties began discussions for an Amended Cooperation Agreement well before the Term Sheet was even completed.  On May 7, 2025 (over a month before the Term Sheet was finalized), Ligado circulated a draft Second Amended and Restated Cooperation Agreement. Scherling Decl. Ex. 5.  The proposed draft included 46 instances of the term "NGSO"; the 2010 Cooperation Agreement has none.

24.    Ligado's draft also included an "Index of Exhibits" recognizing that both Exhibit I (the schedule of coordinated satellites) and Exhibit L (the L-Band Coordination Plan establishing rights to operate in specific frequencies, within certain power levels, and in within certain geographic regions) would need to be updated, and that there would need to be a new a new Exhibit M (later referred to as Exhibit O) setting forth the new "NGSO Operational Requirements."  *See id*.:

**INDEX OF EXHIBITS**
**[WILL BE UPDATED]**

| Exhibit | Subject | Status |
|---|---|---|
| A | Definitions | Attached to Agreement |
| B | The Spectrum Plan | Attached to Agreement |
| C | Default Spectrum Plan | Attached to Agreement |
| D | Ligado Coverage Footprint / Exclusive Spectrum Use Region | Attached to Agreement. Additional details will be in Exhibit L. |
| E-H | Intentionally Omitted | |
| I | Coordinated Satellites | To be updated. Combine old Exs I and J; and add NGSO Network |
| J | Intentionally Omitted | |
| K | Technical Information about Satellites | Remains same |
| L | L-Band Coordination Plan | Working. Needs to be updated as it is tied to various spectrum Plans. |
| M | NGSO Operational Requirements | To be provided by Ligado – consistent with Exhibits 4 and 6 to the Collaboration Agreement and the Coop Agreement. |

25.     From that point forward, and especially after the Term Sheet was finalized on June 10, 2025, the parties negotiated amendments to the Cooperation Agreement to implement the settlement terms, including the contemplated coordination of AST's NGSO satellites.  There were multiple conference calls among engineers and regulatory personnel to address technical and operational terms and parameters.

26.     Most relevant here, several drafts of the documents bearing on the updated NGSO coordination were exchanged between the parties. For example:

(a)   On July 2, 2025, Inmarsat sent a markup of the Second Amended and Restated Cooperation Agreement, *id.* Ex. 6, and, on July 11, 2025, sent its first markup of Exhibit L, the "L-Band Coordination Plan," and the new Exhibit O (formerly M) with the "NGSO Operational Requirements." *Id.* Ex. 7. Exhibit L was heavily edited from the existing version to accommodate the new Ligado/AST NGSO system, as well as Inmarsat's own contemplated NGSO systems. *Id.*

(b)   On July 18, 2025, Ligado circulated revised versions of three technical exhibits. *Id.* Ex. 8. Its revised Exhibit I added certain NGSO satellites to the schedule of "Coordinated Satellites" and indicated that more needed to be added. Ligado's revised Exhibit L referred to the newly-created Exhibit O, entitled "NGSO Operational Requirements," which included a chart setting forth the power levels permitted for NGSO satellite operations.

(c)   On July 22, 2025, Inmarsat's external counsel circulated an "Issues List" that (among other things) flagged how the parties were to deal with adding NGSO satellites that would not be included on Exhibit I as of the execution date of the Amended Inmarsat Cooperation Agreement (Issue 2) and also noted that the parties still needed to finalize Exhibits L and O (Issue 20). *Id.* Ex. 9.

(d)   On July 28, 2025, Ligado circulated a further markup of the L-Band Coordination Plan (Exhibit L) to try to bring the parties closer to a final agreement. *Id.* Ex. 10.

27.     The coordination negotiations went smoothly until July 29, 2025, when AST proposed a change to Exhibit L that ultimately derailed the discussions altogether. *Id.* Ex. 11. The plain language of the original Exhibit L has, since inception almost 20 years ago, given Inmarsat alone "Exclusive Use" of all the L-Band spectrum outside of North America. But AST proposed new language to carve itself out of that longstanding restriction:

> (iv)     Notwithstanding anything else in this Agreement, Inmarsat and AST acknowledge and agree that:
>
> **(A)**     With regard to Mexico, the technical requirements in this Agreement shall not apply to AST (or its Related Parties) except for their use of the Tier 1 Spectrum; and
>
> **(B)**     AST's operations (including in the L-band) outside of Ligado Region A and Mexico are not restricted or prohibited by this Agreement.

28.     In Inmarsat's view, nothing in the Term Sheet authorized this alteration to Exhibit L. To the contrary, the Term Sheet was clear that the "technical, geographic and other limitations" that applied to Ligado would apply equally to AST and its new network, including Inmarsat's exclusivity rights. To be clear, the Term Sheet language maintaining the same "limitations" does *not* mean that the existing GSO coordination provisions were adequate to coordinate an NGSO system. Although the *numerical* limits remained the same for GSO and NGSO systems, the *means* for applying those limits needed to be updated considerably to ensure the parties' operations were protected. Neither Ligado nor AST ever disagreed with Inmarsat on this point. Indeed, if the existing agreement was sufficient to coordinate the Proposed NGSO System there would have been no need to draft revised technical exhibits at all.

29.     Where the parties *did* disagree concerned the separate issue of exclusivity outside North America. The geographic exclusivity provided in Exhibit L is particularly relevant in the case of an NGSO system because, unlike Ligado's sole GSO satellite covering North America,

NGSO satellites by definition operate globally and Inmarsat has existing satellite operations all around the globe. Unless suitably constrained *everywhere* (not just in North America), AST's satellites would interfere with Inmarsat's global services on a perpetual basis.

30. Inmarsat believes its "Exclusive Use" rights outside North America are clear, but Ligado and AST argued that Cooperation Agreement never provided Inmarsat with exclusivity outside North America or, at a minimum, did not provide for any exclusivity that would bind AST. This dispute—which is entirely distinct from the issue in the Motions about whether the operations of the Proposed NGSO System have been coordinated *anywhere*, including *within* North America—halted the parties' negotiations of the Amended Inmarsat Cooperation Agreement.

### F. The Motions to Enforce

31. Unable to bridge the divide over exclusivity outside North America, Inmarsat and Ligado filed competing motions asking the Court to enforce the Term Sheet. *See* Dkts. 825, 826 (the "Motions to Enforce").

32. At the time, Inmarsat believed that the Court would either conclude that AST's alteration to Exhibit L quoted above was not appropriate (as Inmarsat argued) or that it was appropriate (as Ligado and AST argued). Once the parties' rights outside North America were adjudicated, the parties would thereafter complete the coordination negotiations for NGSO operations within North America that were otherwise proceeding smoothly. Indeed, the relief Inmarsat sought was merely to require Ligado and AST to return to the table—that is, "to cooperate in drafting and to execute, as promptly as reasonably practical, the 'Inmarsat-AST Agreement' contemplated by the [Term Sheet]" while making clear that AST would not be carved out of the pre-existing "Exclusive Use" provision. Dkt. 825-2 ¶ 2.

33. The Court held a hearing on the Motions to Enforce on August 29, 2025 (the "August 29 Hearing"). At the outset of the hearing, the Court previewed its ultimate ruling:

> I think I'm just denying both motions and saying go take the terms
> that are contained in the settlement term sheet, write them into the
> mediated agreements … and if you got a problem later you have
> already decided where to handle it.  So, if a problem comes up later,
> go deal with it there because I just don't – I just don't see what basis
> I would have to determine that any of the parties here have described
> for me a basis upon which I can find that the settlement term sheet
> supports their arguments.  I think it all impedes too much to the other
> side of the dispute and I would be doing an awful lot of, I guess,
> interpretation without really understanding what my basis would be
> for doing so to impute agreements or motivations to the parties either
> by the absence of language or reading things into the words that I
> think are just beyond what I can really gather from the mediated
> agreement.

*Aug. 29 Hr'g Tr.* at 6:18-7:10.  At the conclusion of the hearing, the Court ruled as it had previewed:

> The parties are directed to include the language that is specifically
> identified in the settlement term sheet.  If there is a dispute about
> what it ends up meaning in concrete terms and practical terms, then
> there is a way in that settlement term sheet to deal with that.  It
> provides where you go if you have a disagreement and you can deal
> with it there.

*Id.* at 30:7-14.

34.    On September 2, 2025, the Court issued its order directing the parties "to incorporate the specific language of the Settlement Term Sheet . . . into the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, as applicable, unless otherwise mutually agreed by the parties."  Dkt. 940 (the "September 2 Order") ¶ 3.  In short, the parties were to transpose the Term Sheet language into the definitive agreements.

35.    Consistent with the Court's order and guidance, the parties later executed the Amended Inmarsat Cooperation Agreement (Scherling Decl. Ex. 12) and an Inmarsat-AST Agreement (*id.* Ex. 13) (together, the Post-Petition Contracts") in forms that simply attached the Term Sheet—with no substantive provisions beyond that.  The numerous draft technical exhibits

that, had they been agreed, would have actually coordinated the Proposed NGSO System, were never revisited.

### G. Inmarsat Repeatedly Informed Ligado And AST That Coordination Is Not Complete

36. On September 26, 2025, Ligado circulated the first draft of the FCC application it proposed for the new AST network. *Id.* Ex. 14, at 10. Inmarsat's counsel responded on October 4, 2025, stating (among other things): "Inmarsat cannot conclude that the draft you circulated complies with the Cooperation Agreement or the Inmarsat-AST Agreement." Inmarsat posed several technical questions and also asked whether AST was going to be co-applicant. *Id.* at 8-9. Inmarsat understood that AST was required to join the application because, as the entity that will actually own and operate the relevant satellite network, it is a real-party-in-interest to the FCC application.

37. In the following weeks, Ligado would provide further drafts and answer some (but far from all) of Inmarsat's questions. On November 6, 2025, in the final email in the discussion, Inmarsat's counsel made clear that: (i) the Proposed NGSO System was not coordinated with Inmarsat; (ii) Ligado was invited to continue the coordination process; and (iii) Ligado should not make any (false) representation to the FCC suggesting that the Proposed NGSO System was coordinated, *see id.* at 1-3:

> 2. The draft application repeatedly asserts that "SkyTerra Next" has been coordinated with Inmarsat and specifically asserts "that the operations of the SkyTerra Next have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement. . ." Those assertions are not accurate. To be sure, the Term Sheet contemplated that the Proposed NGSO System **would be** coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement. In fact, the parties' actions confirm this requirement to coordinate the Proposed NGSO System. Once the Term Sheet was concluded the parties exchanged multiple drafts of the Amended Inmarsat Cooperation Agreement that included amendments to the current Article 3 (Article 2 in the drafts) and Exhibit L to expand the L-band coordination to include NGSO systems, and amendments to Exhibit I to include the Proposed NGSO System on the list "Coordinated Satellites." While completing those amendments would have coordinated the Proposed NGSO System, none of those amendments was adopted. Nothing in Amendment 22 of the Cooperation Agreement, the Inmarsat-AST Agreement or Judge Horan's order coordinated the Proposed NGSO System. Accordingly, the Proposed NGSO System has simply not been coordinated with Inmarsat. Inmarsat is prepared to work with AST and Ligado to coordinate the Proposed NGSO System. Until that happens, neither AST nor Ligado should assert that the Proposed NGSO System has been coordinated with Inmarsat. In the meantime, Inmarsat continues to reserve all rights.
>
> Best regards,
>
> **Alfred M. Mamlet**

38.     This email was not the first or only time that Ligado and AST were told what should have been obvious to them—that the Proposed NGSO System was not coordinated. Inmarsat reiterated the lack of coordination directly to the FCC (and copied to Ligado and AST) on at least two other occasions.

39.     The first occurred on September 9, 2025, when Viasat (Inmarsat's parent company) filed a comment letter with the FCC relating to the application of a third party, Planet Labs PBC ("Planet Labs"), to allow certain of Planet Labs' satellites to communicate in the L-band with Inmarsat satellites. Ligado and AST had filed comments in August 2025 protesting that Planet Labs' application did not provide enough information to ensure that Planet Lab's contemplated L-band operations would not interfere with their own L-band operations, including the Proposed NGSO System. Viasat responded on September 9 by highlighting that AST had no grounds to complain about potential L-band operations interfering with the Proposed NGSO System. As Viasat explained, AST was not yet licensed in the L-band and, in fact, its "potential L-band operations" were not yet "appropriately coordinated." *Id.* Ex. 15, at 2. AST and Ligado

subsequently responded to Viasat's letter but did not dispute that coordination of AST's potential L-band operations had not been completed. *Id.* Ex. 16.

40. On November 21, 2025, Viasat made a similar filing with the FCC regarding a similar application from a different third party. Ligado and AST had also opposed that filing by arguing that the L-band operations of the Proposed NGSO System might suffer interference. Again, Viasat was clear that Ligado and AST lacked any basis to complain because they "had not coordinated any potential L-band NGSO operations with Viasat." *Id.* Ex. 17, at 3. Viasat added: "Although Inmarsat has invited AST and Ligado to resume coordination negotiations, they have not accepted the invitation. Therefore, ***the coordination process is far from complete***." *Id.* Again, when AST and Ligado filed a response on December 15, 2025, they did not dispute Viasat's point that AST's Proposed NGSO System was not coordinated with Inmarsat. *Id.* Ex. 18.

### H. Ligado's Non-Compliant FCC Application

41. On December 8, 2025—over a month after Inmarsat's November 6 email to Ligado and AST offering to resume coordination efforts, and without any discussion with Inmarsat in the meantime—Ligado filed its FCC application. Despite being filed under penalty of perjury, and despite Inmarsat explicitly and repeatedly stating otherwise to Ligado and AST, the application falsely represents that the Proposed NGSO System (now referred to as "SkyTerra Next") is coordinated under the Cooperation Agreement. Among other inaccurate statements, the application represents that "the operations of the SkyTerra Next system have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." Dkt. 1220-2 at 12.

42. Those agreements did not coordinate the SkyTerra Next system. In fact, the Amended Inmarsat Cooperation Agreement was not adapted to coordinate AST's proposed NGSO satellite system at all. "SkyTerra Next" (by that or any other name) is not listed on Exhibit I, which

denotes those satellites that have been coordinated. And Ex. L—the actual "Coordination Plan" itself—is entirely unchanged from 2010, seven years before AST was even founded.

43. The Ligado application also omits Inmarsat's repeated protestations about the lack of coordination. Instead, Ligado told the FCC its application "meets all of the requirements for [Inmarsat's] affirmative support," *id*. at 8-9, when Ligado and AST well knew Inmarsat's position otherwise.

44. As a result of the actions by Ligado and AST, Inmarsat filed the New York Complaint to protect its rights. Inmarsat remains willing to complete the coordination negotiations that began months ago and to thereafter support a compliant FCC application. But it cannot risk the FCC approving the Proposed NGSO System on the mistaken premise that that system is coordinated with Inmarsat and cannot risk the system operating in a way that harms Inmarsat's global satellite business.

## III. <u>OBJECTION</u>

**A. Inmarsat Did Not Violate The Automatic Stay When It Filed The Complaint In Accordance With The Post-Petition Contracts' Exclusive Jurisdiction Provision And This Court's Prior Instructions.**

**1. The Automatic Stay Does Not Apply To Inmarsat's Enforcement Of Its Rights Under The Post-Petition Contracts.**

45. As this Court knows well, "[p]roceedings or claims arising post-petition are not subject to the automatic stay." *In re Chester*, 2025 WL 2816599, at *7 (Bankr. D.N.J. Oct. 2, 2025) (quoting *Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 335 (3d Cir. 1984), *overruled on other grounds by In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010)); *In re Henderson*, 560 B.R. 365, 370 (Bankr. D.N.M. 2016) ("Thus, the automatic stay does not prevent the commencement of a lawsuit to collect a post-petition debt.").

46. Moreover, 28 U.S.C. § 959 provides that "[t]rustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property." Here, Inmarsat's suit is directed at Ligado's "carrying on" of its business connected with its license to use the L-Band spectrum and the operation of the Proposed NGSO System. Scherling Decl. Ex. 1 ¶¶ 1, 6, 52-59. Indeed, Ligado asserts that Inmarsat's suit for declaratory judgment and opposition of Ligado's pending FCC application could "critically affect the Debtors' **go-forward business**." Dkt. 1220 at ¶ 36. Inmarsat's suit thus falls squarely outside of section 362(a)(1) and squarely within section 959. *See Haberern v. Lehigh & N. E. Ry. Co.*, 554 F.2d 581, 585 (3d Cir. 1977) ("This statutory provision [§ 959] establishes a clear exception to blanket stays entered by a reorganization court."); *In re Summit Metals, Inc.*, 477 B.R. 484, 496 (Bankr. D. Del. 2012) ("trustees (or other court-appointed officers) may be sued *without* permission of the appointing court if the act in question occurred while 'carrying on business' connected with the estate"); *In re Globe Bldg. Materials, Inc.*, 345 B.R. 619, 636 (Bankr. N.D. Ind. 2006) (a suit under section 959 may be commenced "without the plaintiff's [sic] first seeking relief from the automatic stay").[4] Consequently, no stay relief was needed.

47. Ligado asserts that Inmarsat is seeking to "obtain possession" or "exercise control over" property of the estate in violation of section 362(a)(3). Not so. Inmarsat does not seek to obtain or control Ligado's FCC license. Rather, Inmarsat simply seeks to ensure that Ligado

---

[4] Ligado misplaces reliance (Dkt. 1220 at 14) on *In re Steward*, 338 B.R. 654 (Bankr. D.N.J. 2006). *Steward* involved a probate suit in state court seeking to remove the debtor as executor of an estate, an action that was not based on post-petition conduct and that could have been commenced before the bankruptcy case. *Id.* at 656-57. Accordingly, the suit in *Steward*, unlike Inmarsat's suit, fell squarely within section 362(a)(1), which stays an action "against the debtor that was or could have been commenced" before the bankruptcy case. Nor does *Steward* implicate (or address) section 959.

complies with its post-petition contractual obligations and does not mislead the FCC.  *See In re Kish*, 41 B.R. 620, 623 (Bankr. E.D. Mich. 1984) ("Citizens, by its suit, does not seek to deprive the trustee of anything; it merely seeks to have the trustee use its property in a manner consonant with state environmental laws."); *see also Larami Ltd. v. Yes! Ent. Corp.*, 244 B.R. 56, 59-60 (D.N.J. 2000) (rejecting the argument that section 362(a)(3) barred a suit for damages and an injunction arising out of post-petition conduct).  In *Kish*, a citizen group sued in state court to enjoin the debtor and the trustee from continued operation of part of the debtor's landfill business and to force the revocation of the debtor's operating license.  41 B.R. at 621, 623.  The court in *Kish* rightly rejected the trustee's argument that the suit violated section 362(a)(3), holding that even if plaintiff was seeking to destroy the debtor's property interest (the operating license), it was not seeking to obtain or acquire it.  *Id.* at 623 ("If Congress had intended the result urged by the trustee, it would have used the words 'deprive the estate of' in place of the word 'obtain.'"); *see also Larami*, 244 B.R. at 59 ("Larami seeks to prevent [debtor] from infringing on its patented water gun design," and not to "seize control of any of [debtor's] inventory or equipment.").[5]  The relief Inmarsat seeks is far more modest than that in *Kish*—Inmarsat does not ask that Ligado's L-band

---

[5]     Ligado's reliance (Dkt. 1220 at 14) on *In re City of San Bernardino*, 558 B.R. 321, 328 (C.D. Cal. 2016) is also misplaced.  In *San Bernardino*, the court found that a citizen's suit against the city and certain of its officers to enjoin certain search and seizure practices "effectively exercise[d] control" over the money paid to the city employees conducting those tasks and would "force the City to spend money to reduce crime that it may not otherwise have spent."  *Id.* at 329.  *San Bernardino* was a chapter 9 bankruptcy, which is subject to an additional automatic stay provision in connection with claims against the municipality's officers.  *See* 11 U.S.C. § 922.  Unlike section 362, section 922 is not limited to staying pre-bankruptcy claims.  *See In re Jefferson Cnty., Ala*, 484 B.R. 427, 448-49 (Bankr. N.D. Ala. 2012).  Moreover, *San Bernardino* did not address, and is at odds with, 28 U.S.C. § 959, which allows for suits to be brought without relief from the stay based on the carrying on of the debtor's post-petition business.  It is also at odds with several decisions, including *Kish* and *Larami*, that hold that suits to enjoin unlawful post-petition conduct are not subject to the stay.  *See generally In re Colo. Altitude Training LLC*, 2012 WL 993530, at *3 (Bankr. D. Colo. Mar. 23, 2012) ("Section 362(a)(3) was intended to prevent interference with a bankruptcy court's orderly disposition of the property of the estate, it was not intended to preclude post-petition suits to enjoin unlawful conduct.").

license be revoked, but simply that Ligado comply with its Post-Petition Contracts and truthfully represent the parties' positions to the FCC.

### 2. Even If The Stay Otherwise Applied, Inmarsat Understood That This Court Instructed The Parties To Litigate Future Disputes In New York.

48. Even if the automatic stay otherwise could have applied to Inmarsat's commencement of the New York Action to enforce its rights under the Post-Petition Contracts, the Court modified the stay when it approved the Term Sheet and subsequently directed the parties to incorporate the Term Sheet into the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement. The Term Sheet, which the Court approved "in its entirety," expressly provides that all disputes (other than a certain inapplicable exception) must be resolved in the New York Supreme Court, Commercial Division or the federal court in the Southern District of New York (the "New York Court"). In accordance with the Court's September 2 Order, that provision was incorporated into the post-petition Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement and thus is a binding post-petition obligation on the Debtor (as well as AST and Inmarsat). As a result, a breach by Ligado or AST of either of the Post-Petition Contracts entitles Inmarsat to seek relief in the New York Court, as provided in those agreements. *See Paradise Valley Country Club v. Sun Valley Dev. Co. (In re Paradise Valley Country Club)*, 26 B.R. 990, 992-93 (Bankr. D. Colo. 1983) (assumption of lease created a new post-petition obligation the breach of which would entitle counterparty to seek remedies as set forth in terms of lease and in accordance with state law); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (alleged post-assumption, post-confirmation breaches were "properly now the subject of a state court proceeding").

49. If there were any doubt about this conclusion, Inmarsat believes the Court erased it in its numerous express statements on the record at the August 29 Hearing. Indeed, the Court first

suggested that "if there is a dispute [under the Post-Petition Contracts], Inmarsat, to the extent they need it, ***they have stay relief and they can go pursue it wherever they need to pursue it***."  Aug. 29, 2025 Hr'g Tr. at 28:20-22.  The Court later confirmed:

> The parties are directed to include the language that is specifically identified in the settlement term sheet.  ***If there is a dispute about what it ends up meaning in concrete terms and practical terms, then there is a way in that settlement term sheet to deal with that. It provides where you go if you have a disagreement and you can deal with it there.***[6]

*Id.* at 30:7-14.

50.     Towards the end of the hearing, Inmarsat sought to eliminate any possible uncertainty:

> I want to clarify, Your Honor is not rejecting that notion that there is – Your Honor is not ruling on whether there's a case or controversy one way or the other such that if the parties do have the dispute that I've been forthright with the Court I do think we [ ] have, ***then the parties will be able to go to whatever court has the appropriate jurisdiction to resolve that dispute …. if either of [Ligado or AST] disagrees with it, they should say so now.***

*Id.* at 35:18-36:3.  The Court indicated its agreement, saying "[y]eah."  *Id.* at 36:5.  Neither Ligado nor AST said anything to the contrary.  It is thus hard to understand how Ligado and AST can try to invoke the automatic stay to avoid litigating in the New York Court.

---

[6]     In light of this Court's clear instruction that the parties should litigate any "concrete" dispute in New York court, Ligado feels it necessary to repeatedly assert that "[t]here is no concrete or practical dispute" currently between the parties.  *See, e.g.*, Dkt. 1220 at 15.  That is not credible.  For one thing, elsewhere in its papers Ligado candidly acknowledges that there *is* a "clear disagreement between the Debtors, AST, and Inmarsat as to what the Amended Inmarsat Cooperation Agreement" says, *id.* at 18, and argues that the "Complaint is another attempt by Inmarsat to reopen the dispute over the interpretation of the Amended Inmarsat Cooperation Agreement," *id.* at 19.  Indeed it is.  To be clear, Inmarsat sued in New York Court because there is (quite obviously) a "concrete and practical dispute" between the parties as to what the Amended Inmarsat Cooperation Agreement requires and who, if anyone, has breached that contract.  Inmarsat is currently seeking to have that dispute adjudicated and is entitled to have that occur in New York as the parties agreed.

## B. This Court Lacks The Power To Grant The Requested Relief.

51.     Ligado and AST are asking the Court for far more than enforcement of the automatic stay—they seek truly extraordinary relief in the form of mandatory injunctions and dismissal of the New York Action *with prejudice*—all through mere contested matters instead of an adversary proceeding.  That request is procedurally improper and this Court thus lacks the power to grant the requested relief.

52.     To start, "Federal Rule of Bankruptcy Procedure 7001 sets forth matters that may **only** be resolved through an adversary proceeding." *In re Mansaray-Ruffin*, 530 F.3d 230, 234 (3d Cir. 2008) (internal quotations omitted).  Among those matters is any "proceeding to obtain" exactly what Ligado and AST seek here, namely "an injunction or other equitable relief."  Fed. R. Bankr. P. 7001(g).

53.     Because the law is so clear, there are countless decisions enforcing Bankruptcy Rule 7001(g) and concluding that injunctive relief cannot be pursued or awarded by motion as a contested matter.  In fact, as the Seventh Circuit has recognized, were the Court to issue relief pursuant to a motion where an adversary proceeding is instead required, the Court's order would be subject to mandatory vacatur.  *See Matter of Perkins*, 902 F.2d at 1258 (holding that an adversary proceeding "commenced by motion rather than by complaint will be dismissed" and that any order entered in such an "action commenced by motion will be vacated"); *see also Jordan v. State of Washington (In re Prehired, LLC)*, 2025 WL 2661765, at *4 (D. Del. Sept. 17, 2025) (affirming bankruptcy court's denial of motion seeking an order compelling the State of Washington to "undo" a state court judgment because it was a "'mandatory injunction' that 'requires an adversary proceeding'" (quoting Fed. R. Bankr. P. 7001(g))); *In re Lengacher*, 485 B.R. 380, 385 (Bankr. N.D. Ind. 2012) ("a contested matter [is] not the proper vehicle for seeking injunctive relief").

54.     The reason the Bankruptcy Rules require full-blown adversary proceedings in these circumstances is plain:  Motions involve "fewer procedural protections" than adversary proceedings and "are generally designed for the adjudication of simple issues" only.  *In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 290 (Bankr. S.D. Tex. 2021) (citations omitted).  This concern is especially acute here because Ligado and AST seek the maximum possible relief (final adjudication of Inmarsat's claims) through the most summary of procedures (a bare motion).  The Bankruptcy Rules do not permit them to do so.

55.     Even setting aside that the relief requested cannot be granted by a mere motion, the Court should still deny the Motions because—regardless of the procedural vehicle employed—this Court also lacks the authority to resolve the merits of a pending state court case.  To be sure, bankruptcy courts have the power to *stay* a state court proceeding.  But doing so "is neither a dismissal of a suit nor a deprivation of jurisdiction over the matter; it is merely a suspension of the proceedings."  *In re James*, 940 F.2d at 51.  What bankruptcy courts may *not* do is "collaterally examine the merits of the state court proceedings."  *Id*. at 47, 51-52.  Especially given the "overriding need for comity between state and federal courts," "federal collateral review of a state proceeding is inappropriate."  *Id*. at 51-52; *see also In re Raphael*, 238 B.R. 69, 84 (D.N.J. 1999) (citing *James* and concluding it was "improper for the bankruptcy court and district courts to collaterally examine the merits" of a state court case); *accord In re Rhodes*, 2022 WL 18285078, at *4 (Bankr. W.D. La. Dec. 14, 2022) ("The court, however, agrees with Defendant that it lacks the authority to dismiss the state court avoidance action."); *In re Manire*, 1992 WL 219811, at *1 (Bankr. E.D. Ark. July 28, 1992) ("This Court has no authority to dismiss a case pending in another

court."). By requesting the Court order dismissal of the New York Action, Ligado and AST are requesting the Court to do precisely what is plainly prohibited under settled law.[7]

### C.   In Any Event, Inmarsat's Complaint Is Meritorious And Should Proceed.

56.   Because the Court lacks the power to grant the Motions, it need not proceed any further or bother to consider the merits.  But to the extent the Court nonetheless concludes that it should delve into the merits of the pending state court claims, Ligado and AST cannot meet the extraordinarily high standards that courts apply when considering the type of injunctive relief at issue here.  Specifically, an injunction that would "alter the status quo by commanding some positive act" is considered a "mandatory" injunction, *Doe v. Del. State Univ. Bd. of Trs.*, 2021 WL 2036670, at *2 (D. Del. May 21, 2021) (citation omitted), where the moving party bears a "particularly heavy" burden to show that its right to relief is "indisputably clear," *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citation omitted).  The burden is higher still when the moving party seeks "substantially the relief it could obtain after a trial on the merits," *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023), because that sort of injunction "cannot be undone," *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022).  *See also*, *e.g.*, *Iron City Indus. Cleaning Corp. v. Loc. 141, Laundry & Dry Cleaners Int'l Union*, 1970 WL 686, at *3 (W.D. Pa. Sept. 22, 1970) ("A court should not by mandatory injunction grant temporary relief which will dispose of the case on the merits.").

---

[7]   Finally, AST wrongly suggests that "Inmarsat itself recognizes that the Court retains jurisdiction with respect to the Mediation Order and [Term Sheet] and has previously moved the Court for relief under the same theory."  Dkt. 1221 at 19.  While Inmarsat did invoke the Court's retention of jurisdiction in the Mediation Order *before* the Term Sheet was formally supplanted by the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, Inmarsat does not "recognize" that this Court has any jurisdiction to enforce the Term Sheet now.  For while the terms of the Term Sheet were incorporated into the Post-Petition Contracts, the Mediated Agreement itself is now, legally speaking, a dead letter.

57.     Far from having shown that their right to relief on the merits is "indisputably clear," Ligado and AST are simply wrong to assert that Inmarsat has anticipatorily breached its obligation to support the pending FCC application.  As detailed below, the parties in breach are Ligado and AST who, in contravention of the Post-Petition Contracts, failed to coordinate the Proposed NGSO System before asking the FCC to approve it.

### 1.     Ligado And AST Breached The Term Sheet And Failed To Satisfy A Material Condition To Inmarsat's Support Obligation.

58.     Inmarsat is not obligated to support the pending FCC application because the support obligation is not triggered until the Proposed NGSO System is coordinated.  That simply has not happened.  In fact, because the FCC application was filed before the parties coordinated, Ligado and AST are the parties who breached the Post-Petition Contracts.

59.     The relevant contract language is contained in Section 2 of the Term Sheet (incorporated verbatim into the Post-Petition Contracts), which states that the anticipated regulatory applications to the FCC and its Canadian counterpart would request formal recognition that the "operations of the Proposed NGSO System *have been coordinated*."  The full provision is set forth below:

> The applications will expressly:
>
> (i) state that the operations of all AST and Ligado spacecraft individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement and Ligado's other coordination agreements with various parties; and
>
> (ii) request that the FCC and ISED *recognize that the operations of the Proposed NGSO System have been coordinated* subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement.

Scherling Decl. Ex. 12, at Ex. 1 § 2; Ex. 13, at Ex. 1 § 2 (paragraph breaks added). Inmarsat agreed to "affirmatively support" regulatory applications only insofar as they "meet the . . . conditions" above. *Id.*

60.     The thrust of the New York Complaint is that the obligation for Ligado and AST to file applications seeking recognition that the Proposed NGSO System's operations "have been coordinated" necessarily includes an antecedent obligation to complete that coordination before filing the application. Again, the Proposed NGSO System is simply *not* coordinated.[8]

61.     As discussed above, the parties began, but never completed, the NGSO coordination process. *Id.* Exs. 5-10. The discussions were derailed by a collateral dispute over whether Inmarsat had exclusive usage rights to portions of the L-band spectrum outside of North America. *Id.* Ex. 11. When this Court decided it would not resolve that dispute, Inmarsat invited Ligado and AST to resume the NGSO coordination discussions because, as Inmarsat repeatedly made clear, the Proposed NGSO System was still *not* coordinated. *Id.* Exs. 14, at 1-2, 15, 17. Ligado and AST refused.

62.     In November 2025, Inmarsat expressly warned Ligado and AST against representing otherwise to the FCC, writing in an email: "Inmarsat is prepared to work with AST and Ligado to coordinate the Proposed NGSO System. Until that happens, neither AST nor Ligado

---

[8]     Furthermore, AST breached the Inmarsat-AST Agreement (which incorporates the Term Sheet) by not joining Ligado's application to the FCC. The Term Sheet is clear that "Ligado ***and AST*** will provide Inmarsat with the redacted FCC and ISED applications for a proposed non-geostationary satellite orbit satellite system to be operated in the L-Band in North America." *Id.* Ex. 12 at Ex. 1, § 2. It further provides that the FCC applications must reference limitations on "all ***AST*** and Ligado spacecraft." *Id.* The choice to file the FCC application in Ligado's name alone appears designed to allow AST—the entity that would actually own, control and operate the NGSO satellite system—to avoid being formally bound to honor the promises in the application or any conditions that the FCC may impose in connection with a license. This, too, is a failure to perform a condition precedent necessary to trigger Inmarsat's regulatory support obligations.

should assert that the Proposed NGSO System has been coordinated with Inmarsat." *Id.* Ex. 14, at 2.

63.     But a month after Inmarsat's email—without any response from Ligado or AST in the meantime—Ligado plowed ahead with its FCC Application, falsely telling the FCC that "the operations of the [the Proposed NGSO System] ***have been coordinated*** subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." Dkt. 1220-2 at 12. This was a breach, and Inmarsat was left with no choice but to file suit to protect its rights.

64.     In support of their request that this Court summarily and finally adjudicate this current dispute on the merits, Ligado and AST advance three arguments: (i) that there is no coordination obligation at all; (ii) that the existing coordination terms in the 2010 Agreement suffice; and (iii) that the Court has already decided the disputed issues against Inmarsat. All are meritless.

> ### 2.     Ligado And AST Are Required To Actually Coordinate The Proposed NGSO System, Not Merely State That Coordination Has Occurred.

65.     According to Ligado and AST, Section 2 of the Term Sheet simply requires it to "submit a regulatory application to the FCC containing certain language," and, if it does so, Inmarsat must support the FCC application. Dkt. 1220 ¶ 46; *see also* Dkt. 1221 ¶ 38 (AST arguing that Inmarsat's support obligation was triggered simply because "the FCC Application contains the exact representations that are required"). In other words, Ligado and AST want the Court to conclude that any application that recites the words in the Term Sheet triggers Inmarsat's support obligation, obviating the need for the Court to "wade into what 'coordination' means." Dkt. 1220 ¶ 46.

66.     The Court should reject a myopically literal conception of the Term Sheet. It is true that the Term Sheet does not expressly state, "*The parties must coordinate the Proposed NGSO*

*System before filing the FCC application*."   But any sensible interpretation of the express requirement to seek the FCC's formal recognition that the operations "have been coordinated" means that the coordination must, in fact, occur beforehand.   This accords with fundamental contract law principles under which courts enforce "not merely literal language" but also "whatever may be reasonably implied," including "any promises which a reasonable person . . . would be justified in understanding were included."   *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citation omitted); *see also In re Welded Constr., L.P.*, 605 B.R. 35, 40 (Bankr. D. Del. 2019) ("A contract should not be construed to disregard common sense in favor of formalistic literalism that defies logic.") (citation modified); 23 Williston on Contracts § 63:21 (4th ed.) (express contract provisions are supplemented by "implied provisions as are indispensable to effectuate" them).

67.    This principle is commonly applied when "performance by one party to a contract presupposes . . . another act," which is not stated expressly.   22 N.Y. Jur. 2d Contracts § 316.   In that case, there is an "implied obligation" to "do the act which the performance of the contract necessarily involves."   *Id.*; *accord W & G Sea-ford Assocs., L.P. v. Eastern Shore Mkts., Inc.*, 714 F. Supp. 1336, 1346 (D. Del. 1989) (contract terms "are to be implied" where "they are necessarily involved in the contractual relationship" and are "too obvious to need expression" (citation omitted)).

68.    Thus, for example, in *Weeks v. Rector of Trinity Church in N.Y.*, 67 N.Y.S. 670, 673 (N.Y. App. Div. 1900), a contractor's ability to perform—completing the building on time— depended on the owner first obtaining a building permit.   The contract did not expressly state that the owner had to get the permit.   But the court found that since the contractor could not practically or lawfully proceed without the permit, there was "an implied obligation that [the owner] would

procure the permit within the time necessary to enable the [contractor] to proceed." *Id.* at 672; *see also*, *e.g.*, *Edwards v. Prudential Prop & Cas. Co.*, 814 A.2d 1115, 1120 (N.J. Super. Ct. App. Div. 2003) (holding that the duty to "pay" under an insurance policy "clearly presupposes a request or demand for payment and the presentation of facts supporting the claim").

69.     Here, the express obligation to make a representation to the FCC that the parties' operations "have been coordinated" clearly contemplates that the underlying coordination actually took place. By contrast, Ligado and AST suggest that the parties agreed that the FCC application (submitted under penalty of perjury) simply required a recital of certain words without regard for their truth. That makes little sense. That the Term Sheet—which was, after all, just a term sheet and not a fully fleshed-out agreement—does not spell out the coordination obligation explicitly does not change the fact that the obligation is inescapably clear from its language and context.

70.     The best evidence that Inmarsat's understanding is correct is the parties' own behavior. They spent months drafting complicated technical documents to reflect the necessary NGSO coordination not because it was fun (it wasn't!) but precisely because they understood that doing so was required. It was not for lack of anything better to do that the parties exchanged a proposed Exhibit I that would have listed the proposed NGSO System as coordinated under the terms of the revised L-band Coordination Plan. Scherling Decl. Ex. 8. This work was done for a reason. And under settled contract law, the parties' course-of-dealing evidence is highly instructive in interpreting the contract's terms: "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." *IBJ Schroder Bank & Tr. Co. v. Resol. Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1995) (quoting Restatement (Second) of Contracts § 202, cmt. g (1981)); *see also Bd. of Educ. of Appoquinimink School Dist. v. Appoquinimink Educ. Ass'n*, 1999 WL 826492, at *8 (Del. Ch. Oct. 6, 1999) (same). Nowhere in

Ligado's or AST's papers do they explain why so much effort was devoted to modifying the Cooperation Agreement's L-band Coordination Plan if all of that work was actually unnecessary to coordinate the Proposed NGSO System.

> **3.     The Existing Contract Terms Do Not Coordinate The Proposed NGSO System.**

71.     Ligado and AST next make the fallback argument that the only required "coordination" is what is reflected in the skeletal Amended Inmarsat Cooperation Agreement and in the Inmarsat-AST Agreement. Dkt. 1220 ¶ 43; Dkt. 1221 ¶ 41. This, too, is incorrect.

72.     The Cooperation Agreement itself makes clear what is required for satellites to be coordinated. Those steps have not been followed. Specifically, to be coordinated, satellites must be listed either on Exhibit I (entitled, "Newly Coordinated Satellites") or Exhibit J (entitled, "Previously Coordinated Satellites") or must be added as a "Replacement Satellite" or "Future Satellite" in the "L-Band Coordination Plan." Scherling Decl. Ex. 3 §§ 3.3(a)(i)), 3.3(b)(ii). Exhibits I and J have not been updated to include a single satellite in the Proposed NGSO System. Nor do any AST satellites appear in the L-Band Coordination Plan. Again, the parties *started* to draft documents that accomplish these necessary changes, *e.g.*, *id.* Ex. 8 (Ligado's draft, revised Ex. I), but never finished.

73.     The Post-Petition Contracts make *no changes* to the existing L-band Coordination Plan from the 2010 Cooperation Agreement (*id.* Ex. 3 at Exhibit L), which was designed for GSO satellites and not for AST's Proposed NGSO System. In claiming that "AST and Ligado have plainly satisfied any obligations they have under the Mediated Agreement to coordinate the operations of the Proposed NGSO System," AST cites only to the Term Sheet's dispute resolution provisions. Dkt. 1221 ¶ 41 (citing Term Sheet § 3). It is far from clear, but it appears AST is arguing that because the parties agreed to a mechanism to enforce coordination terms, coordination

necessarily must have occurred. That argument lacks logic. The parties agreed to a dispute resolution procedure because they anticipated that coordination would occur. But the mere existence of a mechanism to enforce certain terms does not itself brings those terms into existence.

74. As Ligado and AST well know, the coordination process for an NGSO system is fundamentally different and more complex than for a GSO system. These issues are discussed at length in Inmarsat's Complaint, Scherling Decl. Ex. 1 ¶¶ 4, 43-45, but, tellingly, the motion papers from Ligado and AST have nothing to say about the difference between NGSO and GSO satellites or the extensive efforts the parties initially made (but never completed) to account for those differences. If Ligado or AST really thought the existing GSO-specific terms were adequate, one would expect them to defend that position. They have not tried.

75. Similarly, as noted above, Inmarsat has already twice told the FCC that the AST Proposed NGSO System has not been coordinated with Inmarsat. *Id.* Exs. 15, 17. Neither time did Ligado or AST object. Instead, they accepted Inmarsat's characterization that the Proposed NGSO System had not been coordinated. *Id.* Exs. 16, 18.

### 4. This Court Has Not Already Addressed The Issues In Inmarsat's Complaint.

76. Finally, Ligado and AST argue that the issues in Inmarsat's Complaint "have already been addressed and disposed of" by the Court when, in August 2025, Inmarsat and Ligado filed competing Motions to Enforce the Term Sheet. Dkt. 1221 ¶ 4; *see also* Dkt. 1220 ¶ 25 (Ligado stating that "Inmarsat makes the same arguments it previously asserted to this Court"). As AST puts it, when the Court resolved those motions via what AST misleadingly calls the "Coordination

Order," the Court "definitely resolved" the issues in Inmarsat's Complaint.[9]   Dkt. 1221 ¶ 7. Inmarsat must have attended a different hearing and received a different order, because these characterizations are flatly wrong.

77.     The issue before the Court in August 2025 concerned geographic exclusivity—namely whether Inmarsat has exclusive rights vis-à-vis Ligado to the L-band outside North America, and whether AST should be bound by that same exclusivity.   The issue raised in Inmarsat's New York Complaint is far broader—whether the Proposed NGSO System is coordinated to operate *anywhere*, including *within* North America.

78.     In its August 2025 motion, Inmarsat argued that "dating back to its original Cooperation Agreement with Ligado" it had "exclusive use of the L-band spectrum *outside* of North America" and that, under the Term Sheet, AST was bound to that obligation as well.   Dkt. 825 ¶¶ 1-2.   For its part, Ligado disputed that the Cooperation Agreement *ever* provided for Inmarsat's exclusive use outside North America and that, even if it did, "AST never agreed to drastically restrict its use of the L-Band."   Dkt. 826 ¶ 5.   As discussed above, the Court ultimately did not side with either party, and instead preserved their dispute about exclusivity for another day. Dkt. 940 ¶ 3.

79.     Contrary to the arguments of Ligado and AST, *nothing* about these events addressed (let alone resolved) the issues in the Motions now before the Court, such as whether the Proposed NGSO System is coordinated under the existing (and unmodified) 2010 version of Exhibit L, or what was required to complete the coordination process.   At no point during motion practice in August 2025 did Ligado or AST argue, for example, that the existing 2010 coordination terms for

---

[9]     At best, AST's description of this Court's September 2 Order as a "Coordination Order" is highly misleading.   At worst, it is purposefully deceptive advocacy that violates AST's duty of candor to this Court.

GSO satellites were sufficient for purposes of the anticipated FCC application for the Proposed NGSO System.  If anyone had made such a startling suggestion, Inmarsat would have swiftly objected.  It did not so object because these issues were simply not raised or decided before.

80.     At bottom, there can be no serious suggestion that any substantive dispute was resolved in August 2025.  Indeed, the Court's September 2 Order, the text of which was agreed between the parties, clearly provides that "[a]ll parties' rights are reserved with respect to the terms and provisions of the Settlement Term Sheet, the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement (each as defined in the Settlement Term Sheet), including, for the avoidance of doubt, the matters presented to the Court in connection with the Motions to Enforce."  Dkt. 940 ¶ 5.  It is simply not credible to suggest that this language actually coordinated the operations of the Proposed NGSO System.

## IV.   CONCLUSION

WHEREFORE, for the foregoing reasons, Inmarsat respectfully requests that this Court deny the Motions.

Dated: January 12, 2026
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
      tcairns@pszjlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
Matthew Scheck
Kate Scherling
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000
Email: benjaminfinestone@quinnemanuel.com
      matthewscheck@quinnemanuel.com
      katescherling@quinnemanuel.com

-and-

**STEPTOE LLP**
Charles Michael
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
Email: cmichael@steptoe.com

Alfred M. Mamlet
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Email: amamlet@steptoe.com

*Counsel to Inmarsat Global Limited*