# **Exhibit F**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 25-10006 (TMH) |
| LIGADO NETWORKS LLC, *et al.*,[1] | Jointly Administered |
| Debtors. | |
| | **Objection Deadline: August 28, 2025, 4:00 p.m. (ET)**<br>**Hearing Date: September 22, 2025, at 2:00 p.m. (ET)** |

## MOTION OF INMARSAT GLOBAL LIMITED FOR ENTRY OF AN ORDER ENFORCING AND IMPLEMENTING THE MEDIATED AGREEMENT

Inmarsat Global Limited ("Inmarsat") hereby moves, under (1) section 105(a) of the

Bankruptcy Code; (2) this Court's *Order (i) Authorizing The Debtors To Enter Into the AST*

*Definitive Documents and (ii) Granting Related Relief*, D.I. 692 (the "Mediated Agreement

Order"); and (3) the Mediated Agreement among the Debtors (collectively, and including

predecessor entities, "Ligado"), AST & Science, LLC ("AST"), and Inmarsat, D.I. 692-1 (the

"Mediated Agreement"), for entry of an Order, substantially in the form attached hereto as

Exhibit A (the "Proposed Order"), enforcing and implementing the Mediated Agreement. In

support, Inmarsat states as follows.

### INTRODUCTION

1.      Inmarsat brings this motion to hold AST to the unambiguous terms of the parties'

Mediated Agreement, which the Court approved and entered as an Order. Inmarsat has worked in

good faith to implement the terms of that Mediated Agreement. AST, by contrast, refuses to abide

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

by its terms and insists that it will only proceed with implementing the Mediated Agreement if Inmarsat surrenders its ability to enforce its valuable contractual right to the L-band spectrum outside North America—a right that Inmarsat has held dating back to its original Cooperation Agreement with Ligado and *never* agreed to give up at any point, even as AST, in essence, steps into Ligado's shoes. To ensure that Ligado's reorganization plan can move forward, this Court should promptly hold AST to the terms to which it agreed.

2.      As the Court will recall, Inmarsat and Ligado have been parties to the Cooperation Agreement since 2007. While that Agreement is complex in many ways, as relevant here, the basic bargain was straightforward. Ligado gets exclusive use of the bulk of the parties' combined, highly-valuable L-band satellite spectrum in North America. In exchange, Ligado (1) compensates Inmarsat financially, and (2) grants Inmarsat exclusive use of the L-band spectrum *outside* of North America. Inmarsat's exclusive right to use non-North American L-band spectrum is essential to its global business. Even just off the coasts of North America, Inmarsat intensively uses the L-band spectrum for its maritime services business, which generated more than half of Inmarsat's mobile satellite service revenues when the Cooperation Agreement was first executed and still generates hundreds of millions of dollars in revenue. *See* Inmarsat plc, Annual Report and Accounts (2007), at 3;[2] Viasat FY2024 Annual Report (2024), at 33.[3]

3.      Inmarsat has made it abundantly clear throughout these proceedings that it will not agree to cede its exclusive right under the Cooperation Agreement to use the non-North American L-band spectrum. Nor was Inmarsat ever required to allow Ligado to carve out this important

---

[2] https://www.inmarsat.com/content/dam/inmarsat/corporate/documents/result-centre/Inmarsat_plc_Annual_Report_and_Accounts_2007.pdf.coredownload.pdf

[3] https://investors.viasat.com/static-files/5e5c4a86-4602-46ad-b17f-e2e2b8158d79

right from the Cooperation Agreement. Under Bankruptcy Code § 365, Ligado had the choice to assume or reject the Cooperation Agreement in its entirety—it had no authority to assume the Agreement while somehow excising Inmarsat's exclusive right to use L-band spectrum outside North America. Neither Ligado nor AST may dispute this legal reality.[4]

4.     When Ligado filed for bankruptcy, its pre-planned exit centered on a commercial transaction with AST whereby Ligado would assume the Cooperation Agreement—*in full,* as it must—but then sublease its spectrum usage rights to AST so that AST's planned satellite network could reach the U.S. market. That proposed transaction did not purport to alter Inmarsat's exclusive rights to L-band spectrum outside North America, nor could it legally do so. However, the proposed transaction raised the question of whether Inmarsat could *enforce* those rights (and its other rights under the Cooperation Agreement) against AST.

5.     Given this uncertainty, Inmarsat filed an objection to the AST transaction. The basic problem was that the transaction would thrust Inmarsat into a partnership with AST but, since AST was purportedly not taking formal assignment of the Cooperation Agreement under Bankruptcy Code § 365(f), AST would not be in contractual privity with Inmarsat or directly accountable to honor *all* the contractual terms, including the technical and geographic limitations like Inmarsat's exclusive L-band rights outside of North America. Inmarsat asserted this constructive assignment was unlawful; otherwise, Inmarsat could only hope that AST stayed

---

[4] *See In re Italian Cook Oil Corp*., 190 F.2d 994, 996-97 (3d Cir. 1951) ("The debtor is given the right to adopt or reject an executory contract. He must do one or the other. If the debtor deems the contract to possess no equity or benefit for the estate he rejects it as burdensome. If, on the other hand, he concludes that the executory contract does have an equity for the estate he adopts it. ***These principles of law have become too well established to permit of doubt. The debtor, however, may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other***."). (cleaned up and emphasis added).

within the Cooperation Agreement's limits where Inmarsat's only recourse would be against a non-operating entity—Ligado.

6. Inmarsat ultimately withdrew its objection because the parties reached the Mediated Agreement, which called for the parties to execute an "Amended Inmarsat Cooperation Agreement." One of the key accomplishments of that Mediated Agreement was to address Inmarsat's enforcement concerns by creating strengthened mechanisms for enforcing the Cooperation Agreement's technical, geographic and other limitations, including a new "Inmarsat-AST Agreement," whereby Inmarsat could directly enforce those limits against AST.

7. The Mediated Agreement also repeatedly reinforces Inmarsat's L-band rights outside of North America. Among other things, both AST and Ligado agreed to be bound by the "technical and/or geographic limitations" of the Amended Inmarsat Cooperation Agreement. Those limitations include the allocation to Inmarsat of exclusive use rights to operate in L-band satellite spectrum outside of North America. The Mediated Agreement states that "strict compliance" with these "geographic" limits is "essential to the integrity" of the Amended Inmarsat Cooperation Agreement and binds AST to honor those limits, just the same as Inmarsat and Ligado have been bound all along. That was the critical assurance that Inmarsat needed in order to withdraw its objections to the Ligado-AST transaction.

8. But in connection with finalizing the documents to implement the Mediated Agreement, AST has—out of nowhere—insisted that Inmarsat's right to the exclusive use of the L-band spectrum outside North America should somehow not bind AST. AST drafted a proposed revision to the Amended Inmarsat Cooperation Agreement carving out an exception for AST to operate freely outside North America, and repeatedly refused to include language, taken nearly verbatim from the Mediated Agreement, in the draft AST-Inmarsat Agreement that AST would

"strictly comply" with the "geographic . . . limits" of the Amended Inmarsat Cooperation Agreement. AST is thus refusing to proceed with implementing the Mediated Agreement unless Inmarsat abandons its ability to enforce the exclusive non-North American L-band rights that are a critical part of Inmarsat's consideration under the Cooperation Agreement.

9.     This Court should reject AST's attempt to avoid the Mediated Agreement's plain terms. Given the key role that Inmarsat's non-North American L-band rights played in the Cooperation Agreement, and Inmarsat's consistent efforts in these proceedings to ensure it could enforce those rights against AST, one would expect the Mediated Agreement to speak clearly on this issue if Inmarsat intended to effectively abandon those rights to AST. Yet there is no hint anywhere in the Mediated Agreement that Inmarsat jettisoned its critical non-North American L-band rights.[5]

10.     Further, AST's position makes no sense given Inmarsat's insistence from the start that, if AST were to essentially substitute for Ligado under the Cooperation Agreement, then the carefully balanced technical and geographic restrictions—*all* of them—needed to be preserved as against AST and be subject to meaningful enforcement. It would do Inmarsat no good to have the technical and geographic limitations that protect the viability of its multi-billion-dollar business apply only against Ligado where Ligado will become a non-operating intermediary for AST's business and where AST will operate dozens of satellites in comparison to one satellite for Ligado. In short, nothing in the Mediated Agreement reflects Inmarsat agreeing to relax the Cooperation Agreement's geographic limitations against AST in any respect.

---

[5] Indeed, the Mediated Agreement calls for Inmarsat to take *less* monetary consideration than it was otherwise entitled to receive under the Cooperation Agreement. It beggars belief that Inmarsat would agree to take less money in exchange for granting AST significantly better spectrum rights.

11.     In contending otherwise, the best AST can do is wildly distort the language of a footnote pertaining to the required limitations (including geographic restrictions) on Ligado or AST regulatory applications for an L-band network operating in North America. As Inmarsat understands the argument, because the restrictions pertain "solely" to the "initial" applications for L-band authority in North America, AST, by implication, is supposedly unrestricted as to operations it may propose under any *additional* regulatory applications, regardless what the Cooperation Agreement itself allows. But the footnote simply does not say that. It does not purport to alter the Cooperation Agreement. Nor could its language somehow override the express text elsewhere in the Mediated Agreement committing AST to the Cooperation Agreements' technical and geographic limits. That AST must resort to such a dubious approach— suggesting that Inmarsat surrendered one of its most important contractual rights through the unstated implications of a footnote about regulatory applications—only confirms that AST is trying to force Inmarsat to accede to terms to which the parties never agreed.

12.     The Court should direct AST to honor the terms to which it agreed so that the implementation of the Mediated Agreement, and, ultimately, confirmation of Ligado's reorganization plan, can move forward.

### JURISDICTION AND VENUE

13.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware, Inmarsat consents to entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments in connection herewith consistent with Article III of the United States Constitution.
Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory and legal predicates for the relief requested are section 105(a) of the
Bankruptcy Code, the Mediated Agreement Order, and the Mediated Agreement.

## BACKGROUND

**The Cooperation Agreement and L-Band Exclusive Use**

15.     Inmarsat and Ligado are in the business of "mobile satellite services," or "MSS,"
which refers to the transmission of satellite signals to mobile terminals, hand-held devices, or
other equipment that is transportable. Mobile satellite services are commonly used where there is
limited land-based infrastructure (*e.g.*, cell towers).

16.     Inmarsat was formed in 1979 to provide safety of life and other communications
services to ships traversing the oceans globally. Over time, Inmarsat has expanded its services to
airplanes and land-mobile customers.

17.     Today, Inmarsat still uses MSS to provide connectivity to (among other
customers) ships and airplanes. Inmarsat's largest customer is the U.S. government. Ligado uses
MSS to provide service to governmental emergency response operations, to customers involved
in remote monitoring, and for other "mission critical" applications. D.I. 348, at 19 n.11; D.I. 2
¶¶ 25 n.10, 27, 41; D.I. 349, at 24.

18.     Historically, Inmarsat and Ligado held rights to "thin slivers" of the highly
valuable "L-band" satellite spectrum, which they used to provide service to their customers. D.I.
348, at 19 n.11; D.I. 2 ¶ 25 n.10.

19.     In 2007, Inmarsat and Ligado signed the original "Cooperation Agreement," by
which Inmarsat would allocate to Ligado substantial, contiguous blocks of the two parties'
overlapping L-band spectrum rights in North America so that Ligado could launch a new, next

generation communications network. *Id*. ¶ 25. An Amended and Restated Cooperation Agreement was executed in 2010 (attached hereto as Exhibit B, the "Cooperation Agreement").

20.     The fundamental bargain reflected in the Cooperation Agreement is that, in exchange for Ligado gaining exclusive use of most of the L-band spectrum in North America for its planned network, Ligado provided Inmarsat with (1) substantial cash payments; and, most relevant for this motion, (2) exclusive use of the L-band spectrum *outside* North America.[6]

21.     The second part of Inmarsat's consideration—*i.e.,* the exclusive right to L-band spectrum outside North America—is captured in Exhibit L to the Cooperation Agreement. Exhibit L specifies which spectrum the parties will have the exclusive right to use and where, and defines the critical term "Exclusive Use," as follows:

> ***Exclusive Use*** means that, as between Inmarsat and [Ligado's predecessors] and in relation to a particular geographic area, only the Party with such Exclusive Use in that defined geographic area is permitted to operate any satellite beam in such area having its beam peak entirely within such area, or to provide service to customers in such area.

Cooperation Agreement, Ex. L, at L-12.

22.     Ligado's allocated spectrum in North America is divided into three "Tiers." Within each Tier, the parties agreed that Ligado would have Exclusive Use in certain defined North American "Regions."

23.     The parties also agreed, in Exhibit L, that Inmarsat would have Exclusive Use of the same spectrum in the three "Tiers" in certain other "Regions," essentially comprising the rest

---

[6] The Cooperation Agreement coordinated the parties' combined L-band spectrum rights, but other satellite operators have rights to use other portions of the L-band spectrum, as well as rights to use spectrum in other bands. The spectrum at issue in this motion is just one component of a much wider range of spectrum used by satellite operators to provide communications services in competition with one another.

of the world outside of North America. *See id.*, at Ex. L § 1.1(c). For example, in Tier 3, Inmarsat

has Exclusive Use in "Inmarsat Region A."

> Inmarsat is permitted to re-use Tier 3 Spectrum in the operation of
> its Coordinated Networks [satellites], provided that such re-use is
> carried out only within ***Inmarsat Region A*** and ***Inmarsat shall
> have Exclusive Use in such region for such purposes***.

*Id*. Ex. L § 1.1(c)(iii)(B) (emphasis added).

    24.    The parties defined "Inmarsat Region A" as the entire world outside the orange

boundary around North America:



*Id*. Ex. L, at L-15. The geographic separation—with Ligado using Tier 3 spectrum inside North

America, and Inmarsat using Tier 3 spectrum outside North America—provided for the parties to

use the spectrum efficiently without interfering with each other. The parties adopted similar

language, and roughly similar maps, for Tier 1 and Tier 2 spectrum, as well. *Id*. Ex. L

§§ 1.1(c)(i)(B), (c)(ii)(B).

25.     This coordinated arrangement was a critical component of the commercial bargain for Inmarsat because, as between Inmarsat and Ligado, Inmarsat's maritime and aviation businesses (among others) enjoy the exclusive use of L-band spectrum outside North America.

**Ligado's Bankruptcy and the Proposed AST Transaction**

26.     In January 2025, Ligado filed for bankruptcy. D.I. 1. A centerpiece of its pre-planned reorganization was a commercial transaction with AST, whereby Ligado would assume the Cooperation Agreement and transfer the "usage rights with respect to [Ligado] L-band MSS spectrum" to AST in exchange for cash payments and other consideration. D.I. 2 ¶ 15.

27.     Ligado's "first day" declaration attached a binding term sheet between AST and Ligado making clear that the proposed arrangement was, in essence, a complete sublease of Ligado's L-band rights: "Ligado will grant to AST the right to use Ligado's satellites, ground station assets and L-band Spectrum, including substantially all of the capacity on SkyTerra-1 [the only operational Ligado satellite] and any replacement or follow on satellite." D.I. 2, at 320. At the "first day" hearing Ligado's counsel explained that Ligado's MSS service was not "a self-sustaining business" and so AST was going to take over. D.I. 109, at 22:6-24:6.

28.     AST's aspiration is to build a new network of non-geostationary orbit ("NGSO") satellites that will utilize the L-band spectrum made available to Ligado via the Cooperation Agreement. D.I. 2, at 2. This will require regulatory approval, which, as Ligado's counsel explained, could take up to 40 months after plan confirmation to complete. D.I. 109, at 32:15-33:3.

29.     Notably, the AST-Ligado term sheet is clear that AST's access to Ligado's "L-band MSS spectrum usage rights" is "subject to *all* the technical, power, operational, legal, regulatory and other requirements and limitations in, the Viasat/Inmarsat Cooperation

Agreement." D.I. 2, at 320 (emphasis added); *see also id.* at 321 (stating that AST's network would be "using the L-band Spectrum in accordance with the parameters of the Cooperation Agreement"). In other words, even the AST-Ligado term sheet requires AST to honor Inmarsat's exclusive use of the L-band spectrum outside North America.

30.     AST and Ligado thereafter drafted definitive documents that, echoing their term sheet, make clear that AST will be fully taking over Ligado's L-band rights under the Cooperation Agreement and mandating AST's compliance with all of the Cooperation Agreement's terms. The Ligado-AST "Strategic Collaboration and Spectrum Usage Agreement" grants AST the "exclusive right to use the Ligado L-Band MSS Spectrum," subject to AST's "observance of the measures and actions deemed necessary by Ligado to remain in compliance in all material respects with . . . the applicable terms, conditions, limitations, operational requirements, and technical requirements . . . required to ensure Ligado remains in compliance with . . . the Cooperation Agreement." D.I. 359-3 § 2.1.

**Inmarsat Objects to the AST Transaction**

31.     When Ligado moved for Court approval of the AST transaction, Inmarsat objected. The Cooperation Agreement expressly prohibits assignments and delegations of rights or obligations, *see* Cooperation Agreement § 9.3, but the AST transaction would force Inmarsat to "cooperate extensively with third-party AST and its contemplated satellite system," while "remain[ing] in privity solely with Ligado" and thereby inhibiting Inmarsat's ability to hold AST to the geographic, technical and other limits of the Cooperation Agreement. D.I. 462 ¶ 3.

32.     At the time, Inmarsat—which had no seat at the table when the AST-Ligado deal was struck and no opportunity for due diligence on AST—was not convinced that AST's lofty ambitions could be realized within the parameters of the Cooperation Agreement. If Inmarsat was

going to be thrust into a partnership with AST, the objection explained, "Inmarsat's consent" was necessary, and Inmarsat would not consent unless it was "assured that Ligado and/or AST will promptly satisfy **all obligations**—monetary and otherwise—under the Cooperation Agreement." *Id*. ¶ 4 (emphasis added). Thus, Inmarsat position was quite clear: AST would have to comply with (among other things) Inmarsat's exclusive use of non-North American L-band spectrum under the Cooperation Agreement.

33.     Inmarsat also argued that Ligado and AST were, in effect, seeking an end-run around the assignment provisions of the Bankruptcy Code. Although Bankruptcy Code § 365(f) authorizes assignments of contracts notwithstanding anti-assignment clauses, that provision would require Ligado to assign the Cooperation Agreement *in full* to AST, so that AST would take on the Cooperation Agreement "*cum onere*," that is, subject to "*all* [its] benefits and burdens," and be in direct privity with Inmarsat. *Id*. ¶ 16 (emphasis added). But, again, the Ligado-AST proposal was for Inmarsat to coordinate spectrum with AST while having recourse only to Ligado to ensure compliance.

**Inmarsat, Ligado and AST Settle Their Differences In Mediation**

34.     At the Court's suggestion, Inmarsat, AST and Ligado agreed to mediate these and related issues before Judge Robert Drain (Ret.). D.I. 306, at 95:19-96:7 (transcript); D.I. 391 (Order).

35.     On June 13, 2025, AST, Ligado and Inmarsat notified the Court, via a revised proposed order approving the AST transaction, that they had reached agreement and that Inmarsat no longer objected to the AST transaction. D.I. 651. The parties at the same time submitted for the Court's approval of their Mediated Agreement, which was in the form of a detailed, binding term sheet. *Id*.

36.     On June 24, 2025, the Court issued an Order that authorized the AST transaction to go forward, and that further stated: "[T]he Mediated Agreement is approved in its entirety and the parties agree to perform in accordance with and be bound by the terms set forth therein." D.I. 692 ¶ 6. In the same Order, the Court "retain[ed] jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, including enforcement of the Mediated Agreement." *Id*. ¶ 13.

37.     The terms of the Mediated Agreement reflect the parties' efforts to satisfy Inmarsat's publicly-filed objections to the AST transaction—chiefly that it needed AST's full compliance with the Cooperation Agreement and direct recourse against AST to ensure that compliance.

38.     *First*, the Mediated Agreement provides that "AST and Inmarsat shall execute a separate binding agreement (the 'Inmarsat-AST Agreement') to give the parties the right to enforce directly against each other the commitments made to each other in Sections 2-3 hereof . . . . " *See* Mediated Agreement, pg. 1 n.5.

39.     *Second*, Section 2, in turn, provides that the regulatory applications for AST's proposed NGSO system will "state that the operations of **all** AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, ***will be consistent with and remain within the technical, geographic and other limitations*** in the Amended Inmarsat Cooperation Agreement." *Id.* § 2 (emphasis added).

40.     *Third*, Section 3 expressly incorporates the geographic limits in Cooperation Agreement Exhibit L, the source of Inmarsat's exclusive right to use L-band spectrum outside of North America. A violation of those rights is defined as a "Coordination Breach":

> The Amended Inmarsat Cooperation Agreement shall include a
> process for resolving any disputes about compliance with its

technical, **_geographic_** and other limitations, or any claims of interference. If, a Party is alleged to have breached the technical and/or geographic limitations of the Amended Inmarsat Cooperation Agreement in **_Exhibits_** B, C, **_L_**, M, N, T and U, (the "Cooperation Agreement Limits") and such breach is alleged to either (a) be caused by Inmarsat's operations, or (b) be caused by the operations of the Proposed NGSO System and/or the Ligado satellites (in either case, a "**_Coordination Breach_**,") . . . .

*Id.* § 3 (emphases added). Among other remedies in Section 3 is prompt access to injunctive relief for Coordination Breaches. *Id.* Section 3 thus indisputably contemplates that AST will be bound by Exhibit L, which contains Inmarsat's exclusive right to L-band spectrum outside North America.

41.    *Fourth*, Rider A again emphasizes the importance of the geographic and other limits under the Cooperation Agreement: "The Parties expressly agree that strict compliance with the **_geographic_**, power, out-of-band emissions and other limits set forth in this Agreement ('Cooperation Agreement Limits') is **_essential to the integrity of this Agreement_**." *Id.* at Rider A (emphasis added).

## AST Seeks to Rewrite the Settlement

42.    The parties have been unable to complete and execute the AST-Inmarsat Agreement, or the Amended Inmarsat Cooperation Agreement, because AST contends that it should be carved out of Inmarsat's Exclusive Use of L-band spectrum outside of North America—despite the lack of any suggestion along those lines in the Mediated Agreement itself.

43.    This stunning assertion was made plain in a markup from AST's counsel to the updated Exhibit L to the draft Amended Inmarsat Cooperation Agreement. AST added: "Notwithstanding anything else in this Agreement . . . AST's operations outside Ligado Region A and Mexico"—*i.e.*, North America—"are not restricted or prohibited by this Agreement":

> (iv)  Notwithstanding anything else in this Agreement, Inmarsat and AST acknowledge and agree that:
>
> (A)  With regard to Mexico, the technical requirements in this Agreement shall not apply to AST (or its Related Parties) except for their use of the Tier 1 Spectrum; and
>
> (B)  AST's operations (including in the L-band) outside of Ligado Region A and Mexico are not restricted or prohibited by this Agreement.
> ~~(B)~~

44.     In other words, AST proposed a radical change to the geographic restrictions in Exhibit L, even though there is *nothing* in the Mediated Agreement suggesting the parties agreed to make such a change.[7]

45.     Later, Inmarsat proposed to insert the following language from Rider A of the Mediated Agreement (modified as shown below) into the draft AST-Inmarsat Agreement:

> The Parties expressly agree that ~~strict compliance~~their operations shall strictly comply with the geographic, power, out-of-band emissions and other limits set forth in ~~this~~the Amended Cooperation Agreement ("Cooperation Agreement Limits")<u>, which</u> is essential to the integrity of this Agreement.

46.     But AST repeatedly refused to agree to Inmarsat's proposed language. In short, AST recognizes that "strict compliance" with the geographic limits is "essential" to the parties' agreements but will not actually agree to strictly comply with those limits.

## RELIEF REQUESTED

47.     Inmarsat seeks to compel AST to cooperate in drafting and to execute, as promptly as reasonably practical, the "Inmarsat-AST Agreement" contemplated by the Mediated

---

[7] This markup falls outside the mediation privilege, *see infra* ¶¶ 63-64, because once the Mediated Agreement was finalized and entered as an Order of the Court, Judge Drain's involvement ceased and, unlike with drafts of the Mediated Agreement, the parties did not label drafts of the Amended Inmarsat Cooperation Agreement as covered by the mediation privilege or provide drafts to Judge Drain.

Agreement, such that AST is bound by all the geographic, power, out-of-band and other limits set forth in the Amended Inmarsat Cooperation Agreement, including (without limitation) the geographic restrictions reflecting Inmarsat's "Exclusive Use," to the exclusion of AST or its affiliates, of the L-band spectrum outside North America, in accordance with the geographic boundaries and limits detailed in Exhibit L to the Amended Inmarsat Cooperation Agreement.

**ARGUMENT**

**I.     The Mediated Agreement Unambiguously Binds AST to the Cooperation Agreement's Geographic Limits**

48.     The impediment to implementing the Mediated Agreement is AST's stubborn insistence that the Mediated Agreement allows it to get the benefit of Ligado's Exclusive Use of the bulk of the relevant L-band spectrum *inside* North America without abiding by Inmarsat's Exclusive Use of the L-band spectrum *outside* of North America, as specified in Exhibit L of the Cooperation Agreement. This position is flatly wrong. The Mediated Agreement unambiguously binds AST (and Ligado) to *all* the technical and geographic restrictions of the Cooperation Agreement, including those in Exhibit L. As discussed above:

- The Mediated Agreement defines a Coordination Breach to include one party "breach[ing] the technical and/or *geographic limitations* of the Amended Inmarsat Cooperation Agreement in *Exhibit[]* . . . *L*." Mediated Agreement § 3 (emphases added).

- The Mediated Agreement requires AST to formally commit to the FCC (and to its Canadian counterpart) "that the operations of *all* AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit *will be consistent with and remain within the technical, geographic and other limitations* in the Amended Inmarsat Cooperation Agreement." *Id.* § 2 (emphases added).

- In Rider A, the parties "expressly agree that strict compliance with the *geographic*, power, out-of-band emissions and other limits set forth in this Agreement ('Cooperation Agreement Limits') is *essential to the integrity of this Agreement*." *Id*. at Rider A (emphases added).

Thus, the Mediated Agreement explicitly requires that AST comply with Exhibit L and contemplates no changes to the geographic limitations therein.

49.     There is no way to read these provisions except that the geographic limits in Exhibit L—including Inmarsat's Exclusive Use rights—are preserved and fully applicable to AST. And, under governing New York law, "[w]hen an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).[8]

50.     The context in which the Mediated Agreement arose only reinforces this conclusion. As discussed, Inmarsat originally objected to the AST Transaction because it was an attempt by AST and Ligado to essentially transfer to AST the benefit of the Cooperation Agreement, without ensuring that AST was subject to all the corresponding burdens. Particularly concerning for Inmarsat was the risk that AST's contemplated network would exceed the Cooperation Agreement's technical and geographic limitations and thereby materially disrupt a core segment of Inmarsat's own business—but Inmarsat would have no contractual privity with AST and thus a limited ability for prompt recourse.

---

[8] The Cooperation Agreement is governed by New York law, *see* Cooperation Agreement § 9.6, which means that the Mediation Agreement, which does not purport to change that clause, remains governed by New York law. *See, e.g., RGC Int'l Investors, LDC v. Ari Network Servs., Inc.*, 2004 WL 189784, at *3 (D. Del. Jan. 22, 2004) (concluding that "subsequent modification[s] . . . whether asserted as an amendment or as a separate contract, would still be governed by the choice of law provisions" of the original contract); *see also, e.g., Skaff v. Progress Int'l, LLC*, 2013 WL 5716177, at *3 (S.D.N.Y. Oct. 21, 2013) ("[B]ecause the Third Addendum contains no governing law clause, any obligations arising under it are covered by the original Merger Agreement's governing law clause"), *adopted in relevant part by*, 2014 WL 856521, at *4 (S.D.N.Y. Mar. 4, 2014); *Perry v. FleetBoston Fin. Corp.*, 2004 WL 1508518, at *2 n.2 (E.D. Pa. July 6, 2004) (applying original choice-of-law clause to contract amendment). Regardless, this motion is based on basic contract law precepts that do not vary across jurisdictions. *See, e.g., In re Promise Healthcare Group*, LLC, 2024 WL 1925902, at *6 (Bankr. D. Del. May 1, 2024) ("Where the contract itself is unambiguous, the Court's obligation is simply to enforce it according to its terms.") (applying Delaware law).

51.     Section 3 of the Mediated Agreement squarely addresses these concerns by creating a direct enforcement mechanism against AST. That enforcement mechanism repeatedly refers to the technical and geographic limitations of the Cooperation Agreement, and explicitly calls out the geographic limitations in Exhibit L. And the Mediated Agreement nowhere contemplates any changes to the relevant limitations in Exhibit L or suggests any exception to AST's agreement to be bound by Exhibit L.

52.     Inmarsat also objected to the AST Transaction on the related ground that it was an end-run around Bankruptcy Code §365(f). That sub-section requires that, if Ligado is to assign the Cooperation Agreement to AST, it must assign the *whole* agreement, including the obligation to be bound by Inmarsat's Exclusive Use rights to the non-North American L-band spectrum. *In re Thornhill Bros. Fitness, L.L.C.*, 85 F.4th 321, 326 (5th Cir. 2023) (holding that the "all-or-nothing assignment rule under § 365(f)" means that "a debtor assuming an executory contract cannot try to "separate the wheat from the chaff" or otherwise "assign a fraction of a contract"). Again, Inmarsat aggressively sought to protect—not abandon—its key contractual right to exclusive non-North American L-band spectrum. Given Inmarsat's consistent efforts to invoke its rights under §365(f) to protect its exclusive L-band spectrum outside North America, one would expect that any abandonment of those rights would be stated clearly and directly in the Mediated Agreement. Yet there is no hint that, in an agreement designed to allow Inmarsat to enforce the Cooperation Agreement against AST, Inmarsat gave up the ability to enforce one of its most important rights. To the contrary, the Mediated Agreement explicitly binds AST to Exhibit L and contemplates no change to Exhibit L's scope.

## II.     AST Gravely Misreads the Mediated Agreement

53.     In an effort to radically change the bargain, and to erase Inmarsat's L-band exclusivity outside North America, AST has gravely misread certain language in a footnote in

Section 2 of the Mediated Agreement, relating to AST's contemplated satellite system to be operated in North America. In sum, Section 2 sets forth various commitments that Ligado and AST agree to make in their initial applications for regulatory approval to the FCC and to its Canadian counterpart, ISED, so that, in exchange, Inmarsat supports those initial applications (and *only* those initial applications). Mediated Agreement § 2. Among other things, Ligado and AST have committed to include in their regulatory applications (i) a range of restrictions to ensure compliance with the Cooperation Agreement for purposes of the L band, and (ii) other restrictions to avoid conflict with Inmarsat's other spectrum rights around the world. *Id*. § 2 & n.7. The L-band restrictions include expressly committing to the FCC and ISED that "the operations of all AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement . . . ." *Id*. § 2. These provisions are quite obviously important: Inmarsat needs precise details about the contemplated regulatory applications so that it can be comfortable with its return commitment to support them.

54.     As best Inmarsat understands AST's argument, because the footnote in Section 2 refers to certain matters that must be included "solely" in the "initial" regulatory applications— one of which is that the applications be "limited to Ligado's geographic coverage areas in North America specified in Exhibit L"—then, by implication, AST is unrestricted as to operations it may seek to conduct under any *additional* regulatory applications, regardless of what the Cooperation Agreement says. *Id*. § 2 n.7. This reading stretches the words in the footnote beyond what they can plausibly bear.

55.     In context, the footnote provides:

Ligado and AST will provide Inmarsat with the redacted FCC and ISED applications for a proposed non-geostationary satellite orbit satellite system ***to be operated in the L-Band in North America (***the "Proposed NGSO System")[7]

> [7]***Solely with respect to the initial FCC and ISED applications for the Proposed NGSO System, such applications shall***: (a) consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement, state that use of the L-Band by the Proposed NGSO System will comply with the Amended Inmarsat Cooperation Agreement, (b) ***with respect to the L-Band***, ***be limited to Ligado's geographic coverage areas in North America specified in Exhibit L*** and Ligado's Spectrum assignments in the then-operative Spectrum Plan, (c) not include any S-band operations in the coverage area of the Inmarsat S-band network over Europe and North Africa, (d) not include service links or feeder links in the Ku-band or the Ka-band, and (e) provide that AST/Ligado and Inmarsat/Viasat will coordinate the Proposed NGSO System feeder links with any Inmarsat or Viasat NGSO system, provided that such Proposed NGSO System feeder links are in the same frequency band as Inmarsat/Viasat feeder links. For the avoidance of doubt, the foregoing does not prohibit the initial FCC and ISED applications from requesting authority for other MSS, IMT-terrestrial or feeder link frequency bands or international operations and provision of service in those other bands.

*Id*. § 2 n.7 (emphases added).

56.     Contrary to AST's arguments, the language in the footnote is perfectly consistent with Inmarsat maintaining its geographic exclusivity. After all, the footnote relates to applications for authority to operate in North America, and expressly states AST's NGSO system "will comply" with the Cooperation Agreement "consistent with Inmarsat's exclusive rights vis-à-vis Ligado" (*i.e.*, "consistent with" the Exclusive Use provision "specified in Exhibit L"). *Id*. Nothing about requiring AST to comply with Exhibit L in its initial application suggests that AST is free to otherwise *ignore* Exhibit L. That is especially true given that, as discussed, elsewhere in the Mediated Agreement, AST explicitly agreed that it *would always* comply with Exhibit L. Even the initial applications must "state that the operations of ***all*** AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, ***will be consistent with and remain***

within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement." *Id.* § 2 (emphasis added). Inmarsat did not bargain for AST to commit to regulators that "all" the AST satellites would "remain" within the Cooperation Agreement limits while retaining the option to renounce that commitment later.

57.     The phrasing AST has seized upon and distorted ("solely"/"initial") is most germane to the listed items in the footnote that are not ongoing and binding commitments under the Cooperation Agreement (subsections (c), (d), and (e)), which relate to other frequency bands (including S-band, Ku-band, Ka-band) that are not addressed by the Cooperation Agreement all. The phrasing at issue makes clear that the *Mediated Agreement itself* is not a barrier to AST pursuing approval in those frequency bands beyond what it agreed not to pursue in the initial one. But the footnote simply does not speak to whatever other impediments (whether by contract, regulation or otherwise) may exist for purposes of subsequent applications. If the parties intended the footnote to mean that Inmarsat consents to, or waives all future objections to, AST operating in particular frequency bands and geographies, words to that effect would have been included. But they are not.

58.     Further, AST's proposed reading proves too much: among the things that AST and Ligado must state "solely" in their "initial" application is that the AST network "will comply with the Amended Inmarsat Cooperation Agreement." *Id.* § 2 n.7.  But no-one can credibly read the Mediated Agreement to mean that the Cooperation Agreement—which runs through the year 2107—becomes a dead letter once AST decides to file a second regulatory application. Again, if the Mediation Agreement's footnote was intended to bring about a fundamental alteration of the parties' spectrum usage rights, it would have said so.

59. Put simply, the footnote language requiring compliance with Exhibit L in the initial application is consistent with—and certainly does not change—clear commitments elsewhere in the Mediated Agreement *categorically* binding AST to the geographic limits of the Amended Inmarsat Cooperation Agreement, including those in Exhibit L. *See* Mediated Agreement § 3 (defining a "Coordination Breach" as "breach[ing] the technical and/or geographic limitations of the Amended Inmarsat Cooperation Agreement in Exhibits B, C, L, M, N, T and U"); *id.* Rider A (describing "strict compliance with the geographic, power, out-of-band emissions and other limits" as "essential to the integrity" of the Amended Inmarsat Cooperation Agreement).

60. The Court should enforce the plain text of the Mediated Agreement and should reject AST's interpretation as incompatible with the Mediated Agreement's unambiguous terms.

## III. AST Cannot Rewrite The Unambiguous Terms of the Mediated Agreement With Extrinsic Evidence

61. With no textual support for their position, AST may try to offer extrinsic evidence to suggest the Mediated Agreement means something other than what it actually says. The Court should reject out of hand any effort to do so, for at least two reasons.

62. *First,* where, as here, a "contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. l993) (applying New York law, which applies here, *supra* n.8). The relevant provisions of the Mediated Agreement are crystal clear and must be enforced as written.

63. *Second,* based on the "strong policy in promoting full and frank discussions," the federal mediation privilege and Local Rule 9019–5(d) categorically prohibit disclosing communications made in connection with a mediation. *In re Tribune Co.*, 2011 WL 386827, at *8

(Bankr. D. Del. Feb. 3, 2011); *see also Sampson v. School Dist. of Lancaster*, 262 F.R.D. 469, 475

n.4 (E.D. Pa. 2008) (federal mediation applies in cases in federal court where federal claims are

asserted); *Sheldone v. Pennsylvania Turnpike Comm'n*, 104 F. Supp. 2d 511, 517 (W.D. Pa. 2000)

(federal mediation privilege covers "all written and oral communications made in connection

with" a mediation). Since the Mediated Agreement was negotiated with the assistance of Judge

Drain, who was copied on drafts and regularly consulted during the negotiation process, any

discussions, interim drafts and other purported items of extrinsic evidence are categorically

protected from disclosure. *See*, *e.g.*, *Sandoz Inc. v. United Therapeutics Corp.*, 2021 WL 5122069

(D.N.J. Nov. 2, 2021) (enforcing mediation privilege in similar circumstances).

64.    Inmarsat is confident that no extrinsic evidence reflects it ceding its exclusivity

rights, and the best proof of that is the lack of anything along those lines in the Mediated

Agreement itself.[9]  But AST is nonetheless not permitted to try to engender confusion on these

issues, or to try change the meaning of the Mediated Agreement, by violating the sacrosanct

confidentiality of mediation. *See*, *e.g.*, *Kurtin v. Elieff*, 215 Cal. App. 4th 455, 469-70 (Cal. App.

4 Dist. 2013) (mediation privilege precluded "evidence from the mediation" that one side claimed

would inform the meaning of "ambiguities in the settlement agreement").

65.    At bottom, the Court can and should enforce as written the unambiguous terms to

which the parties agreed.

---

[9] Indeed, the terms of the Mediated Agreement are the only objective manifestation of the parties'
intent. As Justice Holmes observed: "[T]he making of a contract depends not on the agreement of
two minds, in one intention, but on the agreement of two sets of external signs—not on the
parties' having *meant* the same thing but on their having *said* the same thing."  Holmes, The Path
of the Law, in Collected Legal Papers 178, as quoted by Judge Friendly in *Frigaliment Importing
Co. v. B. N. S. International Sales Corp.*, 190 F. Supp. 116, 117 (S.D.N.Y. 1960).

## NOTICE

66.     Notice of this motion has been given to all parties requesting notice in the above-captioned proceedings via the Court's CM/ECF system. Inmarsat submits that such notice is sufficient and that no other or further notice need be provided.

## CONCLUSION

For the stated reasons, the Court should grant Inmarsat's motion and, consistent with the enclosed Proposed Order, compel AST to cooperate in drafting and to execute, as promptly as reasonably practical, the "Inmarsat-AST Agreement" contemplated by the Mediated Agreement, such that AST is bound by all the geographic, power, out-of-band and other limits set forth in the Amended Inmarsat Cooperation Agreement, including (without limitation) the geographic restrictions reflecting Inmarsat's "Exclusive Use," to the exclusion of AST or its affiliates, of the L-band spectrum outside North America, in accordance with the geographic boundaries and limits detailed in Exhibit L to the Amended Inmarsat Cooperation Agreement.

Dated: August 14, 2025

STEPTOE LLP

By: */s/ Alfred M. Mamlet*
    Alfred M. Mamlet (admitted *pro hac vice*)
    1330 Connecticut Ave NW
    Washington, DC 20036
    (202) 429-3000
    amamlet@steptoe.com

    Charles Michael (admitted *pro hac vice*)
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    cmichael@steptoe.com

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Laura Davis Jones*
    Laura Davis Jones (DE Bar No. 2436)
    Timothy P. Cairns (DE Bar No. 4228)
    919 N. Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, DE  19899-8705
    (302) 652-4100
    ljones@pszjlaw.com
    tcairns@pszjlaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Benjamin Finestone*
Benjamin Finestone
295 5th Avenue,
New York, NY 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 2010
Austin, TX 78701
(737) 667-6100
matthewscheck@quinnemanuel.com

*Counsel for Inmarsat Global Limited*