# **Exhibit I**

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3                                    .  Chapter 11
     IN RE:                           .  Case No. 25-10006 (TMH)
 4                                    .
     LIGADO NETWORKS LLC,             .  (Jointly Administered)
 5   et al.,                          .
                                      .  Courtroom No. 7
 6                                    .  824 North Market Street
                                      .  Wilmington, Delaware 19801
 7             Debtors.               .
                                      .  Tuesday, January 27, 2026
 8   . . . . . . . . . . . . . . . .  .  2:00 p.m.

 9                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE THOMAS M. HORAN
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:        Andrew Leblanc, Esquire
                             MILBANK LLP
13                           1850 K Street, NW
                             Suite 1100
14                           Washington, DC 20006

15   For Inmarsat:           Benjamin Finestone, Esquire
                             QUINN EMANUEL URQUHART
16                             & SULLIVAN LLP
                             295 Fifth Avenue, 9th Floor
17                           New York, New York 10016

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:         Ian Willoughby, ECRO

21   Transcription Company:  Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

```
1   APPEARANCES (Continued):

2   For AST SpaceMobile:      Madlyn Primoff, Esquire
                              FRESHFIELDS
3                             3 World Trade Center
                              175 Greenwich Street, 51st Floor
4                             New York, New York 10007

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                    <u>INDEX</u>

2    <u>BENCH RULING</u>:                                                    <u>PAGE</u>

3        Debtors' Motion for an Order (I) Enforcing          5

4        the Automatic Stay, (II) Enforcing the
         Mediated Agreement, and (III) Granting

5        Related Relief [Docket No. 1220] and (ii)
         the Emergency Motion by AST & Science LLC

6        for Entry of an Order Enforcing the Mediated
         Agreement and Related Orders of this Court

7        Against Inmarsat Global Limited [Docket No.
         1221]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 2:00 p.m.)

 2              THE COURT:  Good afternoon, counsel. This is Judge

 3    Horan.

 4              We are on the record in Ligado. The purpose of

 5    this hearing today is for me to deliver my ruling on the

 6    pending motions by the debtors and AST regarding the

 7    litigation with Inmarsat in the New York State Court.

 8              Before I begin my ruling I just want to ask: Is

 9    there anybody who is going to wish to be heard?

10         (No verbal response)

11              THE COURT:  Is there anything that I should be

12    aware of before I begin my ruling?

13              MR. LEBLANC:  Your Honor, Andrew Leblanc of

14    Milbank on behalf of Ligado.

15              Nothing from the debtors, Your Honor.

16              THE COURT:  Okay.

17              MR. FINESTONE:  Your Honor, Ben Finestone, Quinn

18    Emanuel, on behalf of Inmarsat.

19              I don't know whether this qualifies or not but the

20    debtors did file a notice of removal of the New York State

21    Court action about a week ago, January 20th, I think.  So,

22    that action currently -- and then after it went to the

23    Southern District of New York pursuant to the automatic order

24    of referral. It was referred down to the bankruptcy court.

25    No, action other then that has been taken but just wanted
```

1    Your Honor to be aware of that.

2              THE COURT:  Okay.  Thank you, Mr. Finestone.

3              Okay.  I am going to --

4              MR. LEBLANC:  And, Your Honor, I can confirm for

5    the Court, as I have mentioned, we had our filing -- we will

6    shortly file a motion to transfer venue depending on the

7    outcome of this hearing.

8              THE COURT:  Okay.  I am going to offer my

9    apologies from the outset, its going to be long.  I didn't

10   have time to write a short ruling.  So, its going to be a

11   long ruling but stick with me.

12             On January 5th the debtors commenced these cases

13   with the goal of a restructuring that was predicated on an

14   RSA negotiated between the debtors and holders of certain of

15   their prepetition funded debt.  A critical component of the

16   restructuring contemplated in this Court is a long-term

17   commercial transaction between the debtors and the AST

18   entities.  The debtors hold licenses from the FCC authorizing

19   use of the L-band spectrum and those licenses constitute

20   property of the debtors estates and represent their principal

21   assets for purposes of reorganization.

22             Since 2010, Ligado and Inmarsat have been parties

23   to an amended and restated cooperation agreement which

24   addresses coordination of the respective rights of the

25   parties to use portions of the L-band spectrum, including

1    providing technical, geographic, and power limitations to

2    prevent harmful interference between the parties satellite

3    operations. The cooperation agreement was originally executed

4    in 2007 and resolved prior disputes between the parties.  The

5    cooperation agreement contains detailed technical provisions

6    in multiple exhibits.

7         From 2007 through the date of the commencement of

8    these cases, the cooperation agreement addressed coordination

9    for GSO satellites, which are satellites that remain in fixed

10   positions relative to the earth. And as of the petition date

11   only one operational Ligado GSO satellite was covered by the

12   coordination provisions of the agreement.

13        Under the AST transaction, Ligado agreed to

14   provide AST with usage rights with respect to the L-band

15   spectrum rights and related assets and to collaborate with

16   AST to commercialize L-band spectrum rights.  Its

17   contemplated that AST will deploy NGSO satellites in

18   connection with this transaction.

19        The transaction provides that Ligado will place an

20   L-band payload onto AST satellites with Ligado maintaining

21   operational control over the payload and ultimate control

22   over the use of the L-band spectrum.  In exchange for those

23   rights, AST has agreed to provide Ligado significant

24   compensation.

25        On March 22nd, 2025, Ligado filed a motion asking

1   this Court to approve entry into the AST transaction that I
2   described earlier.  Inmarsat objected.  And under a March
3   31st, 2025 order, this Court appointed a mediator.  The
4   parties engaged in mediation before Judge Drain.  And after,
5   what I understand to have been, months of extensive mediation
6   the parties reached a comprehensive resolution of all issues
7   between the debtors, AST and Inmarsat.
8           The settlement was memorialized in a mediated
9   agreement dated June 10th, 2025.  Under that agreement, AST
10  agreed to pay Inmarsat in excess of $500 million in three
11  separate installments with the first installment of $420
12  million being due late last year.  In exchange for this
13  consideration, Inmarsat consented to the AST transaction and
14  agreed to provide regulatory support in support of
15  applications to the FCC and the ISED.
16          Section II of the mediated agreement provides in
17  relevant part that Ligado and AST will provide Inmarsat with
18  the redacted FCC and ISED applications.  And that the
19  applications will expressly state the operations of all AST
20  and Ligado spacecraft individually and taken as a whole and
21  regardless of orbit will be consistent with or remains within
22  the technical, geographic, and other limitations in the
23  amended Inmarsat cooperation agreement and Ligado's other
24  coordination agreements with various parties.  And will
25  request that the FCC and ISED recognize that the operations

1    of the proposed NGSO system have been coordinated, subject to

2    the terms of the amended Inmarsat cooperation agreement and

3    the Inmarsat AST agreement and give effect to such agreements

4    by licensing the proposed NGSO system to operate in

5    accordance with the terms of such agreements.  And provided

6    that the application meets the two conditions, Inmarsat shall

7    affirmatively support the initial regulatory application

8    seeking authority to operate the proposed NGSO system within

9    the L-band in North America.

10           Footnote 8 of Section II of the mediated agreement

11   states that the applications will not be more granular in

12   respect of Prong II and the amended Inmarsat cooperation

13   agreement shall not be submitted to the FCC with the initial

14   applications or comments.  And Inmarsat and Viasat shall

15   promptly refer any specific requests by the FCC for the

16   agreement or any portion thereof to Ligado.  The mediated

17   agreement further provides that Ligado and AST had already

18   provided certain due diligence materials requested by

19   Inmarsat to evaluate the technical parameters of the proposed

20   NGSO system.

21           There is a proposed resolution or, I should say,

22   there is an expedited dispute resolution process included.

23   And Section V of the mediated agreement provides that the

24   parties are entitled to seek specific performance of

25   Inmarsat's regulatory support obligations. The mediated

1 | agreement contemplated the parties would execute two

2 | definitive agreement.  In it, an amended Inmarsat cooperation

3 | agreement and the Inmarsat AST agreement.

4 | Footnote 5 of the mediated agreement states that

5 | the Inmarsat/AST agreement would give the parties the right

6 | to enforce directly against each other the commitments made

7 | to each other in connection with any alleged coordination

8 | brief.

9 | Footnote 6 to the mediated agreement provides that

10 | Sections II through IV of the mediated agreement would be

11 | incorporated into the amended Inmarsat cooperation agreement.

12 | On June 23rd, 2025, this Court held a hearing on

13 | the AST transaction motion and the mediated agreement.  At

14 | the hearing, Inmarsat's counsel urged approval and following

15 | the hearing, this Court entered its order authorizing the

16 | debtors to enter into the AST definitive documents.

17 | Paragraph 6 of the AST order provides the mediated

18 | agreement is approved in its entirety and the parties agree

19 | to perform in accordance with and to be bound by the terms

20 | set forth therein.

21 | Paragraph 7 of the AST order provides that debtors

22 | and Inmarsat are authorized to enter into an amendment to the

23 | Inmarsat cooperation agreement on terms consistent with the

24 | terms of this order including for avoidance of doubt the

25 | mediated agreement.

1          The parties began discussions regarding the terms

2    of the amended Inmarsat cooperation agreement before the

3    mediated agreement was finalized and Ligado circulated a

4    draft, second amended and restated cooperation agreement.

5    The draft included a list of exhibits that would need to be

6    updated to address NGSO operations.  And I understand that

7    there were multiple calls among engineers and regulatory

8    personnel to address technical and coordination provisions.

9          On August 14th, 2025, Inmarsat filed this motion

10   for entry of an order enforcing and implementing the mediated

11   agreement and in that motion, Inmarsat sought an order

12   requiring Ligado and AST to incorporate new language

13   addressing operations outside North America.  Ligado also

14   filed a cross motion to enforce.  Held a hearing on that

15   motion.  There was extensive colloquies with the parties and

16   in the end, I ordered that the parties should simply go ahead

17   and incorporate the language that they had agreed to in the

18   mediation.

19         After that, consistent with the Court's

20   instructions, AST and Inmarsat executed their agreement.  The

21   agreement incorporates the language of Section II and III of

22   the mediated agreement verbatim by attaching the mediated

23   agreement as Exhibit 1 and providing that the parties agree

24   to perform. The parties have the right to enforce directly

25   against each other certain commitments made in the mediated

1    agreement.  And Ligado and Inmarsat executed a further

2    amended cooperation agreement.

3              On September 8th, 2025, the debtors filed their

4    amended Chapter 11 plan.  Article 5(b)(6) identified, as the

5    restructuring transaction, the exaction, delivery, and/or

6    performance of any applicable obligations or requirements of

7    the debtors set forth in the AST definitive documents and

8    order.  And the plan further goes on to detail the effect of

9    the AST transaction.

10             I entered a revised findings of fact, conclusions

11   of law and order confirming the plan.  The confirmation order

12   provides that the plan would not become effective until all

13   the conditions in the plan have been satisfied or waived.

14   And it further provides that for the survival of the AST

15   definitive agreements order, which approved the mediated

16   agreement, the effective date of the plan has not yet

17   occurred because the debtors are seeking the appropriate

18   approvals from the FCC and ISED that will be required in

19   order to become effective.  And the debtors remain as

20   debtors-in-possession while in this post-confirmation pre-

21   effective date period.

22             The debtors made a payment, in October, of $420

23   million with the funds provides by AST to the debtors in

24   accordance with the definitive documents between the parties

25   and Inmarsat accepted and retained that $420 million payment.

1    Shortly after plan confirmation, Ligado provided

2    Inmarsat with the first draft of its proposed FCC application

3    and it became apparent that there was a disagreement about

4    whether coordination had, in fact, been made in accordance

5    with the documents.

6    Viasat, which is Inmarsat's parent company, filed

7    a comment letter with the FCC relating to the application of

8    a third-party, Planet Labs, to allow certain of Planet Labs

9    satellites to communicate in the L-band with Inmarsat

10   satellites.  And in a November 21st, 2025 letter, Viasat

11   stated that Ligado and AST had not coordinated regarding the

12   NGSO L-band operations.

13   On December 8th, Ligado filed its application with

14   the FCC and the FCC application was filed by Ligado as the

15   sole applicant because Ligado is the party licensed by the

16   FCC to use the L-band spectrum was seeking to modify its

17   existing satellite license. The FCC application seeks to

18   modify Ligado's current satellite license to operate in the

19   L-band.  And it contains the statements, substantially in the

20   form that were required by Section II of the mediated

21   agreement.  AST submitted a letter supporting the application

22   and stating that AST would be partnering with Ligado.

23   In December, shortly after Ligado filed the FCC

24   application, Inmarsat filed its complaint in the Supreme

25   Court of the State of New York in New York County.  Inmarsat

1  did not seek stay relief before seeking relief from -- I'm

2  sorry, before filing the complaint.  In the complaint,

3  Inmarsat alleges that AST and Ligado breached their

4  obligations into the mediated agreement by not coordinating

5  the operations of the proposed NGSO systems with Inmarsat

6  before the FCC application.

7          AST and Ligado responded by writing letters to

8  Inmarsat, informing Inmarsat of their view that the filing of

9  the complaint constituted a breach of Inmarsat's regulatory

10  support obligations under the mediated agreement and

11  demanding that Inmarsat withdraw the complaint, which

12  Inmarsat has not done.

13          Ligado and AST each filed motions seeking to

14  enforce the motions that are the subject of today's ruling

15  and both motions invoke this Court's retained jurisdiction

16  under Paragraph 13 of the AST order.  I held a hearing on

17  this several weeks ago and this is my ruling:

18          I do have jurisdiction over this matter and I do

19  find that this is a core proceeding because it concerns the

20  administration of the estate and the use of property.  This

21  Court expressly retained jurisdiction in various orders with

22  respect to all matters arising from or relating to the

23  implementation, interpretation and enforcement of those

24  orders, including enforcement of the mediated agreement.

25  That explicit retention of jurisdiction is valid and

1    enforceable.  The present dispute, in my view, concerns

2    interpretation and enforcement of the mediated agreement,

3    which was approved by this Court, and falls within this

4    Court's retained jurisdiction.

5            Section 362, of course, provides that the filing

6    of a bankruptcy petition operates as a stay of various acts

7    as to property of the estate.  Here, the plan that has been

8    confirmed expressly provides that the property does not vest

9    in the debtor until the effective date. It provides that all

10   injunctions or stays in the effect in the Chapter 11 cases

11   shall remain in full force and effect until the effective

12   date.  And because the effective date has not occurred yet,

13   property of the debtors estates remains protected by the

14   automatic stay.

15           The FCC licenses remain property of the estate as

16   does the mediated agreement which was negotiated and executed

17   during the bankruptcy case approved by an order of this Court

18   and it provides, of course, framework for the debtors to

19   monetize their principal assets.

20           Section 362(a)(3) states that any act to obtain

21   possession of property of the estate or property from the

22   estate or to exercise control over the property of the estate

23   is stayed.  The Inmarsat complaint, in New York, seeks a

24   declaration regarding the parties rights and obligations

25   under the mediated agreement and seeks other injunctive and

1   monetary relief.

2          I do find that such -- that seeking such relief

3   constitutes an attempt to control -- exercise control over

4   property of the estate within the meaning of Section

5   362(a)(3).  Permitting Inmarsat to litigate the parties

6   rights under the mediated agreement in State Court would

7   interfere with this Court's administration of the estate and

8   frustrate the plan's implementation.

9          And while 362(a)(1) generally only applies to

10  prepetition claims, the issue here is 362(a)(3) which is

11  different.  And while the complaint nominally asserts post-

12  petition contractual claims, these claims derive entirely

13  from agreements that resolved a dispute arising during the

14  bankruptcy case were approved by a bankruptcy court order,

15  are incorporated into the confirmed plan and concern

16  disposition of estate property.

17         The -- Inmarsat argues that Section 959 applies

18  here and that this is not an issue of the automatic stay.

19  And while 28 U.S.C. 959(a) permits suits against debtors-in-

20  possession with respect to any of their acts or transaction

21  in carrying on business connected with such property, this

22  exception is subject to the general equity power of the

23  bankruptcy court.

24         Section 959 was intended to permit suits

25  concerning ordinary business operations without requiring

1  parties to seek stay relief for routine matters.  This action

2  does not concern ordinary business operations.  It seeks to

3  adjudicate the parties rights under the court approved

4  mediation agreement that resolved fundamental objections to

5  what would ultimately be a reorganization plan.  It concerns

6  the ability to consummate its plan.  And where, as here, a

7  bankruptcy court is expressly provided jurisdiction to

8  enforce an agreement, Section 959 does not provide an

9  independent basis for parallel litigation in another forum.

10        Critically, Section 959 doesn't displace Section

11  362(a)(3)'s prohibition on acts to exercise control over

12  state property.  Those provisions serve different purposes

13  and Section 959 cannot be read to nullify the stay's

14  protections for core bankruptcy agreements but even if the

15  automatic stay did not apply and 959 applied, Section 959

16  affords a bankruptcy court a great deal of discretion.  And

17  for the reasons that I described, such as the absolutely

18  critical nature of the FCC licenses and the mediated

19  agreement to the bankruptcy estates and the go forward

20  business that would be implemented under a plan that would be

21  effective, I, likewise, would exercise that discretion under

22  959 to bar the New York action from going forward.

23        AST argues that the stay should be extended to

24  them. Its an unusual -- or I should say, an extraordinary

25  remedy to extend the automatic stay to a non-debtor third

1  party but where there is such an identity of interest

2  existing between the debtor and non-debtor such that the

3  debtor would be the real party in interest and litigation

4  would directly affect the debtors assets or ability to

5  reorganize, the stay can be extended.

6          AST is funding the vast majority of the payments

7  under the transaction which is the center place of the plan.

8  So, for that reason I do find that AST and Ligado share an

9  identity of interest in obtaining the regulatory approvals.

10 And the New York State action, if successful, would directly

11 impact the debtors ability to consummate their plan by

12 creating regulatory uncertainty or opposition that could

13 cause denial of the FCC application.  So, the stay,

14 therefore, is properly extended to protect AST from

15 litigation that would have an immediate adverse effect on the

16 debtors estates.

17         Actions taken in violation of the automatic stay,

18 or course, are *void ab initio*.  And this Court has authority

19 to void the New York State action or, alternatively, to

20 enjoin Inmarsat from prosecuting it further but dismissal is

21 appropriate whereas here the claims asserted in the State

22 Court fall within the Court's retained jurisdiction and the

23 plaintiff filed without seeking stay relief despite knowledge

24 of the proceeding.

25         Inmarsat has argued that a contested matter was

1  not the appropriate vehicle for determination of this dispute

2  and that an adversary proceeding is required; however, under

3  Rule 7001(g) an adversary proceeding isn't required where the

4  relief sought is provided in a Chapter 11 plan.  And I do

5  find that that is the circumstance here and that the relief

6  that would be enforced here was enforced under a plan and,

7  therefore, does not require an adversary proceeding.

8          (Pause)

9              THE COURT:  So -- sorry, give me just one moment.

10             Okay.  Section 2 of the mediated agreement

11  establishes two conditions precedent that require Inmarsat's

12  regulatory support obligations.  The first requires that the

13  FCC applications state that the operations will be consistent

14  with and remain within the technical, geographic, and other

15  limitations in the amended Inmarsat cooperation agreement,

16  and condition 2 requires that the FCC application requests

17  that the FCC recognize that the operations of the proposed

18  NGSO system have been coordinated subject to the terms of the

19  amended Inmarsat cooperation and the Inmarsat AST agreement.

20             So, this language requires a statement that

21  coordination exists under and pursuant to these agreements,

22  but not that some additional coordination process beyond the

23  agreement's terms has been completed.

24             Footnote 8 to Section 2 expressly states the

25  applications will not be more granular in respect of the

1   prong 2 that I described earlier, and this provision directly

2   refutes any argument that the FCC application must contain

3   detailed technical specifications or elaborate coordination

4   documentation beyond the statements required by condition 2.

5   If additional detailed coordination were required as a

6   condition precedent, that provision of Footnote 8 would be

7   rendered meaningless.  So, Inmarsat's interpretation that

8   extensive additional coordination must occur before the FCC

9   application can be filed is irreconcilable with the parties'

10  explicit agreement that the application will not be more

11  granular.

12          The mediated agreement also does not state that

13  the parties must negotiate or complete additional technical

14  exhibits before filing the FCC application, and it doesn't --

15  the mediated agreement does not condition Inmarsat's

16  regulatory support on Inmarsat's subjective satisfaction that

17  coordination has been sufficient.

18          By executing the amended Inmarsat cooperation

19  agreement and the Inmarsat AST agreement, AST and Ligado

20  committed that operations of the proposed NGSO system would

21  comply with the cooperation agreement's terms, and these

22  limitations apply to satellite operations regardless of

23  whether the satellites are GSO or NGSO; the protections

24  against harmful interference apply equally to both types of

25  operations.

1              The FCC application accurately states that
2    operations will be consistent with and remain within the
3    technical, geographic, or other limitations of the amended
4    Inmarsat cooperation agreement, satisfying condition 1, and
5    requests that FCC recognition that operations have been
6    coordinated, satisfying condition 2; therefore, both
7    conditions have been satisfied.
8              Inmarsat has argued that the FCC application was
9    improperly done because Inmarsat -- rather, AST and Ligado
10   are not joint applicants, but under the applicable FCC
11   regulations only the licensee, which here is Ligado, can
12   apply to modify its license.  AST's public letter of support
13   filed with the FCC achieves the purpose of having both
14   entities on record supporting the proposed NGSO system.  So,
15   Inmarsat's assertion that joint filing was required has no
16   support, neither the mediated agreements -- or in the
17   mediated agreements' text and cannot be implied where the
18   parties did not include such requirement, and they couldn't
19   have required that the parties file jointly because only
20   Ligado as the licensee can file that application.
21             Inmarsat has argued that the mediated agreement
22   has been superseded by other post-petition contracts, but I
23   find that position to be without merit because the mediated
24   agreement is incorporated by reference into the post-petition
25   agreements, and the confirmation order provides for the

1    survival of the AST order which approved the mediated

2    agreement and, therefore, it remains enforceable.

3              So, I find here that specific performance is

4    warranted.  Under both Delaware and New York law, specific

5    performance requires a valid enforceable agreement that the

6    party seeking specific performance was ready, willing, and

7    able to perform.  The balance of equities favors specific

8    performance and there is no adequate remedy at law, and all

9    requirements are satisfied here.  The mediated agreement is a

10   valid, binding contract, it was negotiated at arm's length

11   through mediation under Judge Drain, and all the parties of

12   course, having signed onto the mediated agreement, urged this

13   Court to approve it, which I did.

14             AST and Ligado have performed.  AST and Ligado

15   have paid to Inmarsat the initial payment of $420 million.

16   Ligado has performed by filing its FCC application that

17   requires the requisite language set forth in Section 2 of the

18   mediated agreement and have otherwise complied with this

19   Court's orders, and they have represented that they are

20   ready, willing, and able to perform all remaining obligations

21   under the mediated agreement.  So, therefore, the balance of

22   the equities weighs in favor of specific performance.

23             Denying specific performance would allow Inmarsat

24   to retain $420 million so far without providing the

25   consideration it bargained to provide.  Conversely,

1    compelling Inmarsat to honor its commitment causes Inmarsat

2    no cognizable harm.  Inmarsat agreed to these obligations,

3    has been paid.  Failure to obtain the regulatory approval

4    would likely result in failure of the plan, causing

5    catastrophic harm to the estates and their stakeholders.

6             The L-band spectrum is a finite Government-

7    allocated resource that can't be purchased on the open

8    market.  The opportunity for AST to obtain usage rights to

9    the L-band spectrum is unique and cannot be replicated.  If

10   regulatory approval is denied or substantially delayed

11   because of Inmarsat's opposition, the harm would be

12   irreparable.  No amount of money could recreate the

13   opportunity to deploy those satellites at that specific time.

14   And, similarly, Ligado cannot be adequately compensated in

15   damages for loss of the AST transaction, which represents its

16   only viable path to emergence from Chapter 11.  And the

17   mediated agreement itself contemplates specific performance.

18   So, it's not only warranted, but it's expressly bargained for

19   under the mediated agreement.

20            As I noted, the AST transaction is the cornerstone

21   of the reorganization, and regulatory approval is a condition

22   precedent to plan consummation.  If Inmarsat were permitted

23   to withhold the regulatory support that it committed to make

24   based on interpretations that I find to be contrary to the

25   mediated agreement's plain language, it would give Inmarsat

1    improper leverage to extract additional concessions.  So,

2    enforcement of the mediated agreement protects the finality

3    of plan confirmation and vindicates this Court's ability to

4    oversee an orderly reorganization.

5              So, I am going to enter an order finding that

6    Inmarsat violated the automatic stay under Section 362(a)(3),

7    and that dismissal with prejudice is appropriate given the

8    stay violation, this Court's retained jurisdiction over the

9    subject matter of the complaint, and Inmarsat's failure to

10   seek stay relief despite knowledge of these bankruptcy

11   proceedings.  So, I'm going to put together a form of order.

12   I have to synthesize this ruling with the two competing

13   orders -- or not competing orders, but the two slightly

14   different orders that AST and Ligado filed, and I will enter

15   that order in short order.

16             I will note that this is a difficult issue and,

17   while I do find that there was a violation of the automatic

18   stay, I also believe that Inmarsat had reasonable -- in my

19   view, reasonable good faith arguments as to why Section 959

20   applied; I think they were incorrect, but I understand the

21   position.  And while certainly it's a willful stay violation,

22   based upon the briefing and the arguments of the parties, I

23   do believe that it was a position that Inmarsat took in good

24   faith.

25             So, I'm going to enter an order, and that

1    concludes my ruling and we are adjourned.

2            MR. FINESTONE:  Your Honor --

3            THE COURT:  Yes, Mr. Finestone, I'll hear from

4    you.

5            MR. FINESTONE:  Thank you, Your Honor.  For the

6    record, Ben Finestone, Quinn Emanuel, on behalf of Inmarsat.

7            Thank you for the work that the Court put into

8    disposing of the matter.  Your Honor, under Bankruptcy Rule

9    8007(a), we are required to move for a stay pending an appeal

10   or to move for a modification of an injunction that the Court

11   may issue with Your Honor before proceeding to the District

12   Court, and under that same rule we're permitted to make that

13   motion in advance of the filing of the notice of appeal.

14           Now, Your Honor, of course everything that I say

15   to the Court is with respect, but we are going to need to

16   appeal this matter because -- not so much, Your Honor --

17   primarily with respect to the disposition on the merits of

18   our lawsuit without any real due process, without an

19   adversary proceeding pending before the Court.  So, I'd like

20   to make that motion now, Your Honor, so that Your Honor can

21   either modify the injunction pending our appeal or allow us

22   to proceed to the District Court.

23           And if I could do so, Your Honor, first I'd touch

24   briefly on likelihood of success on the merits.  The Supreme

25   Court in Coney Island Auto Parts just this week issued an

1  order -- issued an opinion a week or two ago and it concerned

2  -- it concerned Federal Rule of Civil Procedure 60(b).  And

3  I'm not arguing that 60(b) applies here, but that decision

4  stands for a proposition that the Bankruptcy Rules of

5  Procedure and the Federal Rules of Civil Procedure are to be

6  taken seriously and their language is to be taken seriously

7  and strictly.  And Rule 7001(g) here, Your Honor, says that

8  injunctive relief is inappropriate unless there's an

9  adversary proceeding pending, and there wasn't an adversary

10 proceeding pending here, Your Honor.  In fact, we had ten to

11 14 days max to prepare, no evidence was submitted, there was

12 no discovery taken between the parties, there wasn't the

13 opportunity to do so, and Your Honor has effectively disposed

14 of the New York action, which is a very, very serious and

15 complex breach of contract action.

16         Now, Your Honor, I'll just go back a little

17 further.  Without conceding that that contract is ambiguous,

18 I think all parties would concede that there's a high

19 likelihood that term sheet is ambiguous, and the reason that

20 there's a high likelihood it's ambiguous is because it was

21 just a term sheet that we were forced to put into a final

22 agreement.  And so this is exactly the kind of contract that

23 is not fit for disposition in ten days and to find that

24 there's no obligation to coordinate other than just to cut

25 and paste some language into an agreement, Your Honor, I

1   think we were wronged on that conclusion.  There's a serious

2   obligation to coordinate.  And, Your Honor, had we been able

3   to turn this into a final agreement, I think the parties

4   would have done a better job at it, all three parties, but we

5   weren't; we tried, we brought it to the Court.

6            And I say all that, Your Honor, just to say this

7   can't be disposed of in ten days.  This kind of term sheet

8   litigation cannot be disposed of in ten days and in a way

9   that enjoins us, Your Honor -- I mean, I guess we haven't

10  seen the text of Your Honor's order, we haven't seen the text

11  of Your Honor's order, but I've heard that Your Honor is

12  going to dismiss our action with prejudice.  I think that

13  can't be done given this background, but I would say is that

14  one thing that certainly can't be done is an order enjoining

15  us from saying something truthful to the FCC or, alternative,

16  enjoining us from -- so, enjoining us from objecting with the

17  FCC or enjoining us mandatorily to support the FCC, that's

18  just -- that's a serious litigation, we disagree pretty

19  forcefully with the other side, and that's not something that

20  could have been resolved, Your Honor.

21           So, I think given the due process if nothing else,

22  I think we have a likelihood of success on reversing the

23  injunction that Your Honor has described today, if that was

24  the Court's intention, that's as I best understood it.

25           And in terms of irreparable harm, Your Honor, Your

1  Honor cited to a provision in the term sheet about how the

2  parties agreed that there would be irreparable harm, and what

3  the parties agreed to actually was that if there's a

4  coordination breach there would be irreparable harm.  And we

5  agree and that's what's going to happen here, we're the ones

6  that face the irreparable harm because there's no

7  coordination even ironed out and there will be a breach.  The

8  breach that they're saying that we won't -- that we are not

9  going to support, the parties did not agree that that would

10 be irreparable harm, and there's a reason for that because

11 the parties can argue to the FCC and the FCC can make an

12 informed decision.  But the irreparable harm prong, Your

13 Honor, really supports the motion that I'm currently making,

14 which is that if we're not able to speak to the FCC

15 truthfully and concerning the coordination, then the FCC is

16 going to be ill informed, and that's not only irreparable

17 harm for us, Your Honor, that's real public policy concerns,

18 public policy concerns that I believe trump the needs of this

19 reorganization, which has several years before it goes

20 effective and which basically in substance is nothing more

21 than a look-through to AST as a business counterparty, Your

22 Honor.

23          So, likelihood of success, Your Honor, if Your

24 Honor actually does enter injunctive relief, I believe is

25 very, very strong, and the risk of irreparable harm if

1   there's a coordination breach, which is really what's going

2   to happen if they're allowed to just -- I mean, their

3   argument, Your Honor, that Your Honor has accepted is that

4   because the words say they're coordinated, they're

5   coordinated, that's a formula for complete disaster, all

6   kinds of interference, and the parties did agree that does

7   give rise to irreparable harm.

8           So, Your Honor, I'd ask for you to modify the

9   injunction pending our appeal so that we can proceed with the

10  FCC, and what is the harm in that to see what the FCC says.

11  The FCC should be informed.  If our arguments have no merit,

12  as Your Honor believed, then the FCC can consider that, but

13  gagging us, as the debtors and AST have asked, that's real

14  irreparable harm and that's real public policy concerns.  So,

15  the action is stayed, I'm not asking for a stay of that

16  ruling, but I'm asking for a stay that we can't go to the

17  FCC, Your Honor, that kind of injunction --

18          THE COURT:  Okay.  Let me --

19          MR. FINESTONE:  -- pending our appeal.

20          THE COURT:  Thank you.  Let me hear from Mr.

21  Leblanc.

22          MR. LEBLANC:  Yes, thank you, Your Honor, Andrew

23  Leblanc of Milbank on behalf of Ligado.

24          Your Honor, I think as you made clear when we were

25  before the Court and what we argue, this Court always retains

1    jurisdiction to enforce its own orders.  What you are doing

2    here is enforcing your own order, nothing more, nothing less.

3    That order could not have been more clear about what was

4    required of the parties.  We did, as Your Honor has just

5    found, everything that was required of us, including putting

6    these specific words verbatim into our FCC application.

7             And, Your Honor, you will recall that it was

8    Inmarsat's suggestion at the August 29th hearing that Your

9    Honor simply adopt those.  That was what they pled in their

10   pleadings.  And Your Honor took the bench and said, Inmarsat

11   suggested I just make you put the words in, I'm going to do

12   that unless you can convince me otherwise, Mr. Leblanc.  And

13   I said, Your Honor, we agree with that.

14            So, there is no merit to their position, full

15   stop, period, full stop.  So, there is no basis for Your

16   Honor to enter a stay because there is no likelihood of

17   success on those merits.

18            Now, let me talk to the next question, the risk of

19   irreparable harm.  It is hard to imagine something more

20   egregious than what was just argued, Your Honor.  We have an

21   FCC application, what we negotiated for was we would pay them

22   $420 million, plus a hundred million dollars coming due at

23   the end of March, in return for their support because we

24   recognize the value of that support.  We've now complied with

25   our obligations, including paying the money, and they're

1   saying we're not going to give you our support and that's not

2   irreparable harm.  I can't imagine something more irreparable

3   than that, Your Honor.

4          I do believe that the terms of the mediated

5   agreement provide a finding of irreparable -- an agreement

6   that there is irreparable harm if the parties do not comply

7   with the terms of the mediated agreement, which Inmarsat has

8   flatly said it intends to do.  So, there is a clear risk of

9   irreparable harm, Your Honor.

10          And what Mr. Finestone is saying is don't enjoin

11  me from doing exactly the thing that I agreed in the mediated

12  agreement I would not do, that's what he's saying.  Your

13  Honor should deny the stay request.

14          Now, if Your Honor were to entertain a stay

15  request, you should condition that stay request -- and I

16  think Your Honor should not, but if you were to stay this

17  because the FCC could open the comment period, Inmarsat could

18  then start filing pleadings, we would have to be proceeding

19  in the New York State Court if the judgment were stayed, what

20  Your Honor should do is condition the imposition of that stay

21  -- you should deny it, but you should condition it on the

22  imposition of a bond of not less than the $420 million, Your

23  Honor.  That would be -- that's the minimum undertaking that

24  should be required for them to stay this order because that

25  is what we paid them.

1          So, again, Your Honor should deny the stay, but if
2     you were to agree to impose a stay, they should return the
3     $420 million to the estate, it will be held in escrow, and
4     when this is determined on appeal and if they have -- if they
5     have chosen notwithstanding the stay violation,
6     notwithstanding the mediated agreement to oppose our
7     application and caused us even further damage than they
8     already have, then that money will be available to satisfy
9     any losses that we will have incurred.
10         So, again, I think the right answer is Your Honor
11    deny the stay that's requested, allow your order to take
12    effect, have that complaint dismissed -- Your Honor, if an
13    appellate court disagrees with you and that dismissal is
14    overturned, it's overturned and it doesn't have any effect,
15    so there's no irreparable harm with respect to that -- and
16    impose the terms that they agreed to in the mediated
17    agreement, otherwise impose a consequence to their failure to
18    comply with it that is meaningful, Your Honor.
19              THE COURT:  Okay.
20              MR. FINESTONE:  Your Honor, may I respond on two
21    points?
22              THE COURT:  I have a hard stop at 3 o'clock and I
23    mean it.  So --
24              MR. FINESTONE:  Okay.
25              THE COURT:  -- just keep that in mind.

1          MR. FINESTONE:  Will do, Your Honor.  First of

2     all, Ligado keeps saying that we violated a court order.  We

3     didn't violate any court order, Your Honor.  These disputes

4     were not brought to the Court such that the Court considered

5     -- me violating a court order would be if I went out after

6     today and violated your court order.  These disputes were

7     never brought to Your Honor previously, they were never

8     brought to Your Honor with the mediated order, they were

9     never brought to Your Honor with the plan, all they were was

10    approving them entering into the agreement.  We didn't

11    litigate all these issues through mental telepathy.  I'm just

12    surprised that they argue we violated a court order, it's

13    wrong.

14          On the payment of the cash, Your Honor, Your Honor

15    knows, the payment of the cash was to cure the agreement.

16    That cures all their past failures for years and years and

17    years of not paying us something.  The obligation to support,

18    that's a look-forward obligation, and we don't have to

19    support if they didn't coordinate.  Your Honor, it's crazy,

20    it's actually crazy to say that we need to support something

21    with the FCC that says this satellite is coordinated if it's

22    not.

23          And so, Your Honor, we need this thing stayed

24    pending the appeal.  There is no irreparable harm done to

25    anybody if it's stayed because all we're talking about is

1  opening up our mouths to the FCC.  The idea that they're so

2  scared that we're going to say something untruthful to the

3  FCC is -- it's incredible, it's actually incredible.  The

4  only thing that we would say to the FCC is true and for the

5  good of really all of the citizens that care about what the

6  FCC is doing.  And an injunction order gagging us with the

7  FCC, again, Your Honor, it's a perfect formula for

8  irreparable harm and anti-public policy.  They're mad that

9  they had to pay the cash, that's -- there are lots of

10 obligations under this contract.  If the litigation proceeds,

11 they can assert some sort of claim why we breached the

12 contract and we can assert some sort of claim why they

13 breached the contract, and that gets resolved in an adversary

14 proceeding, Your Honor, but this summary disposition, it's

15 not fair, it's not fair to our client, and we need an

16 injunction pending our appeal, Your Honor.

17              THE COURT:  Okay.  Let me hear from Ms. Primoff,

18 please.

19              Good afternoon, Ms. Primoff.

20              MS. PRIMOFF:  Good afternoon, Your Honor.  Thank

21 you.

22              Your Honor has just made a ruling which the 75

23 people on this phone have heard loud and clear, and it's

24 quite uncustomary to reargue and re-litigate the issues that

25 are the very subject of Your Honor's ruling.  And any appeal

1   here would be interlocutory, so it's not at all clear to me

2   that there is this grand right of appeal.  What's being

3   referred to as a term sheet is not a term sheet at all.  It's

4   a definitive contract and, if it were anything less than

5   that, AST would not have paid $420 million and committed us

6   to pay another hundred million dollars in just two months

7   time.

8          So, to echo Mr. Leblanc's comments, if there is to

9   be an appeal, and we don't think that there should be, then

10  it should be 420 million plus the hundred million that's

11  otherwise payable on March 31.  But we think Your Honor is

12  spot on and that there's no harm in making Inmarsat support

13  the FCC obligation, which is precisely what they committed to

14  do in the parties' binding contract.

15         MR. FINESTONE:  And they agreed to coordinate and

16  haven't done so, Your Honor.  The argument --

17         THE COURT:  Okay --

18         MR. FINESTONE:  -- that it's interlocutory is

19  frivolous.

20         THE COURT:  -- okay, I've heard enough.

21         I'm going to enter an order reflecting my ruling

22  today and I will take the request for a stay pending appeal

23  under advisement, and I will issue my ruling on that

24  simultaneously with entry of my order and that's how I'm

25  going to handle it.  Okay?

1           So, with that --

2           MR. FINESTONE:  Thank you, Your Honor.

3           THE COURT:  -- thank you very much.

4     (Proceedings concluded at 2:55 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATION
 2           We certify that the foregoing is a correct
 3  transcript from the electronic sound recording of the
 4  proceedings in the above-entitled matter to the best of our
 5  knowledge and ability.
 6
 7  /s/ William J. Garling                January 27, 2026
 8  William J. Garling, CET-543
 9  Certified Court Transcriptionist
10  For Reliable
11
12  /s/ Tracey J. Williams                January 27, 2026
13  Tracey J. Williams, CET-914
14  Certified Court Transcriptionist
15  For Reliable
16
17
18
19
20
21
22
23
24
25
```