# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INMARSAT GLOBAL LIMITED,<br><br>Appellant,<br><br>v.<br><br>AST & SCIENCE, LLC, and LIGADO NETWORKS, LLC,<br><br>Appellees. | Docket No. 1:26-cv-00118<br>Bankruptcy Case No. 25-10006 (TMH) |

## DECLARATION OF JOHN P. JANKA

1. I am the Chief Officer, Global Government Affairs & Regulatory at Viasat, Inc. ("Viasat"), the parent company of Inmarsat Global Limited ("Inmarsat"). I submit this declaration in support of Inmarsat's Emergency Motion for Stay Pending Appeal of the Bankruptcy Court's January 30, 2026 Order that, among other things, requires Inmarsat to support one of Ligado's Federal Communications Commission ("FCC") applications.

2. I have advised satellite companies for almost forty years, including for decades as a partner with Latham & Watkins LLP. I was outside counsel to Inmarsat in the negotiation of the Cooperation Agreement (defined below) with Ligado's predecessors in 2007, and the Amended and Restated Cooperation Agreement in 2010. In my current role at Viasat, which I joined in 2020, I am in charge of the team responsible for satellite "coordination" globally for Viasat and Inmarsat, and I am also in charge of the team responsible for relationships with, and filings before, the FCC and other telecommunications regulatory agencies around the world. I participated directly in drafting and revising proposed amendments to the Cooperation Agreement in mid-2025, which are

discussed below. Based on my experience, I am fully familiar with the technical and regulatory issues discussed in this Declaration.

3. Unless stated otherwise, the statements in this Declaration are based on my personal knowledge and the exhibits are true copies of the originals.

**The Importance of Satellite Coordination**

4. Satellites transmit and receive signals wirelessly to support a wide range of applications, including data transmissions, internet access, and voice communications. Satellite signals travel principally via electromagnetic radio frequencies. A range of frequencies is referred to as "spectrum," and segments of spectrum are commonly grouped together in "bands." This appeal concerns a portion of spectrum in the highly valuable "L band."

5. Spectrum is a scarce resource because there is a finite amount available. In addition, certain frequencies are particularly suitable for specific types of radio-frequency transmissions. As a practical matter, the available spectrum is limited further because, in the case of the frequencies at issue here involving "mobile satellite services," it is not generally feasible for multiple satellite operators to use overlapping frequencies in the same or immediately adjacent geographic areas at the same time without causing interference. And even use of frequencies adjacent to those frequencies used by another satellite can create interference if that use is not properly managed. In practical terms, a user trying to make a voice call over a satellite could have the call blocked or dropped if there is an interfering signal from another satellite.

6. National governments generally regulate and allocate spectrum within their borders. In the United States, the FCC is charged with "assign[ing] frequencies for each individual station" and more generally has "authority to allocate electromagnetic spectrum" for commercial purposes. 47 U.S.C. §§ 303(c), (y). To minimize interference and optimize the efficient use of spectrum, the responsible national governments generally require that satellites they authorize be

"coordinated" with other satellites. When Ligado's predecessor was first licensed to use the L-band spectrum, that license was expressly "subject to international coordination" with Inmarsat and other international satellite operators. *In the Matter of the Applications of North American Mobile Satellite, Inc. et. al*, 4 FCC Rcd. 6041, 1989 WL 512585 (1989) (¶¶ 52, 106, 137). Because satellite signals often traverse national borders, coordination is typically done either directly on a government-to-government basis or indirectly on a satellite operator-to-satellite operator basis.

7. "Coordination" refers to the process of exchanging technical information, and agreeing on technical, geographic, and other parameters and limitations, so that the operations of different satellite systems and networks do not interfere with one another. Coordination is complete, or "effected," only when the coordinating parties have agreed to appropriate parameters, limitations, and other relevant terms. Typically, satellite operators can coordinate to mitigate interference risks by using different parts of the spectrum, operating in sufficiently separate geographic areas, and limiting the power emitted from (and to) their satellites.

8. Coordination is particularly important to Inmarsat, which has provided mobile satellite services globally since its inception in 1979, including safety services to airplanes and maritime vessels. The company's maritime safety services are provided pursuant to a public service obligation under an international treaty and include (among other things) responding to distress calls from ships—essentially a 911 service for the high seas. For airplanes, Inmarsat provides critical cockpit communications services, particularly to planes crossing oceans without access to terrestrial-based services. Today, Inmarsat continues to provide safety and emergency services and also provides conventional forms of connectivity to commercial and government customers (including the U.S. government, Inmarsat's largest customer) at sea, in the air, and on land.

**The Cooperation Agreement**

9.      In 2007, Inmarsat and Ligado's predecessors (which I will refer to as "Ligado" for simplicity) signed a 100-year "Cooperation Agreement" that, among other things, resolved coordination disputes between the parties, and provided Ligado with access to greater and more contiguous spectrum over North America in return for both (i) a series of cash payments over the 100-year term of the Agreement, and (ii) certain commitments from Ligado about Inmarsat's spectrum rights in the rest of the world. I was external counsel for Inmarsat in negotiating the 2007 Agreement, the 2010 Amended and Restated Cooperation Agreement (Ex. 1), and several amendments.

10.     A key function of the Cooperation Agreement is to reflect coordination between specifically identified Inmarsat and Ligado satellites with clearly identified technical and operating parameters. Most notably "Exhibit L," entitled "L-Band *Coordination Plan*," sets forth important technical and operational details about (among other things) which party may operate in what frequencies, at what power levels, and in which geographic regions. In addition, "Exhibit I" and "Exhibit J" list the specific satellites that the parties have coordinated (with a cross-reference to detailed technical and operational parameters that are on file about those satellites), and the Cooperation Agreement sets forth a process for adding additional satellites by agreement to the coordination effectuated by the Cooperation Agreement.

**The Term Sheet**

11.     Ligado filed for bankruptcy in 2025, and sought to essentially sublease its L band spectrum usage rights under the Cooperation Agreement to a third party, AST SpaceMobile, Inc. ("AST"). AST aspires to build a network of non-geostationary ("NGSO") satellites that would provide "direct to device" connectivity to smartphones and operate in the L band. Inmarsat objected to the AST transaction because it would have forced Inmarsat, without its consent, to

cooperate extensively for the next 80 years with Ligado's new partner, AST—the actual owner and operator of the new satellite system—while remaining in privity solely with Ligado. Ex. 2.

12. Inmarsat, Ligado, and AST participated in a bankruptcy court-ordered mediation. I was involved in negotiating and drafting the "Term Sheet," dated June 10, 2025, that resulted from the mediation. The Term Sheet obligated the parties to draft and execute two further, definitive contracts: (i) an "Amended Inmarsat Cooperation Agreement," and (ii) an "Inmarsat-AST Agreement." Ex. 3, at Ex. 1. The Amended Inmarsat Cooperation Agreement would coordinate potentially hundreds of new AST NGSO satellites, defined as the "Proposed NGSO System." The Inmarsat-AST Agreement would then give Inmarsat and AST the right to enforce directly against one another the new coordination terms ultimately agreed in the Amended Inmarsat Cooperation Agreement. At that point, the Term Sheet contemplated that Ligado and AST could apply for FCC approval of the new NGSO system with Inmarsat's support.

13. One key reason the Term Sheet required amending the Cooperation Agreement is that the original Cooperation Agreement did not cover NGSO satellites like the ones AST proposes to operate. From 2007 through today, the Cooperation Agreement has addressed the coordination only of geostationary ("GSO") satellites. Each of these satellites sits in a single orbital "slot" approximately 35,000 kilometers away and maintains the same fixed position relative to the Earth. Only *one* operational Ligado GSO satellite is covered by the current coordination agreement. But AST seeks to operate a network of hundreds of NGSO satellites, at least 96 of which would operate in the L-band spectrum at issue.

14. These contemplated NGSO satellites will constantly move in relation to the Earth, from a position only a few hundred kilometers away, and thus present much more difficult coordination challenges. Because GSO satellites always remain in the same relative position to

one another, the potential interference from one particular GSO satellite into another is limited only to those satellites within a certain proximity, and the interference environment is static. By contrast, NGSO satellites, like those in AST's contemplated system, travel so fast they circle the globe every 90 minutes—16 times a day—passing right through the service area of every Inmarsat GSO satellite around the world. Operations over each AST satellite therefore are a potential source of interference into Inmarsat operations many times a day and the interference from the operation of multiple NGSO satellites is aggregated through complex and dynamic geometries. Unless adequately constrained through coordination, the resulting interference could have material and adverse effects on Inmarsat's operations.

**Negotiation of the Amended Inmarsat Cooperation Agreement**

15.     The parties began discussions for an Amended Cooperation Agreement well before the Term Sheet was even completed. On May 7, 2025 (over a month before the Term Sheet was finalized), Ligado circulated a draft Second Amended and Restated Cooperation Agreement. Ex. 4. The proposed draft included 46 instances of the term "NGSO"; the Cooperation Agreement has none.

16.     Ligado's draft also included an "Index of Exhibits" recognizing that both Exhibit I (the schedule of specifically-identified coordinated satellites) and Exhibit L (the L-Band Coordination Plan establishing rights to operate in specific frequencies, within certain power levels, and within certain geographic regions) would need to be updated, and that there would need to be a new a new Exhibit M (later referred to as Exhibit O) setting forth the new "NGSO Operational Requirements," *see id*. at pg. iii:

### INDEX OF EXHIBITS
### [WILL BE UPDATED]

| Exhibit | Subject | Status |
|---|---|---|
| A | Definitions | Attached to Agreement |
| B | The Spectrum Plan | Attached to Agreement |
| C | Default Spectrum Plan | Attached to Agreement |
| D | Ligado Coverage Footprint / Exclusive Spectrum Use Region | Attached to Agreement. Additional details will be in Exhibit L. |
| E-H | Intentionally Omitted | |
| I | Coordinated Satellites | To be updated. Combine old Exs I and J; and add NGSO Network |
| J | Intentionally Omitted | |
| K | Technical Information about Satellites | Remains same |
| L | L-Band Coordination Plan | Working. Needs to be updated as it is tied to various spectrum Plans. |
| M | NGSO Operational Requirements | To be provided by Ligado – consistent with Exhibits 4 and 6 to the Collaboration Agreement and the Coop Agreement. |

17. From that point forward, and especially after the Term Sheet was finalized on June 10, 2025, the parties (with my involvement) were heavily negotiating updates to the Cooperation Agreement to implement the Term Sheet, including the contemplated NGSO coordination. There were multiple conference calls among engineers and regulatory personnel (such as me) to address technical and operational terms and parameters.

18. Most relevant here, there were several drafts back and forth of the documents bearing on the updated NGSO coordination that needed to be done, consistent with the Term Sheet. It is not feasible to set forth here a full record of the parties' negotiations, but a few examples below will illustrate the nature of the discussions.

(a)     On July 2, 2025, Inmarsat sent a markup of the Second Amended and Restated Cooperation Agreement, Ex. 5, and, on July 11, 2025, sent its first markup of Exhibit L, the "L-Band Coordination Plan," and the new Exhibit O (formerly M) with the "NGSO Operational Requirements." Ex. 6. Exhibit L was heavily edited from the existing version to accommodate the new Ligado/AST NGSO system, as well as Inmarsat's own contemplated NGSO systems. *Id.*

(b)     On July 18, 2025, Ligado circulated revised versions of three technical exhibits. Ex. 7. Ligado's revised Exhibit I added references to certain NGSO satellites that it wished to be reflected on the schedule of "Coordinated Satellites" and indicated that more needed to be added. Ligado's revised Exhibit L referred to the newly-created Exhibit O, entitled "NGSO Operational Requirements," which included a chart setting forth the power levels permitted for Ligado/AST NGSO operations.

(c)     On July 22, 2025, Inmarsat's external counsel circulated an "Issues List" that (among other things) flagged how the parties were to deal with adding future additional NGSO satellites that would not be included on Exhibit I as of the execution date of the Amended Inmarsat Cooperation Agreement (Issue 2) and also noted that the parties still needed to finalize Exhibits L and O (Issue 20). Ex. 8.

(d)     On July 28, 2025, Ligado circulated a further markup of the L-Band Coordination Plan (Exhibit L) to try to bring the parties closer to a final agreement. Ex. 9.

19. The negotiations were going smoothly until July 29, 2025, when AST proposed a fundamental change to Exhibit L, unrelated to the issue of coordinating NGSO operations within the other existing terms of the Cooperation Agreement. AST's proposed change brought the parties' negotiations of the Amended Inmarsat Cooperation Agreement to a complete halt.

20. On September 2, 2025, the Bankruptcy Court issued an order directing the parties "to incorporate the specific language of the Settlement Term Sheet" into both the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement. Ex. 10 ¶ 2 (Order); Ex. 11 (Hearing Transcript). Thus, the Term Sheet—an incomplete document containing only the general terms of the parties' agreement—would be converted directly into the two definitive agreements, with no other terms added. The parties did just that, Exs. 12, 13, meaning that the important effort to coordinate the Proposed NGSO System remained unfinished business.

**Inmarsat's Concerns Over Ligado's Proposed FCC Application**

21. On September 26, 2025, Ligado circulated the first draft of the FCC application it proposed for the operation of the AST NGSO system in the L band (the "FCC Application"). Ex. 14, at 10. Our outside counsel responded on October 4, 2025, stating (among other things): "Inmarsat cannot conclude that the draft you circulated complies with the Cooperation Agreement or the Inmarsat-AST Agreement." We posed several technical questions, and also asked whether AST would be a co-applicant, *id*. at 8-9, because AST was the entity that would actually own and operate the satellite system.

22. In the following weeks, Ligado would provide further drafts, and answers to some (but far from all) of Inmarsat's questions. In the final email in the discussion, on November 6, 2025, Inmarsat's counsel made clear (i) that the Proposed NGSO System had not been coordinated with Inmarsat, (ii) that Ligado and AST were invited to continue the coordination process, and (iii)

that Ligado should not make any (false) representation to the FCC suggesting that the Proposed NGSO System was coordinated, *see id.* at 1-3:

> 2. The draft application repeatedly asserts that "SkyTerra Next" has been coordinated with Inmarsat and specifically asserts "that the operations of the SkyTerra Next have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement. . ." Those assertions are not accurate. To be sure, the Term Sheet contemplated that the Proposed NGSO System **would be** coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement. In fact, the parties' actions confirm this requirement to coordinate the Proposed NGSO System. Once the Term Sheet was concluded the parties exchanged multiple drafts of the Amended Inmarsat Cooperation Agreement that included amendments to the current Article 3 (Article 2 in the drafts) and Exhibit L to expand the L-band coordination to include NGSO systems, and amendments to Exhibit I to include the Proposed NGSO System on the list "Coordinated Satellites." While completing those amendments would have coordinated the Proposed NGSO System, none of those amendments was adopted. Nothing in Amendment 22 of the Cooperation Agreement, the Inmarsat-AST Agreement or Judge Horan's order coordinated the Proposed NGSO System. Accordingly, ==the Proposed NGSO System has simply not been coordinated with Inmarsat.==
>
> ==Inmarsat is prepared to work with AST and Ligado to coordinate the Proposed NGSO System. Until that happens, neither AST nor Ligado should assert that the Proposed NGSO System has been coordinated with Inmarsat.== In the meantime, Inmarsat continues to reserve all rights.
>
> Best regards,
>
> Alfred M. Mamlet

23.     This email was not the first or only time that Ligado and AST were told what should have been obvious to them—that the Proposed NGSO System was *not* coordinated. Inmarsat, through its corporate parent, Viasat, reiterated the absence of coordination directly to the FCC (copying Ligado and AST) on at least two other occasions.

24.     The first occurred on September 9, 2025, when Viasat filed a comment letter with the FCC (copying Ligado and AST) relating to the application of a third party, Planet Labs PBC ("Planet Labs"), to allow certain of Planet Labs' satellites to communicate in the L band with Inmarsat satellites. Ligado and AST had filed comments in August 2025 protesting that Planet Labs' application did not provide enough information to ensure that Planet Lab's contemplated L-band operations over Inmarsat satellites would not interfere with their own L-band operations, including the Proposed NGSO System. Viasat responded on September 9 by highlighting that AST had no grounds to complain about potential L-band operations interfering with the Proposed NGSO System. As Viasat explained, AST was not licensed in the L-band by the FCC and, in fact,

10

its "potential L-band operations" were not yet "appropriately coordinated." Ex. 15, at 2. AST and Ligado subsequently responded to Viasat's letter but did not dispute that coordination of AST's L-band operations had not occurred. Ex. 16.

25. On November 21, 2025, Viasat made a similar filing with the FCC regarding a similar application from a different third party. Ligado and AST had also opposed that filing by arguing that the L-band operations of the Proposed NGSO System might suffer interference. Again, Viasat was clear that Ligado and AST lacked any basis to complain because they "had not coordinated any potential L-band NGSO operations with Viasat." Ex. 17, at 3. Viasat added: "Although Inmarsat has invited AST and Ligado to resume coordination negotiations, they have not accepted the invitation. Therefore, *the coordination process is far from complete*." *Id*. (emphasis added). Again, when AST and Ligado filed a response on December 15, 2025, they did not dispute Viasat's point that the Proposed NGSO System was not coordinated with Inmarsat. Ex. 18.

**Ligado's FCC Application**

26. On December 8, 2025—over a month after Inmarsat's November 6 email to Ligado and AST offering to resume coordination efforts, and without any discussion with Inmarsat in the meantime—Ligado filed its FCC Application. The FCC Application represents, falsely, that the L-band operations of the Proposed NGSO System (now referred to as "SkyTerra Next") are coordinated under the Cooperation Agreement. The application also inaccurately represents that "the operations of the SkyTerra Next system *have been coordinated* subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." Ex. 19, at 8 (emphasis added). Moreover, the application ignores Inmarsat's repeated protestations about the lack of coordination and, instead, asserts the application "meets all of the requirements for [Inmarsat's] affirmative support." *Id*. at 8-9.

11

27. As a result of the actions of Ligado and AST, Inmarsat filed a complaint in New York state court to protect its rights. Specifically, Inmarsat alleged that Ligado and AST had breached their contractual obligation to coordinate before filing the FCC Application, and that the application falsely stated coordination was complete. Ex. 20. Inmarsat sought a declaration that SkyTerra Next has *not* been coordinated. *Id.* at 22-23

**Inmarsat Will Suffer Irreparable Harm if the Bankruptcy Court's Order is Not Stayed**

28. I understand that the Bankruptcy Court entered an order on January 30, 2026, ordering, among other things, Inmarsat to support Ligado's FCC Application, which I understand requires Inmarsat to file comments and reply comments in support of the application and refrain from taking any public or private action contrary to that support. Also on January 30, 2026, the FCC accepted the FCC Application, Ex. 21, commencing a thirty-day comment period. 47 C.F.R. § 25.154(a)(2). If the Bankruptcy Court's order is not stayed, therefore, Inmarsat would be required to file comments in support of the FCC Application by March 2, 2026.

29. As discussed, the FCC Application contains several critical misrepresentations. In particular, the application represents that the proposed satellite system has been "coordinated under the cooperation arrangement between Ligado and Inmarsat," Ex. 19, at 8, when, in Inmarsat's view, that is not true. As discussed above, the parties engaged in coordination discussions from May to July 2025, until AST brought things to an impasse. Vital coordination work remains to be completed. Suitably modifying the Cooperation Agreement to address NGSO operations is essential for ensuring that the Proposed NGSO System can operate without risking harm to Inmarsat's business and customers. The FCC needs to be aware of the absence of coordination so that it can appropriately address the deficiency.

30. If Inmarsat is prevented from expressing these serious concerns, then even if it ultimately prevails on appeal, the FCC comment period would already have closed and Inmarsat

may be foreclosed from petitioning the FCC to deny the application. The FCC may grant the application at any time after the comment period closes, risking AST operating its NGSO system in ways that could severely disrupt Inmarsat's business and operations. For oceanic ships, Inmarsat operates the Global Maritime Distress and Safety System ("GMDSS"), a "maritime 911" service established by International Maritime Organization. A mariner in distress pressing the GMDSS button on their Inmarsat terminal is connected directly with the closest Rescue Coordination Center, such as the U.S. Coast Guard. For planes crossing the oceanic regions, Inmarsat's cockpit communications service may be the only means of communications a pilot has. Inmarsat's safety missions accentuate the importance that my team and I place on comprehensive coordinations with other satellite operators.

31.     Inmarsat has already truthfully represented to the FCC that "the coordination process is far from complete" as recently as November 21, 2025. Ex. 17, at 3. Requiring Inmarsat's implicit endorsement of Ligado's misleading statements regarding coordination would force Inmarsat to not only contradict its own prior statements, but to violate its obligation under U.S. law not to make "incorrect" statements to the FCC or "intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading." 47 C.F.R. § 1.17(a), (b)(2). Worse still, as seasoned FCC practitioners are well aware, that there is even potential criminal liability for making false and misleading statements to the FCC. 18 U.S.C. § 1001. Put simply, forcing Inmarsat to tell the FCC something that is untrue is a serious problem.

**Ligado And AST Do Not Face Comparable Harm**

32.     I expect Ligado and AST may claim that the Bankruptcy Court's Order is the only way that they will be assured of Inmarsat's support for the application within the comment period that is closing soon. But, to start, this is a circumstance of their own making. There was no

particular deadline or need for Ligado to file the FCC application when it did, on December 8, 2025. It would have benefitted all parties for Ligado and AST to have taken up Inmarsat's invitation to complete the coordination process before filing. With some diligence, that could have been completed by December 8, 2025, but Ligado and AST chose to not even try.

33. In all events, they still have options to avoid any claimed time pressure regarding Inmarsat's support. Because Ligado is asking for a form of forward-looking discretionary relief, I cannot imagine, based on my experience, that the FCC would deny a request from Ligado to defer processing the application, to extend the comment period while these disputes are sorted out, or to allow Ligado to withdraw its application, without prejudice to re-filing. If none of these options is acceptable, and if Inmarsat is permitted to express its serious concerns to the FCC, Ligado will in all events have a right to reply to any comments from Inmarsat and to explain its position to the FCC, which at that point could make its own independent public interest determination.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
February 3, 2026

_____
John P. Janka