**EXHIBIT I**

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

INMARSAT GLOBAL LIMITED,

                           Plaintiff,

    —*against*—

AST SPACEMOBILE, INC.,

LIGADO NETWORKS LLC, and

LIGADO NETWORKS (CANADA) INC.,

                        Defendants.

Index No. _____

To:    AST SpaceMobile, Inc.
        Corporate Creations Network, Inc.
        1521 Concord Pike, Suite 201
        Wilmington, DE 19803

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis for venue is CPLR 503(a).

Dated:  New York, New York
            December 19, 2025

Alfred M. Mamlet*
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
amamlet@steptoe.com
*pro hac vice* application forthcoming

Respectfully submitted,

STEPTOE LLP

By:  */s/ Charles Michael*_____
     Charles Michael
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 506-3900
     cmichael@steptoe.com

Benjamin Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue,
New York, New York 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

*Counsel for Plaintiff Inmarsat Global Limited*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                         RECEIVED NYSCEF: 12/19/2025

Case 1:26-cv-00118-GBW     Document 20-9     Filed 02/11/26     Page 3 of 27 PageID #: 1601

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| INMARSAT GLOBAL LIMITED,<br><br>                                    Plaintiff,<br><br>—*against*—<br><br>AST SPACEMOBILE, INC.,<br><br>LIGADO NETWORKS LLC, and<br><br>LIGADO NETWORKS (CANADA) INC.,<br><br>                                    Defendants. | Index No. _____ |

To:     Ligado Networks LLC
        c/o Corporation Service Company
        100 Shockoe Slip, Fl. 2
        Richmond, VA, 23219

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

        The basis for venue is CPLR 503(a).

Dated:  New York, New York
        December 19, 2025

Alfred M. Mamlet*
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
amamlet@steptoe.com
*pro hac vice* application forthcoming

Respectfully submitted,

STEPTOE LLP

By:  */s/ Charles Michael*     _____
        Charles Michael
        1114 Avenue of the Americas
        New York, New York 10036
        (212) 506-3900
        cmichael@steptoe.com

Benjamin I. Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue,
New York, New York 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

*Counsel for Plaintiff Inmarsat Global Limited*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                      RECEIVED NYSCEF: 12/19/2025

Case 1:26-cv-00118-GBW     Document 20-9     Filed 02/11/26     Page 4 of 27 PageID #: 1602

# SUPREME COURT OF THE STATE OF NEW YORK
# COUNTY OF NEW YORK

INMARSAT GLOBAL LIMITED,

                                 Plaintiff,

      —*against*—

AST SPACEMOBILE, INC.,

LIGADO NETWORKS LLC, and

LIGADO NETWORKS (CANADA) INC.,

                             Defendants.

Index No. _____

To:    Ligado Networks (Canada) Inc.
        1601 Telesat Court Ottawa, ON
        K1B, 1B9
        Canada

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis for venue is CPLR 503(a).

Dated:  New York, New York
          December 19, 2025

Alfred M. Mamlet*
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
amamlet@steptoe.com
*pro hac vice* application forthcoming

Respectfully submitted,

STEPTOE LLP

By:  */s/ Charles Michael*
     Charles Michael
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 506-3900
     cmichael@steptoe.com

Benjamin Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue,
New York, New York 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

*Counsel for Plaintiff Inmarsat Global Limited*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

INMARSAT GLOBAL LIMITED,

                                Plaintiff,

—*against*—

AST SPACEMOBILE, INC.,

LIGADO NETWORKS LLC, and

LIGADO NETWORKS (CANADA) INC.,

                             Defendants.

---

Index No. _____

### COMPLAINT

Plaintiff Inmarsat Global Limited ("Inmarsat"), for its complaint against Ligado

Networks LLC and Ligado Networks (Canada) Inc. (collectively, "Ligado"), and against AST

SpaceMobile, Inc ("AST"), alleges as follows:

### INTRODUCTION

1.      By this action, Inmarsat seeks to hold Ligado and AST to their contractual

obligation to "coordinate" with Inmarsat the satellites that they plan to operate, so that those

satellites do not cause interference to Inmarsat's satellite services. In the satellite industry,

"coordination" refers to satellite operators making technical arrangements to ensure that they can

operate in overlapping (or adjacent) spectrum without their satellite services interfering with one

another. Ligado recently filed an application with the Federal Communications Commission

("FCC") that seeks approval for a new type of satellite system that would be controlled and

operated by its business partner, AST. The application unequivocally represents to the FCC that

the new network has been coordinated with Inmarsat. As Ligado and AST well know—because

the parties spent weeks unsuccessfully attempting to coordinate—that is simply not true.

Coordination is particularly important in this case because, beyond its conventional services to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/19/2025

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 6 of 27 PageID #: 1604

commercial businesses and government customers, Inmarsat provides safety services to airplanes and maritime vessels that require extremely high levels of reliability. It is thus imperative that Ligado and AST honor their contractual obligation to complete coordination with Inmarsat before operating this new satellite system.

2.      The origins of this case trace back to 2007, when Inmarsat and Ligado's predecessors signed a 100-year "Cooperation Agreement." Both parties had overlapping rights to use certain highly valuable spectrum. Under the Cooperation Agreement: (i) Inmarsat granted Ligado exclusive use of certain North American spectrum, (ii) Ligado agreed to Inmarsat's exclusive use of spectrum outside North America, and (iii) Ligado agreed to make substantial payments to Inmarsat. At the time, Ligado aspired to build a new type of communications network, referred to as "ATC." Ligado's ATC network would take spectrum initially licensed for a satellite-only communications service to launch an integrated service combining both terrestrial cellular and satellite signals. The planned ATC network faced a barrage of regulatory opposition over many years and never launched. As a result, Ligado's predecessor (LightSquared) filed for bankruptcy in 2012. The emerging entity, Ligado, ultimately fared no better. It filed for bankruptcy earlier this year, blaming the U.S. federal government's opposition to its ATC network.

3.      This lawsuit is an outgrowth of Ligado's second bankruptcy, which it pre-negotiated with AST. Having given up trying to deploy an ATC network, Ligado decided instead to allow a third party, AST, to use the spectrum rights obtained from Inmarsat for a new type of satellite system that can communicate directly with smartphones. AST plans to sell this satellite capacity on a wholesale basis to cellular service providers (*e.g.*, Verizon and AT&T) so those providers could use the satellite service to fill the gaps in their terrestrial wireless coverage areas.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 12/19/2025

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 7 of 27 PageID #: 1605

4.      Ligado and AST's business plan depends on using the spectrum rights obtained from Inmarsat through the Cooperation Agreement. But that plan was conceived without Inmarsat's involvement or consent. During Ligado's bankruptcy proceedings, Inmarsat objected to being thrust against its will into a partnership with AST—a party it neither selected nor coordinated with—for the remaining 80 years of the Cooperation Agreement term. Ligado's attempt to transfer spectrum rights to AST would not only contravene the Cooperation Agreement's prohibition on assignments and delegations but would also pose serious practical problems. Inmarsat would effectively be providing spectrum rights to third-party AST but without a coordination agreement with AST or any other means to ensure AST's planned satellites do not interfere with Inmarsat's commercial and safety services. And even if Ligado could have somehow coordinated AST's satellites under the Inmarsat-Ligado Cooperation Agreement, Inmarsat would not have contractual privity with AST. Adding to the complications was the fact that the Cooperation Agreement was designed for individual "geostationary" orbit (or GSO) satellites, which operate approximately 36,000 kilometers above the Earth at locations that appear fixed in relation to Earth. By contrast, AST's planned network of nearly 100 "non-geostationary orbit" (or NGSO) satellites would operate less than 1,000 kilometers from earth and would visibly move across the sky, raising materially different and *far* more complex coordination issues than those contemplated by the Cooperation Agreement.

5.      During a mediation suggested by the bankruptcy court, Inmarsat, Ligado and AST ultimately executed a binding Settlement Term Sheet that sorted out their differences—or so they thought. The Term Sheet called for the parties to negotiate (i) a more comprehensive Amended Cooperation Agreement that actually coordinated AST's proposed NGSO satellites, and (ii) a direct agreement between Inmarsat and AST to allow both parties to directly enforce the

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 8 of 27 PageID #:
1606

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/19/2025

contemplated coordination terms. But it soon became clear that the Term Sheet had not resolved all the parties' issues. The parties were unable to agree on language for the definitive documents that were to follow the Term Sheet, including the coordination terms that would cover the operation of AST's satellites. At the bankruptcy court's direction, the parties ultimately executed bare-bones definitive documents that did not coordinate AST's proposed NGSO satellites. The bankruptcy court stated explicitly that the parties' disputes were preserved for resolution later before a non-bankruptcy court (such as this Court). Ligado's plan of reorganization was confirmed on September 29, 2025, without resolution of the coordination issues.

6.      On December 8, 2025, Ligado filed an application with the FCC for authority to "deploy and operate an L-band mobile satellite system providing service in the United States aboard [AST's] constellation of NGSO satellites in low Earth orbit." But the application was filed before any coordination was agreed and, thus, falsely represents that AST's satellites have been "coordinated under the cooperation arrangement between Ligado and Inmarsat."[1] This is a serious problem not only because the statement is false, but also because the binding Term Sheet requires the FCC application to ask the FCC to recognize that AST/Ligado's proposed satellites have been coordinated—meaning, necessarily, that the coordination terms needed to be agreed **before** filing the application. Similarly, the Cooperation Agreement itself expressly commits the parties to confer with one another to update their coordination plan when their operations change or new satellites are proposed to be added. Yet that critical work has not been done—despite Ligado's representations to the contrary to the FCC. Another problem is that the application was filed solely by Ligado even though AST owns and operates the relevant satellite system. The

---

[1] Application for Modification of Space Station License, *In re Application for Modification of Space Station License of Ligado Networks Subsidiary, LLC*, SAT-MOD-20251206-00374, (FCC Dec. 8, 2025), at 8.

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 9 of 27 PageID #:
1607

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/19/2025

Term Sheet expressly requires *both* Ligado *and* AST to make commitments to the FCC about the planned operations of all Ligado and AST satellites—and hence contemplates that the application would be filed by both. This is important to Inmarsat because AST will actually own, operate and control the NGSO satellite system and thus be the party responsible for any interference to Inmarsat's operations.

7.    The parties' agreements further contemplate that, assuming certain conditions precedent, Inmarsat is to support Ligado's and AST's FCC applications. Those conditions precedent include Ligado and AST holding up their end of the bargain by completing the coordination work that began this summer and has not finished. In view of Ligado's and AST's breaches, however, Inmarsat's support obligation has not been triggered and Inmarsat intends to oppose Ligado's FCC application.

8.    In the meantime, Inmarsat must bring this action to enforce its contractual rights—rights that are not before the FCC and that must be resolved in court. Inmarsat thus brings this action to compel Ligado's and AST's performance with their coordination obligations that they have thus far ignored and to pursue damages that may arise out of their failure to do so.

## THE PARTIES

9.    Plaintiff Inmarsat Global Limited (referred to here as "Inmarsat") is the primary operating subsidiary of Inmarsat Group Holdings, Ltd. ("Inmarsat Group"). Inmarsat was created in 1979 as a treaty-based inter-governmental organization to develop a global satellite system to meet the commercial maritime and safety communications needs of all nations, including the United States. Its charter later expanded to also cover aviation connectivity needs globally. Inmarsat was privatized in 1999. Today, Inmarsat and Inmarsat Group are headquartered in London and organized under the laws of England and Wales. In May 2023, Viasat, Inc., a

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Delaware company headquartered in Carlsbad, California, acquired Inmarsat and Inmarsat

Group, which continue their businesses and corporate forms.

     10.     Ligado Networks LLC is a Delaware limited liability company headquartered in

Reston, Virginia. Ligado Networks (Canada) Inc. is a Canadian corporation headquartered in

Ottawa, Canada. The two companies (referred to together as "Ligado") are corporate affiliates in

the satellite industry. They have together assumed all the obligations of the original parties to the

Cooperation Agreement.

     11.     AST is a Delaware corporation headquartered in Midland, Texas. It was founded

in 2017 and went public in 2021. AST designs and builds satellites but has yet to generate

significant revenue. AST's most recent annual SEC filing states that the company is building

"the first and only global Cellular Broadband network in space to be accessible directly by

everyday smartphones."

### JURISDICTION AND VENUE

     12.     This Court has personal jurisdiction over Ligado because, with exceptions not

relevant here, Ligado agreed in the Cooperation Agreement to "irrevocably submit[] to the

exclusive jurisdiction of the New York courts, including the federal and state courts for the

purpose of any action or proceeding arising out of or relating to this Agreement." This clause is

enforceable under N.Y. Gen. Oblig. L. § 5-402, which provides for the enforcement of New

York forum selection clauses in contracts that involve more than $1 million in obligations and

that are governed at least in part by New York law. The Cooperation Agreement involves

billions in obligations and is "governed exclusively by the law of the State of New York."

     13.     The Court separately has personal jurisdiction over both Ligado and AST because

the parties agreed in the Term Sheet that certain interference disputes would be resolved through

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

expedited arbitration or in New York courts, and that "all other disputes would be resolved in th[is] Court."

14.     Further, the Court has personal jurisdiction over both Ligado and AST under N.Y. C.P.L.R. 302(a)(1) because the Term Sheet giving rise to this case was negotiated in substantial part during a mediation that occurred in New York County, and thereafter, by multiple lawyers who were primarily in New York County.

15.     For the same reasons discussed above, venue is appropriate by virtue of the parties' agreements and under N.Y. C.P.L.R. 503(a), which provides for venue in "the county in which a substantial part of the events or omissions giving rise to the claim occurred." Alternatively, N.Y. C.P.L.R. 503(a) provides that where, as here, "none of the parties . . . resided in the state" when the action was commenced, the case may proceed in "any county designated by the plaintiff." Inmarsat has chosen New York County.

<u>FACTS</u>

A.     **Satellite And Spectrum Basics**

16.     Satellites transmit signals wirelessly for a wide range of applications, including data transmissions, internet access, and voice communications.

17.     Satellite signals travel via electromagnetic radio frequencies. A range of frequencies is referred to as "spectrum," and slices of spectrum are commonly grouped together in "bands," based on their characteristics and suitable uses (*e.g*., for television signals, radio, voice, data, etc.). Frequencies are measured by the number of oscillations of the signal per second, and commonly expressed in megahertz (MHz, or one million oscillations per second) or gigahertz (GHz, or one billion oscillations per second). This case concerns spectrum in the "L-band," which is between 1 and 2 GHz. In particular, both Inmarsat and Ligado are licensed to use the spectrum between 1525-1559 MHz and 1626.5-1660.5 MHz.

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

18.      Spectrum is a scarce resource because there is a finite quantity. In addition, only certain frequencies are suitable for particular types of radio-frequency transmissions. The available spectrum is limited further because in the case of the frequencies at issue here involving "mobile satellite services," it is not feasible for multiple satellite operators to use the same frequencies in the same or adjacent geographic areas at the same time (due to both technical and operational factors) without causing interference. And even use of adjacent frequencies can create interference if not properly managed. Interference can block or disrupt satellite signals, including interrupting vital safety communications or even preventing an emergency call from being made.

19.      For these reasons, the right to use particular frequencies is highly valuable. Cellular service providers like Verizon and AT&T have paid tens of billions of dollars for the spectrum on which their networks depend.

20.      National governments generally regulate and allocate spectrum. In the United States, the FCC has "authority to allocate electromagnetic spectrum" for commercial purposes. 47 U.S.C. § 303(y).

21.      Satellites typically operate across national boundaries. Ligado's lone operating satellite today is licensed by the FCC and covers North America and Central America. Inmarsat satellites are licensed by the United Kingdom and operate on a global basis in over 160 countries.

**B.      The Mobile Satellite Services Of Inmarsat, Ligado And AST**

22.      Each of Inmarsat, Ligado, and AST is in a business sector referred to as "mobile satellite services," which refers to the transmission of satellite signals to mobile terminals, hand-held devices, or other equipment that can operate while moving.

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 13 of 27 PageID #: 1611

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/19/2025

23.     Inmarsat has provided mobile satellite services since its inception as an intergovernmental organization in 1979, including safety services to airplanes and maritime vessels. The company's maritime safety services are provided pursuant to a public service obligation under an international treaty and include (among other things) responding to distress calls from ships—essentially a 9-1-1 service for the high seas. Today, Inmarsat continues to provide safety and emergency services but also provides conventional forms of connectivity to commercial and government customers (including the U.S. government, Inmarsat's largest customer) at sea, in the air, and on land.

24.     Ligado and its predecessors have been licensed by the FCC to provide mobile satellite services since 1989, although the scope of its commercial operations has been limited, as described more fully below.

25.     AST was formed in 2017 and aspires to sell satellite connectivity on a wholesale basis to cellular service providers, like Verizon and AT&T, so that users will remain connected, via their smartphones, even when they are outside the reach of the traditional cell tower network.

**C.     Satellite And Spectrum Coordination**

26.     To avoid interference and to optimize the efficient use of spectrum, satellite companies must "coordinate" their operations. Coordination refers to the process of exchanging technical information, and agreeing on technical parameters and limitations, so that the operations of satellite systems do not interfere with one another. Coordination is complete, or "effected," only when the coordinating parties have agreed to appropriate technical parameters and limitations and other relevant terms. Typically, satellite operators can coordinate to mitigate interference risks by using different spectrum, operating in separate geographic areas, and limiting power from (and to) their satellites. This is the key function of the Cooperation

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1
Case 1:26-cv-00118-GBW   Document 20-9   Filed 02/11/26   Page 14 of 27 PageID #:
1612
RECEIVED NYSCEF: 12/19/2025

Agreement underlying this case. In fact, the FCC, AST, and Ligado have all repeatedly referred to the Cooperation Agreement as a "coordination" agreement.

27.     The United States is under treaty obligations to coordinate spectrum usage through a U.N. agency called the International Telecommunication Union ("ITU"). International spectrum coordination occurs either on a government-to-government basis, or, as here, on a satellite operator-to-satellite operator basis.

**D.     The Cooperation Agreement**

28.     In December 2007, Inmarsat and certain of Ligado's predecessors (referred to as "SkyTerra") entered into the original Cooperation Agreement. Historically, Inmarsat and SkyTerra (Ligado today) held rights to interspersed slivers of the highly valuable "L-band" satellite spectrum. The fundamental bargain of the Cooperation Agreement was for Inmarsat to make available to SkyTerra substantial, contiguous blocks of L-band spectrum in North America for a 100-year term, so that SkyTerra would have sufficient bandwidth to launch its proposed ATC communications network. SkyTerra agreed Inmarsat would have "Exclusive Use" of the L-band spectrum outside North America, where Inmarsat had longstanding global operations. In exchange for this spectrum arrangement—which would make SkyTerra's business model possible—SkyTerra agreed to make substantial payments to Inmarsat, including, after certain milestones were reached, annual payments of $115 million (increasing 3% annually) through the end of the term in 2107.

29.     In August 2010, SkyTerra—under the new name "LightSquared"—and Inmarsat entered into an amended and restated version of the Cooperation Agreement. The basic structure of the Agreement was unchanged, including the payment terms.

30.     As is relevant to this litigation, the Cooperation Agreement includes several provisions relating to spectrum coordination, most notably "Exhibit L," entitled "L-Band

10

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

13 of 26

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1
Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 15 of 27 PageID #:
1613
RECEIVED NYSCEF: 12/19/2025

Coordination Plan." Exhibit L sets forth details about (among other things) which party may operate in what frequencies, at what power levels, and in which geographic regions. The Cooperation Agreement covers specifically identified satellites, in geostationary orbit, at defined orbital locations, and contemplates that Ligado or Inmarsat can add satellites to the coordination agreement by mutual agreement.

### E.    Ligado Files For Bankruptcy Twice

31.    When the Cooperation Agreement was signed, LightSquared (now Ligado) planned to use the L-band spectrum to provide a new type of service in the United States and Canada integrating both satellite services and land-based cellular service (referred to as an "ancillary terrestrial component," or "ATC"). But LightSquared's attempt to use the Cooperation Agreement spectrum for ATC has been beset with regulatory challenges that persist to this day.

32.    Most notably, businesses in the Global Positioning Systems ("GPS") industry, and certain U.S. government agencies, vigorously protested that the terrestrial component of Ligado's contemplated network—the L-band signals sent from cell towers—would cause harmful interference with GPS systems.

33.    In 2012, the FCC, on the heels of a government report concluding the GPS interference problem could not be overcome, suspended its authorization for LightSquared's ATC network, and the company filed for bankruptcy.

34.    After three years in bankruptcy, a reorganized company re-named "Ligado" emerged in 2015, and immediately sought FCC approval of its ATC plans under different parameters that it hoped would overcome the GPS issues. But its FCC license application would not be resolved for over four years. In the meantime, Ligado did not have an operating ATC business, and owed hundreds of millions of dollars to Inmarsat, which made accommodation after accommodation to allow Ligado to defer the amounts accruing.

11

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

35.     In April 2020, the FCC granted Ligado's long-pending license application, albeit with more stringent conditions than Ligado desired. But, even after securing FCC approval, Ligado never deployed or launched the ATC network. Ligado blames the failure on continued opposition from executive branch agencies (primarily the Department of Defense) and has filed a $39 billion lawsuit in the U.S. Court of Federal Claims, arguing that the U.S. government's actions amount to an unconstitutional "taking" under the Fifth Amendment. That case is pending.

36.     In January 2025, Ligado still had no ATC network and had minimal other business but was facing a deadline to pay long-deferred amounts to Inmarsat totaling approximately $525 million. Unable to pay, Ligado filed for bankruptcy again.

**F.    The AST Transaction And Inmarsat's Objection**

37.     This time, however, Ligado filed for bankruptcy with a pre-negotiated reorganization plan. The centerpiece of its plan was a commercial transaction with AST whereby Ligado would first seek to "assume" the Cooperation Agreement (*i.e.*, to keep the contract in place after emerging from bankruptcy) and then transfer its spectrum usage rights thereunder to AST in exchange for cash and other consideration. And AST, instead of pursuing the ATC network that Ligado had failed to launch, would build a network of satellites that would allow for "direct to device" connectivity to smartphones. This business plan would avoid using L-band spectrum for communications over ubiquitous cell towers that was the source of GPS industry and government opposition to the ATC network.

38.     When Ligado moved for the bankruptcy court's approval of the AST transaction, Inmarsat objected. The Cooperation Agreement expressly prohibits assignments and delegations of the parties' rights or obligations without consent, *see* Cooperation Agreement § 9.3, and the AST transaction was exactly that. It would have forced Inmarsat, without its consent, to cooperate extensively for the next 80 years with Ligado's new partner, AST—the actual owner

12

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1
Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 17 of 27 PageID #:
1615
INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/19/2025

and operator of the satellite network—while remaining in privity solely with Ligado. AST did

not coordinate its proposed nearly-100 NGSO satellites with Inmarsat, even though they

presented very different and much greater interference risks to Inmarsat. Ligado's deal with AST

would have made it difficult or impossible for Inmarsat to hold AST directly responsible for

honoring the terms of the Cooperation Agreement, including the geographic, power, and out-of-

band emissions limits, and other agreed terms of coordination set forth in the Cooperation

Agreement for sharing spectrum among GSO satellites. In addition, the Cooperation Agreement

limits had been set for a discrete number of GSO satellites, not for the additional interference

risks posed by 96 NGSO satellites.

39.    At the time, Inmarsat—which had no seat at the table when the AST-Ligado deal

was struck and no opportunity for due diligence on AST's proposed satellite system—was not

convinced that AST's lofty ambitions to operate NGSO satellites in the L-band could be realized

within the parameters of the Cooperation Agreement. As Inmarsat explained to the bankruptcy

court at the time, if Ligado was to assume the Cooperation Agreement, Inmarsat's contract rights

had to be respected. Thus, if Inmarsat was going to be thrust into a partnership with AST,

Inmarsat would need to consent—which would, in turn, require the parties to agree to

coordination terms covering AST's satellites, including revised technical and other terms to

address Inmarsat's significant concerns about interference from NGSO satellites. The

Cooperation Agreement ensures that Inmarsat's ongoing satellite operations are not disrupted by

interference from Ligado's GSO operations, and Inmarsat needed to ensure that it is similarly

protected from AST's NGSO operations. This could be accomplished only by ensuring that AST

is similarly bound to operate within the limits of the Cooperation Agreement, including those

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1    Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 18 of 27 PageID #:    RECEIVED NYSCEF: 12/19/2025
1616

that protect Inmarsat's operations globally, as modified to cover AST's NGSO satellites and the specific interference risks they pose.

### G.    The Parties' Term Sheet

40.    Inmarsat, Ligado, and AST participated in a bankruptcy court-ordered mediation that ultimately resulted in a binding Settlement Term Sheet, dated June 10, 2025 (the "Term Sheet").

41.    The Term Sheet called for the parties to draft and execute two further, definitive contracts: (i) an "Amended Inmarsat Cooperation Agreement," and (ii) an "Inmarsat-AST Agreement." The Amended Inmarsat Cooperation Agreement was to provide for the coordination of potentially hundreds of new AST satellites, defined as the "Proposed NGSO System." The second document to be drafted, the Inmarsat-AST Agreement, was to give Inmarsat and AST the right to enforce directly against one another the coordination terms ultimately reflected in the Amended Inmarsat Cooperation Agreement, which would cover operation of the new AST satellites.

42.    The Term Sheet contemplated that, once these two new contracts were completed, Ligado would seek confirmation of its reorganization plan with Inmarsat's support. Thereafter, Ligado and AST would seek FCC approval for the Proposed NGSO System as coordinated, and, if certain conditions were met, Inmarsat would support the application. The Term Sheet required that the application request that the FCC "recognize that the operations of the Proposed NGSO System have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." This language confirms that the parties were, in fact, required to coordinate AST's Proposed NGSO System before filing at the FCC. After all, Ligado and AST can only represent truthfully to the FCC that its satellites have been

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 19 of 27 PageID #: 1617

RECEIVED NYSCEF: 12/19/2025

coordinated, and seek the FCC's "recogni[tion]" of that coordination, if coordination has actually occurred.

## H.    The Parties' Difficulty Implementing The Term Sheet, And Resulting Ruling

43.    Negotiation of the two definitive agreements contemplated in the Term Sheet went smoothly—at first. Given the need to adapt the Cooperation Agreement for AST's Proposed NGSO System, the parties agreed to restate the entire Cooperation Agreement rather than a simple amendment. In the weeks immediately following execution of the Term Sheet, the parties exchanged several drafts of the contemplated definitive documents. Most relevant for purposes of this case, they exchanged drafts of updated provisions of the Cooperation Agreement, including Exhibit I (which lists those satellites and their associated ITU filings that are deemed "coordinated" under the Agreement) and Exhibit L (the L-Band Coordination Plan) with technical and other terms adjusted to account for the Proposed NGSO System.

44.    Certain updates were especially important because the original Cooperation Agreement was not drafted for the NGSO satellites in AST's proposed network. From 2007 through today, the Cooperation Agreement has addressed only the coordination of satellites in geostationary orbit—sitting in a single orbital "slot," and maintaining the same fixed position relative to the Earth ("GSO" satellites). Only one operational Ligado GSO satellite is covered by the current coordination agreement. But AST seeks to operate a network of at least 96 NSGO satellites, which are satellites that constantly move in relation to the Earth, from a position much closer to Earth than GSO, and thus present much different coordination challenges.

45.    The process and parameters for coordination are considerably different for an NGSO system than for a GSO satellite. Because GSO satellites always remain in the same relative position to one another, the potential interference from one particular GSO satellite into another is limited only to those satellites within a certain proximity, and the interference

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

environment is static. By contrast, NGSO satellites like those in AST's contemplated system circle the globe every 90 minutes—16 times a day—passing right through the service area of *all of the Inmarsat GSO satellites around the world*. Each AST satellite is a potential source of interference into Inmarsat operations many times a day and the interference from multiple NGSO satellites is aggregated through complex geometries. Coordinating this dynamic environment is a fundamentally different exercise than coordination across the static environment of two GSO systems. These differences, coupled with the requirements of the Coordination Agreement for adding additional satellites, explain why the parties here—at least initially—were exchanging draft amendments to the Cooperation Agreement to accommodate NGSO satellites.

46.     At a high level, the Cooperation Agreement calls for Ligado to operate in different L-band frequencies than Inmarsat in North America, and the drafts called for AST to do the same on its NGSO satellites within North America. Frequency separation is a commonly used means to resolve interference that otherwise could exist with the mobile satellite services operations of different operators. Geographic separation is another common coordination technique to avoid interference. For coordination in the rest of the globe, AST would not operate in the L band *at all outside North America*, consistent with the longstanding geographic separation requirements in Exhibit L of the Cooperation Agreement. Notably, AST would be free to operate in other frequencies in the rest of the world (as its existing satellites already do). As explained below, AST refused to accept this approach that has been the foundation of the Cooperation Agreement for 18 years.

47.     In July 2025, AST circulated comments on a draft amendment that triggered a major disagreement—one that still exists today—relating to the geographic scope of the parties' L-band coordination. The plain language of Exhibit L, as Inmarsat reads it, gives Inmarsat alone

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

"Exclusive Use" of the covered L-Band spectrum outside of North America. Recognizing this point, AST circulated a markup seeking to avoid that restriction. AST proposed to add: "Notwithstanding anything else in this Agreement, Inmarsat and AST acknowledge and agree that . . . AST's operations (including in the L-band) outside of Ligado Region A [essentially, the United States and Canada] and Mexico are not restricted or prohibited by this Agreement."

48.     AST's proposed amendment was unacceptable to Inmarsat. Exclusive use of L-band spectrum outside of North America was a fundamental component of the consideration Inmarsat received in exchange for agreeing to yield spectrum rights to Ligado within North America at the inception of the Cooperation Agreement in 2007. Among other things, that provision requires that Ligado seek and obtain Inmarsat's consent before seeking to operate in the L-band outside North America, where Inmarsat has longstanding operations. AST's proposed change to the Cooperation Agreement had no basis in the Term Sheet. After a few weeks of trying and failing to bridge the divide, the parties filed cross-motions to enforce the Term Sheet before the bankruptcy court. Inmarsat argued that the bankruptcy court should, at a minimum, make clear that the geographic and other restrictions in Exhibit L apply to both Ligado and AST. For its part, Ligado argued that the Cooperation Agreement simply does not speak to the rights of any party outside North America.

49.     In September 2025, the bankruptcy court denied both motions in a manner that postponed resolution of the parties' substantive disputes in favor of simply transposing the Term Sheet language into definitive contracts. The parties were "directed to incorporate the specific language of the Settlement Term Sheet . . . into the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, as applicable, unless otherwise mutually agreed by the parties." During argument on the motion, the bankruptcy court was clear that the parties'

17

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 22 of 27 PageID #:
1620

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/19/2025

substantive disputes should be raised, if at all, at a later day, by following the parties' agreed-
upon dispute resolution procedures: "If there is a dispute about what it ends up meaning in
concrete terms and practical terms, then there is a way in that settlement term sheet to deal with
that. It *provides where you go if you have a disagreement and you can deal with it there*." This
is a reference to the parties' agreement that disputes would be resolved (with certain exceptions)
before courts in New York—not in the bankruptcy court.

50.     Echoing this point, the bankruptcy court's written order was clear that disputes
not resolved by the bankruptcy court were preserved for later adjudication: "All parties' rights
are reserved with respect to the terms and provisions of the Settlement Term Sheet, the Amended
Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement (each as defined in the
Settlement Term Sheet), including, for the avoidance of doubt, the matters presented to the Court
in connection with the Motions to Enforce."

51.     Consistent with the bankruptcy court's order and guidance, the parties executed
an amendment to the Cooperation Agreement (Amendment 22) and an Inmarsat-AST Agreement
in forms that simply attached the Term Sheet—with no substantive provisions beyond that. This
paved the way for the bankruptcy court to approve Ligado's reorganization plan, which it did on
September 29, 2025.

## I.     Ligado's Non-Compliant Application For FCC Approval

52.     Shortly after plan approval, Ligado provided Inmarsat a first draft of its proposed
application with the FCC. Among the concerns that Inmarsat conveyed to Ligado was that
AST—the party operating and controlling the network—was not a co-applicant. The Term Sheet
contemplated that *both* Ligado and AST would apply for FCC approval. After all, it required
both entities to provide due diligence materials, copies of the application for review by Inmarsat,
and, further, included substantive commitments that both entities would make to the FCC.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1
Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 23 of 27 PageID #:
1621
RECEIVED NYSCEF: 12/19/2025

Critically, the FCC application was required to "state that the operations of *all AST and Ligado spacecraft*, individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement." Inmarsat's concern was (and is) that AST refuses to make this commitment to the FCC because it has no intention of honoring it. In fact, AST had repeatedly refused to give its commitment to honor the terms of the Amended Inmarsat Cooperation Agreement.

53.    After reviewing the draft FCC application, Inmarsat also asked various technical questions about AST's planned operations in order to evaluate the interference risks posed by those operations—an essential prerequisite for careful coordination. But these questions in many cases went unanswered. Instead of engaging on the technical issues, the draft FCC application falsely claimed that "the proposed North American L-band NGSO operations are consistent with *and coordinated under the cooperation arrangement between Ligado and Inmarsat*." While the Term Sheet required Ligado and AST to make this statement in its application, that is only because the Term Sheet was premised on the parties' satellites in fact being coordinated under the Amended Inmarsat Cooperation Agreement and that Ligado and AST would not misrepresent the facts to the FCC. However, as noted above, the efforts to coordinate hit an impasse when the parties could not agree on the substantive terms of the L-Band Coordination Plan (Exhibit L) that would go into the Amended Inmarsat Cooperation Agreement. As it stands today, Exhibit L is entirely unchanged from 2010 and is not adapted for NGSO systems like AST's planned network, and Exhibit I (listing coordinated satellites) does *not* include AST's Proposed NGSO System.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1                                                                          INDEX NO. UNASSIGNED
                                                                                 RECEIVED NYSCEF: 12/19/2025

Case 1:26-cv-00118-GBW   Document 20-9   Filed 02/11/26   Page 24 of 27 PageID #:
                                         1622

54.     On November 6, 2025, Inmarsat specifically requested that the parties resume the efforts at coordination that had started months earlier, and stated that it, in the meantime, neither Ligado nor AST should file an application with the FCC falsely "assert[ing] that the Proposed NGSO System has been coordinated with Inmarsat."

55.     Of course, Ligado and AST did not need to be told that they should not falsely assert that the Proposed NGSO System is coordinated when it is not. That is simply common sense. And they were well aware that the Proposed NGSO System was not coordinated, because they had abandoned the coordination efforts earlier this year. Inmarsat has reiterated the lack of coordination repeatedly, not only in the email correspondence discussed above but directly to the FCC (and copied to Ligado and AST) on two separate occasions.

56.     The first occurred on September 9, 2025, when Viasat (Inmarsat's parent company) filed a comment letter with the FCC relating to the application of a third party (Planet Labs PBC) to communicate through its NGSO satellites with certain Inmarsat GSO satellites in the L-band. AST and Ligado filed comments on that application referring to the L-band operations of the Proposed NGSO System. Viasat, in turn, responded by highlighting that AST had no grounds to complain because it was not licensed yet and because, in fact, AST's "potential L-band operations" were not "appropriately coordinated." Notably, AST and Ligado subsequently responded to Viasat's letter but did not dispute that coordination of AST's potential L-band operations had not been completed.

57.     On November 21, 2025, Viasat made a similar filing with the FCC regarding another application from a third party (JSAT Beyond Innovation LLC) that had been similarly opposed by Ligado and AST with reference to the Proposed NGSO System. Again, Viasat was clear that Ligado and AST lacked any basis to complain because they "had not coordinated any

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

potential L-band NGSO operations with Viasat." Viasat added: "Although Inmarsat has invited AST and Ligado to resume coordination negotiations, they have not accepted the invitation. Therefore, the coordination process is far from complete."  Again, when AST and Ligado made a December 15, 2025 reply filing on the JSAT application, they did not dispute Viasat's point that AST's Proposed NGSO System had not been coordinated with Inmarsat.

58.     On December 8, 2025, Ligado filed the FCC application that gives rise to this case. Despite being filed under penalty of perjury, and despite Inmarsat explicitly and repeatedly stating otherwise to Ligado and AST, including in the email correspondence and in the FCC filings discussed above, the application falsely represents that the Proposed NGSO System (now referred to as "SkyTerra Next") is coordinated under the Cooperation Agreement. Among other inaccurate statements, the application represents that "the operations of the SkyTerra Next system *have been coordinated* subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." Ligado and AST know that those agreements did not coordinate the SkyTerra Next system and, in fact, the Amended Inmarsat Cooperation Agreement is not adapted to cover the AST satellites or AST's NGSO satellite system at all. Making matters worse, the application omits Inmarsat's repeated protestations about the lack of coordination and, instead, boldly asserts the application "meets all of the requirements for [Inmarsat's] affirmative support." This statement appears designed to create the false impression that Inmarsat is supportive of the application as filed.

59.     In fact, Inmarsat intends to petition the FCC to deny the application. Inmarsat has no choice but to do so because allowing AST to plow ahead with its planned operations risks damaging interference—including interference with Inmarsat's critical safety services.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW    Document 20-9    Filed 02/11/26    Page 26 of 27 PageID #: 1624

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/19/2025

60.     Inmarsat's opposition to the FCC application will inevitably provoke accusations from Ligado and/or AST that Inmarsat has breached its obligations under the Term Sheet to support the FCC application. Clarity from the Court as to the parties' contractual rights could avoid a major escalation of the parties' disputes, to the benefit of all involved.

61.     The FCC application remains pending.

### CAUSE OF ACTION—BREACH OF CONTRACT

62.     Inmarsat repeats the allegations above.

63.     The Term Sheet obligates Ligado and AST to coordinate the Proposed NGSO System before filing any application with the FCC. This obligation is clear because the Term Sheet requires any FCC application to affirmatively represent, and indeed request that the FCC recognize, that the Proposed NGSO System *has been* coordinated—obviously meaning that no filing can be made until the coordination of that system is completed. The parties have not coordinated the Proposed NGSO System.

64.     The Term Sheet further requires that both AST and Ligado would jointly file the application, not Ligado alone. This obligation is reflected in the fact that the application must commit that "***all AST*** and Ligado spacecraft" will operate strictly in compliance with the limitations in the Amended Inmarsat Cooperation Agreement. The choice to file the application in Ligado's name alone appears designed to allow AST—the entity that would actually own, control and operate the NGSO satellite system—to avoid being formally bound to honor the promises in the application or any conditions that the FCC may impose in connection with a license, including compliance with the Amended Inmarsat Cooperation Agreement. This is not just misleading and unlawful engagement with the FCC; it is a breach of the Term Sheet and creates serious practical risks to Inmarsat's business.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

Case 1:26-cv-00118-GBW     Document 20-9     Filed 02/11/26     Page 27 of 27 PageID #: 1625

RECEIVED NYSCEF: 12/19/2025

65.     Inmarsat therefore seeks a judicial declaration that the Proposed NGSO System has not been coordinated, as required by both the Term Sheet and the Cooperation Agreement, and an order compelling Ligado and AST to comply with their obligations. Damages may arise subsequent to the filing of this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Inmarsat hereby demands

(a)     a judicial declaration that the L-band NGSO satellite operations of Ligado and AST are not coordinated under the Cooperation Agreement;

(b)     an injunction requiring Ligado and AST to immediately cooperate with the Inmarsat to coordinate the L-band NGSO satellite operations of Ligado and AST;

(c)     damages in an amount to be determined at trial; and

(d)     such other relief as the Court deems just and proper.

Dated:  New York, New York
        December 19, 2025

Respectfully submitted,

STEPTOE LLP

By:   /s/ Charles Michael
        Charles Michael
        1114 Avenue of the Americas
        New York, New York 10036
        (212) 506-3900
        cmichael@steptoe.com

Alfred M. Mamlet*
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000
amamlet@steptoe.com
*pro hac vice application forthcoming

Benjamin Finestone
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue,
New York, New York 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

*Counsel for Plaintiff Inmarsat Global Limited*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.