# **EXHIBIT J**

Case 1:26-cv-00118-GBW Document 20-10 Filed 02/11/26 Page 1 of 18 PageID #: 1626

-/0

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LIGADO NETWORKS LLC, *et al.*,[1]<br><br>Debtors. | Ch. 11<br>Case No. 25-10006 (TMH)<br>Jointly Administered<br>**Re: Docket No. 826** |

## INMARSAT GLOBAL LIMITED'S OPPOSITION TO
## LIGADO'S MOTION TO ENFORCE THE PARTIES' MEDIATED AGREEMENT

1. Inmarsat Global Limited ("Inmarsat") hereby opposes the Motion of the Debtors (collectively, "Ligado") to enforce the "Mediated Agreement" (D.I. 692-1) among Inmarsat, Ligado, and AST & Science, LLC ("AST"), and states as follows:

### INTRODUCTION

2. The sole question before the Court is a narrow one: Did AST agree in the Mediated Agreement to accept the same limitations that the Cooperation Agreement currently imposes on Ligado? The answer is clearly "yes."

3. Ligado's motion to enforce the Mediated Agreement does not truly contend otherwise, focusing the majority of its attention not on what the Mediated Agreement provides but on the Cooperation Agreement, which, according to Ligado, does not restrict its L-band activity outside North America. Inmarsat emphatically disagrees with Ligado's interpretation of the Cooperation Agreement and believes the Cooperation Agreement unambiguously provides

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

Inmarsat "Exclusive Use" of the L-band outside North America. But the Court need not, and should not, wade into what Inmarsat and Ligado agreed to when the operative Cooperation Agreement was signed in 2010.

4. The relevant agreement under the Court's purview is not the Cooperation Agreement (or its Exhibit L) but the Court-approved Mediated Agreement. That is the agreement the Court indicated it would be interpreting at the forthcoming hearing. *See* D.I. 879, at 9:2-7 ("[A]ll I need to do here is interpret the settlement papers that arose out of mediation . . . ."); *id.* at 15:6-13 ("The mediation resulted in a written memorialization and that's what I'll be looking to . . . ."). All the Court needs to do to move matters forward is to make clear that, under the plain language of the Mediated Agreement, both Ligado and AST are bound to honor the existing geographic and other limits of the Cooperation Agreement (whatever they may be), and bound to sign definitive documents reflecting that commitment. The existing limits in Exhibit L or elsewhere in the Cooperation Agreement do not need to change or be interpreted. Indeed, the parties expressly agreed in the Mediated Agreement that the technical and geographic requirements "will not change." Mediated Agreement § 2. Holding AST to its mediated bargain will permit Ligado's reorganization Plan to move forward swiftly.

5. The key interpretive issue that is before the Court and that relates to the Mediated Agreement—whether AST is bound to the Cooperation Agreement limits—appears to be barely disputed (if at all) by Ligado. Indeed, Ligado's motion fails to *even mention* the critical provisions of the Mediated Agreement by which AST *expressly agreed* to comply with the Cooperation Agreement's existing limits. Ligado does not mention AST's agreement "that strict compliance with the **geographic**, power, out-of-band emissions and other limits" in the Cooperation Agreement is "**essential to [its] integrity**." *Id.* Rider A. Ligado does not mention that

2

AST agreed to a detailed enforcement regime should there be a "Coordination Breach," where a "Coordination Breach" is defined as a breach of "the technical and/or geographic limitations" of the Cooperation Agreement. *Id.* § 3. Ligado does not mention that it agreed to tell the Federal Communications Commission ("FCC") that "the operations of *all* AST and Ligado spacecraft . . . will *be consistent with and remain* within the technical, *geographic*, and other limitations in the Amended Inmarsat Cooperation Agreement." *Id.* § 2.

6. Ligado's main point with respect to the Mediated Agreement appears to be, instead, that the Mediated Agreement does not "preclude[] [AST] from ever operating in the L-Band outside of the United States and Canada." D.I. 826 ¶ 6. "If this were true," Ligado says, "the Mediated Agreement would have stated so expressly." *Id*. But this is a strawman. Inmarsat *agrees* that the Mediated Agreement imposes no *additional limits* on AST or Ligado beyond those in the Cooperation Agreement. But the Mediated Agreement *does* "state[] . . . expressly"—over and over again—that AST agrees to comply with the same geographic limits that the Cooperation Agreement imposes on Ligado, whatever those limitations may be.

7. To be sure, the parties strongly disagree about exactly what geographic limits the Cooperation Agreement establishes—but, again, that issue is not properly before the Court. If and when AST or Ligado seek to operate in a manner implicating the parties' underlying dispute over the metes and bounds of the Cooperation Agreement, that dispute can be resolved in the appropriate forum and in the context of a concrete factual dispute. And if a future court determines that, contrary to Inmarsat's understanding, Exhibit L does not restrict AST or Ligado from L-band operations outside North America, then so be it. For now, however, any proclamation by the Court about the parties' rights with respect to hypothetical, future AST or

Ligado satellites would be an improper advisory opinion about the Cooperation Agreement, and even beyond the statutory authority of this Court to decide.

8. At bottom, this dispute is far simpler than Ligado's motion makes it out to be. The Court need only answer whether Ligado and AST, in exchange for preserving the benefits of the Cooperation Agreement, agreed to honor the corresponding burdens, just as debtors do every day in this Court. They clearly did. Consistent with the Mediated Agreement, the definitive documents should reflect that obligation.

## BACKGROUND

9. Inmarsat respectfully refers the Court to its earlier-filed motion to enforce the Mediated Agreement, which sets forth the relevant factual background in detail. D.I. 825 ¶¶ 15-46. For the Court's convenience, a brief summary follows.

10. Inmarsat and Ligado are parties to a 100-year Cooperation Agreement originally signed in 2007 to coordinate satellite spectrum rights. The operative version is the Amended and Restated Cooperation Agreement, dated August 6, 2010 (the "Cooperation Agreement"). D.I. 824 Ex. B. The fundamental bargain reflected in the Cooperation Agreement is that, in exchange for Inmarsat providing Ligado with exclusive use of most of the L-band spectrum in North America, Ligado provided Inmarsat with (1) substantial cash payments; (2) exclusive use of some L-band spectrum in North America; and, most relevant for this motion, (3) exclusive use of all L-band spectrum outside North America, pursuant to Exhibit L of the Cooperation Agreement. *See* Cooperation Agreement Ex. L; *see also* D.I. 825 ¶¶ 21-25.

11. Ligado filed this bankruptcy in January because it was unable to pay more than $525 million that had come due under the Cooperation Agreement. Ligado's pre-planned exit is premised on a commercial transaction whereby it would essentially sublease its spectrum rights to AST through the end of the Cooperation Agreement term in 2107. D.I. 2 ¶ 15. Inmarsat

objected to being thrust into an involuntary 80-year partnership with AST without the ability to directly enforce the existing Cooperation Agreement terms against AST. D.I. 462.

12. As part of a Court-ordered mediation before Hon. Robert Drain (Ret.), Inmarsat, Ligado and AST entered into the Mediated Agreement that resolved Inmarsat's objections. The Mediated Agreement calls for the parties to draft and execute two definitive agreements implementing their settlement—an Amended Cooperation Agreement and an Inmarsat-AST Agreement providing for direct enforcement rights for breaches of the Amended Cooperation Agreement. *See* Mediated Agreement, at pg. 1 nn.4-5. Following Plan confirmation, Ligado will resume making approximately $15 million quarterly payments to Inmarsat along with "Cure Payments" totaling $520 million by March 2026. *Id*. § 5.

13. The Mediated Agreement was designed to ensure that AST would be directly bound by the existing Cooperation Agreement limits and subject to meaningful enforcement mechanisms, including prompt relief for any "Coordination Breaches"—which are defined as breaches of the Cooperation Agreement's "technical and/or geographic limitations," including those in "Exhibits B, C, L, M, N, T and U." *Id*. § 3.

14. The Mediated Agreement also makes clear that the Cooperation Agreement's limits are "essential" to its "integrity." This is reflected in the first sentence of Rider A:

> **Rider A**
> The Parties expressly agree that strict compliance with the geographic, power, out-of-band emissions and other limits set forth in this Agreement ("**Cooperation Agreement Limits**") is essential to the integrity of this Agreement. Ligado/AST acknowledges that Inmarsat provides

15. To realize these commitments, Inmarsat proposed that the final Inmarsat-AST Agreement that implements the Mediated Agreement include the language below, whereby AST

5

would "strictly comply" with the limits since all parties agreed "that strict compliance" is

"essential."

Inmarsat's Proposal, August 13, 2025

> **4.2 Strict Compliance with the Amended Cooperation Agreement Limits.** The Parties expressly agree that their operations shall strictly comply with the geographic, power, out-of-band emissions and other limits set forth in the Amended Cooperation Agreement ("**Cooperation Agreement Limits**"), which is essential to the integrity of this Agreement.[19]

But AST deleted the language entirely a few hours later.

AST Markup, August 13, 2025

> ~~4.2 **Strict Compliance with the Amended Cooperation Agreement Limits.** The Parties expressly agree that their operations shall strictly comply with the geographic, power, out-of-band emissions and other limits set forth in the Amended Cooperation Agreement ("Cooperation Agreement Limits"), which is essential to the integrity of this Agreement.[19]~~ 4.3

16. Inmarsat cannot move forward unless and until AST agrees to comply with the Cooperation Agreement limits exactly as they currently apply to Ligado. The Mediated Agreement requires no more and no less. Ligado apparently will not move forward on that basis and so both parties have filed motions to enforce. Both parties agree that the terms of the Mediated Agreement are unambiguous and enforceable.

**ARGUMENT**

**I. Ligado Does Not Seriously Dispute that the Mediated Agreement Unambiguously Binds AST To The Same Limitations the Cooperation Agreement Imposes on Ligado, Including Those in Exhibit L**

17. As Inmarsat explained in its motion, the Mediated Agreement makes clear that AST agreed to be bound by the same limitations that the Cooperation Agreement imposes on Ligado, including the geographic limitations in Exhibit L. D.I. 825 ¶¶ 48-60. Indeed, Ligado does not appear to seriously dispute this point at all.

6

18. *First*, the Mediated Agreement provides that "AST and Inmarsat shall execute a separate binding agreement (the 'Inmarsat-AST Agreement') to give the parties the right to enforce directly against each other the commitments made to each other in Sections 2-3 hereof . . . . " *See* Mediated Agreement, pg. 1 n.5. Section 2, in turn, provides that the regulatory applications for AST's proposed NGSO system will "state that the operations of **all** AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, **will be consistent with and remain within the technical, geographic and other limitations** in the Amended Inmarsat Cooperation Agreement." *Id.* § 2 (emphasis added). Ligado's motion nowhere explains how it can commit to regulators that "the operations of **all** AST and Ligado spacecraft" will both (i) "be **consistent with**" and (ii) "**remain**" within the Cooperation Agreement limits, if AST is not bound to comply with those very limits.[2]

19. *Second,* AST also agreed that it would ask the U.S. and Canadian regulators to condition the license for its NGSO system on limiting its L-band operations to the Ligado service area under the Cooperation Agreement:

> The applications will expressly. . . request that the FCC and ISED recognize that the operations of the Proposed NGSO System have been coordinated **subject to the terms of the Amended Inmarsat Cooperation Agreement** and the Inmarsat-AST Agreement, and give effect to such agreements by **licensing the Proposed NGSO System to operate in accordance with the terms of such Agreements**. Such technical and **geographic requirements** include (but are not limited to) (i) those **limiting the Ligado service area** under the different Tiers **in the Amended Inmarsat Cooperation Agreement** . . . .

---

[2] Section 2 also provides that neither Ligado or AST are required to "constrain their user terminal emissions" or "their satellite emissions (individually or in the aggregate) below the level otherwise provided in Exhibit L." Mediated Agreement § 2. This language clarifying that Ligado and AST may not be constrained *beyond* what is provided in Exhibit L would make no sense if Ligado and AST were not actually bound to comply with Exhibit L in the first instance.

7

*Id.* § 2 (emphasis added, footnotes and paragraph break omitted). Ligado's motion does not explain how AST is to represent to regulators that its system is "subject to" the Cooperation Agreement, including the "service area" therein, if those restrictions are inapplicable.

20. *Third*, Section 3 expressly incorporates the geographic limits in Cooperation Agreement Exhibit L, the source of Inmarsat's exclusive right to use L-band spectrum outside of North America. A violation of those rights is defined as a "Coordination Breach":

> The Amended Inmarsat Cooperation Agreement shall include a process for resolving any disputes about compliance with its technical, ***geographic*** and other limitations, or any claims of interference. If, a Party is alleged to have breached the technical and/or ***geographic limitations*** of the Amended Inmarsat Cooperation Agreement in ***Exhibits*** B, C, ***L***, M, N, T and U, (the "Cooperation Agreement Limits") and such breach is alleged to either (a) be caused by Inmarsat's operations, or (b) be caused by the operations of the Proposed NGSO System and/or the Ligado satellites (in either case, a "***Coordination Breach***,") . . . .

*Id.* § 3 (emphases added). Among other remedies in Section 3 is prompt access to injunctive relief for Coordination Breaches. *Id.* Section 3 thus indisputably contemplates that AST will be bound by Exhibit L and remain in compliance with it. Ligado's motion does not explain how noncompliance with the Cooperation Agreement's "technical and/or geographic limitations" can be deemed a "Coordination Breach" if AST is not bound to honor them in the first place.

21. *Fourth*, Rider A again emphasizes the importance of the geographic and other limits under the Cooperation Agreement: "The Parties expressly agree that strict compliance with the ***geographic***, power, out-of-band emissions and other limits set forth in this Agreement ('Cooperation Agreement Limits') is ***essential to the integrity of this Agreement***." *Id.* at Rider A (emphasis added). Ligado's motion never mentions Rider A's express language even once.

22. The background context giving rise to the Mediated Agreement—also largely ignored by Ligado—only reinforces that the Cooperation Agreement limits were being preserved.

8

As detailed more fully in Inmarsat's earlier-filed motion, Inmarsat objected to the proposed AST transaction because, as originally conceived, AST would be gaining the benefit of the Cooperation Agreement without all the corresponding burdens. AST was effectively seeking an end-run around Bankruptcy Code § 365(f), which requires contracts be assigned only on a "*cum onere*" basis—the good with the bad. D.I. 825 ¶¶ 50-52. Inmarsat insisted that it needed to have the same rights *vis-à-vis* AST as Inmarsat had all along *vis-à-vis* Ligado, including a mechanism for direct enforcement. It makes no sense to suggest that Inmarsat agreed to drop these objections, and to have AST essentially step into Ligado's shoes, while also simultaneously agreeing that AST was somehow not bound to the important restrictions in the Cooperation Agreement.

23. Ignoring both the Mediated Agreement's text, and the context in which it arose, Ligado's motion focuses instead on a strawman. Specifically, Ligado argues that footnote 7 of the Mediated Agreement, listing certain elements that Ligado must include its "initial" applications to regulators, does not *itself* grant Inmarsat a right to exclude AST from L-band spectrum outside North America (beyond AST's initial regulatory application).³ D.I. 826 ¶ 35. That is true but irrelevant. Inmarsat *agrees* that footnote 7 only applies to Ligado/AST's initial application. Inmarsat's argument is that *elsewhere* in the Mediated Agreement—each of the places cited above—AST agreed to be bound by Exhibit L of the Cooperation Agreement which, according to

---

³ For instance, Ligado argues that "[n]owhere does footnote 7 say what Inmarsat claims: that AST agrees never to file other applications seeking authorization outside the scope of the Inmarsat Cooperation Agreement to operate a proposed NGSO system in the L-Band Spectrum outside of North America." D.I. 826 ¶ 35. But Inmarsat does *not* claim that *footnote 7* does any such thing. Inmarsat has never argued that footnote 7 applies to anything but AST's initial regulatory applications. Rather, it is the text of Exhibit L itself, and AST's agreement to be bound to Exhibit L that would, in Inmarsat's view, prohibit AST from "seeking authorization . . . to operate a proposed NGSO system in the L-band spectrum outside of North America."

9

Inmarsat, in turn gives Inmarsat exclusive L-band rights outside North America. Put differently, the source of Inmarsat's exclusive L-band rights outside North America is Exhibit L of the Cooperation Agreement and only Exhibit L. Ligado ignores that argument altogether.

24. Indeed, the header of the only section of Ligado's brief that actually addresses the unambiguous text of the Mediated Agreement states that "***Neither the Mediated Agreement Nor the AST Order*** [the Order approving the Mediated Agreement] Precludes AST's Ability to Obtain Separate Rights To Operate the Proposed NGSO System in the L-Band Outside North America." D.I. 826, pg. 14 (emphasis added). But again, that is not Inmarsat's argument. Inmarsat's view is that as a condition for AST getting exclusive rights to the majority of L-Band Spectrum in North America *the Cooperation Agreement* (and specifically Exhibit L thereof) "precludes" AST from obtaining "separate rights to operate the Proposed NGSO System in the L-Band outside North America." All the Mediated Agreement and AST Order do is bind AST to comply with Exhibit L, whatever Exhibit L states. Ligado's failure to even try to rebut that point is fatal to its motion.

25. Ligado accuses Inmarsat of trying to "insert words or concepts that are not in the Mediated Agreement," *id.* ¶ 31, and, at the recent status conference Ligado's counsel suggested that Inmarsat was "asking to put into the [A]mended [C]ooperation [A]greement" a "restriction" that was not "part of the settlement." Tr. Aug. 21, 2025, at 7:25-8:11. These statements invert reality. Inmarsat seeks only to hold Ligado and AST to the provisions above, *see* ¶¶ 18-21, *supra,* consistent with Inmarsat's position all along that it needs to be able to hold AST to *all* the Cooperation Agreement's existing terms. Inmarsat does *not* seek to add any *new* "restriction[s]" to the Cooperation Agreement; its seeks only to hold Ligado and AST to the ones that exist now. By contrast, it is AST that is trying to add new terms and "insert words or concepts" to which the parties never agreed. Specifically, it is AST that tried to amend Exhibit L to provide AST an

10

*exception* from the Exclusive Use provisions that have been in force between Inmarsat and Ligado for nearly two decades:

> (iv) Notwithstanding anything else in this Agreement, Inmarsat and AST acknowledge and agree that:
>
> (A) With regard to Mexico, the technical requirements in this Agreement shall not apply to AST (or its Related Parties) except for their use of the Tier 1 Spectrum; and
>
> (B) AST's operations (including in the L-band) outside of Ligado Region A and Mexico are not restricted or prohibited by this Agreement.
>
> (B)

26.     AST's proposal makes crystal clear that the parties are before the Court because of AST's attempt to exempt itself from the Cooperation Agreement's limits—not because Inmarsat is trying to add *new* limits to that (or any other) agreement. After all, it is AST that, despite repeatedly agreeing to be bound by the Cooperation Agreement's limits in the Mediated Agreement, now refuses to agree to a straightforward clause in the Inmarsat-AST Agreement that would mirror the text of the Mediated Agreement and state that AST "shall strictly comply" with those limits, whatever they are. D.I. 825 ¶ 25.

II.     **To The Extent Ligado Suggests That AST Agreed to Honor the Cooperation Agreement Only for Purposes of Its "Initial" Regulatory Applications, Not For the Duration of the Cooperation Agreement Term, Ligado is Wrong**

27.     To the extent the Court reads Ligado's motion to accept that AST is bound by whatever limits are in the Cooperation Agreement—which is the clearest way to read its motion—then this Court need go no further. But to the extent Ligado is contending that footnote 7 somehow exempts AST from the Cooperation Agreement's limitations on Ligado, the Court should reject those arguments.

28.     Ligado's motion focuses heavily the word "initial" in footnote 7, bolding it ten times. Although not perfectly clear, Ligado *may* be advancing the following argument: because

11

the "*initial* FCC and ISED applications [must] state that use of the L-Band by the Proposed NGSO System (i) will be limited to North America and (ii) will comply with the Inmarsat Cooperation Agreement," AST is thereby free to "file other applications seeking authorization outside the scope of the Inmarsat Cooperation Agreement to operate a proposed NGSO system in the L-Band Spectrum outside of North America." D.I. 826 ¶ 35 (emphasis in original). The problems with this argument, if it is indeed what Ligado is advancing, are myriad.

29. *First*, as discussed at length above, the Mediated Agreement expressly provides—repeatedly—that AST and Ligado *are* bound to the Cooperation Agreement's limits. Indeed, footnote 7 itself emphasizes "Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement." Mediated Agreement § 2 n.7. The only such exclusive rights are Inmarsat's geographic Exclusive Use rights in Exhibit L. More importantly, nothing in the footnote states that the Cooperation Agreement limits are somehow erased after the initial application. Similarly, nothing in the footnote otherwise overrides the key textual provisions discussed above (i) defining Coordination Breaches by reference to the Cooperation Agreement limits, *see* Mediation Agreement § 3; (ii) requiring regulatory applications to commit that "all" Ligado and AST satellites will "remain" within those limits, *id*. § 2; (iii) asking the FCC to condition the AST NGSO system license on compliance with the geographic limits in the Cooperation Agreement, *id.*; and (iv) stating that "strict compliance" with those limits is "essential to the integrity" of both the Inmarsat-AST Agreement and the Amended Cooperation Agreement. *Id*. Rider A.

30. *Second*, it is a non sequitur to infer from the footnote requirement to include the limits in the "initial" application that those very limits vanish thereafter. That would be an extremely unusual and roundabout way to massively re-allocate the parties' rights, and, to borrow

12

a phrase from Ligado's own brief, would be "squeez[ing] an elephant through a mousehole." D.I. 826 ¶ 47.

31. There is good reason for the parties to have included the terms "solely" and "initial" in footnote 7. In order to obtain Inmarsat's *affirmative support* for the initial applications AST not only reaffirmed that it would comply with the Cooperation Agreement Limits (in subsections (a) and (b)), it agreed—"solely" with respect to the "initial" applications—to certain limitations that went *beyond* the scope of the Cooperation Agreement in subsections (c)-(e). Inmarsat bargained to avoid a situation where it was obligated to support an application that otherwise sought to undermine its legitimate interests in frequency bands *not* governed by the Cooperation Agreement. For instance, as recognized in subsection (c), Inmarsat operates an "S-band network over Europe and North Africa." There is no prohibition in either the Cooperation Agreement or the Mediated Agreement that would prevent AST from applying to use that very same S-band spectrum in place of Inmarsat—*except* the prohibition in footnote 7 that prevents AST from seeking such authority in its initial application. Were it otherwise, AST could have applied for Inmarsat's spectrum and Inmarsat would nevertheless have been required to publicly support that application. But once AST's initial application is in, AST can subsequently choose to file for Inmarsat's S-band spectrum over Europe and North Africa because (i) there is no relevant prohibition against that in either the Cooperation Agreement or the Mediated Agreement, and (ii) Inmarsat is free to oppose such subsequent applications. The same rationale applies with respect to subsections (d) and (e), which also refer to other spectrum where Inmarsat has interests but are not covered by the Cooperation Agreement.

32. Put simply, the bargain in these subsections is clear: Ligado and AST wanted Inmarsat's support for the initial regulatory applications, and Inmarsat agreed to support those

13

applications as long they did not implicate Inmarsat's interests in spectrum bands *not covered* by the Cooperation Agreement. But nowhere in the footnote did Inmarsat agree to abandon the L-band spectrum rights that *are covered* by the Cooperation Agreement.

33. The footnote's reference to "initial" application makes clear that the Mediated Agreement itself does not prohibit AST from pursuing approval for those other spectrum bands in subsequent applications, when Inmarsat would not be correspondingly bound to provide its support. But the footnote simply does not erase the limits on the use of L-Band spectrum engraved in the Cooperation Agreement.

34. *Finally*, "business contracts must be construed with business sense," *In re Downey Fin. Corp.*, 499 B.R. 439, 454 (Bankr. D. Del. 2013), and Ligado's proposed construction makes none. While Ligado's motion focuses on the geographic limitations it seeks to avoid, its argument implicates *all* the Cooperation Agreement limitations in a way that simply cannot be adopted. Under Ligado's view, AST could launch an unlimited number of satellites pursuant to a subsequent regulatory application and those satellites would not be subject to *any* of the Cooperation Agreement limits. AST's satellites would be permitted to operate in the L-band in the United States at any power level AST wants, including power levels that substantially exceed the Cooperation Agreement power limits, disrupting (or even destroying) Inmarsat's own L-band operations. But according to Ligado, Inmarsat would be powerless to stop AST in this circumstance because, in the Mediated Agreement, Inmarsat apparently agreed that AST's ongoing compliance is not required. Once AST promises to comply in its initial application to the FCC, all bets are off.

35. If Ligado and AST really thought they had bargained for Inmarsat to entirely forgo the protection of the Cooperation Agreement limits, then they would be able to point to an

14

express provision in the Mediated Agreement which says exactly that. The absence of such an express provision speaks volumes.[4]

### III. This Court Need Not, And Should Not, Resolve the Parties' Dispute About the Meaning of Cooperation Agreement Exhibit L

36. Inmarsat understands that, for purposes of the forthcoming hearing, the Court will be considering the proper interpretation of the Mediated Agreement only. D.I. 879, at 9:2-7; 15:6-13. Nonetheless, given the heavy reliance in Ligado's motion on its interpretation of Cooperation Agreement—an interpretation with which Inmarsat disagrees profoundly—it bears emphasizing that the Court need not, and indeed should not, delve into abstract questions about the scope of the Cooperation Agreement or Exhibit L.

37. It suffices to move Ligado's reorganization Plan forward for the Court to decide *whether* the Mediated Agreement preserves the Cooperation Agreement's limits, leaving for another day (and another court) the exact scope of *what* those limits are. Ligado and AST have not even applied to regulators to provide a satellite service outside North America inconsistent with the Exclusive Use rights Inmarsat is claiming, let alone launched any satellites. If and when either occur, the parties can litigate the scope of the Cooperation Agreement in the appropriate forum, applying the Cooperation Agreement's terms to the specific factual context that exists then. Indeed, the Mediated Agreement includes detailed dispute resolution procedures to provide a forum for resolving disputes about what the Cooperation Agreement requires. Should a dispute

---

[4] Ligado's motion also references extrinsic evidence that is not properly before the Court, both because the Mediated Agreement is unambiguous and because much of it violates federal mediation privilege and Local Rule 9019–5(d). D.I. 825 ¶¶ 61-65. Inmarsat also believes that Ligado's extrinsic evidence does not show what Ligado claims. Indeed, the extrinsic evidence actually supports Inmarsat. However, because the forthcoming hearing is focused on interpreting the Mediated Agreement *without* extrinsic evidence, D.I. 879, at 9:2-7, 15:2-13, Inmarsat will not discuss extrinsic evidence further, reserving its right to make further submissions if the Court concludes that the Mediated Agreement is ambiguous.

arise, the parties can invoke the dispute resolution procedures they agreed to at the appropriate time.[5]

## CONCLUSION

38.     For the stated reasons, the Court should deny Ligado's motion to enforce the Mediated Agreement.

Dated: August 27, 2025

| STEPTOE LLP | PACHULSKI STANG ZIEHL & JONES LLP |
|---|---|
| By: */s/ Alfred M. Mamlet* <br> Alfred M. Mamlet (admitted *pro hac vice*) <br> 1330 Connecticut Ave NW <br> Washington, DC 20036 <br> (202) 429-3000 <br> amamlet@steptoe.com <br><br> Charles Michael (admitted *pro hac vice*) <br> 1114 Avenue of the Americas <br> New York, New York 10036 <br> (212) 506-3900 <br> cmichael@steptoe.com | By: */s/ Laura Davis Jones* <br> Laura Davis Jones (DE Bar No. 2436) <br> Timothy P. Cairns (DE Bar No. 4228) <br> 919 N. Market Street, 17th Floor <br> P.O. Box 8705 <br> Wilmington, DE 19899-8705 <br> (302) 652-4100 <br> ljones@pszjlaw.com <br> tcairns@pszjlaw.com |

---

[5] Issuing a judicial interpretation of the Cooperation Agreement at this point is not only unnecessary, but exceeds the authority of this Court for at least two reasons. *First*, bankruptcy courts, like other federal courts, cannot "give advisory opinions," *Coffin v. Malvern Fed. Savings Bank*, 90 F.3d 851 (3d Cir. 1996), a classic example of which is "[c]onstruing a contract" based on a "hypothetical state of facts." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649 (3d Cir. 1990). *Second*, the parties' competing motions are grounded in the Court's residual equitable authority under Bankruptcy Code § 105, D.I. ¶ 14, D.I. 826 ¶¶ 24, 27, which authorizes bankruptcy courts to interpret and enforce settlements "executed under the auspices of the Bankruptcy Court," *In re Stokes*, 198 B.R. 168, 175 (E.D. Va. 1996); *see also In re River Center Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (Section 105(a) is appropriate for "enforcing earlier orders of the Court and agreements approved by the Court"). Bankruptcy Code section 105, however, is not an "independent source of substantive authority," *In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005), and cannot be used to proclaim the meaning of a pre-bankruptcy contract under state law. *Accord In re Nunez*, Nos. 98-CV-7077, 2000 WL 655983, at *8 (E.D.N.Y. Mar. 17, 2000) (Section 105(a) "plainly do[es] not allow courts to issue advisory opinions[.]").

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Benjamin Finestone*
Benjamin Finestone
295 5th Avenue,
New York, NY 10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 2010
Austin, TX 78701
(737) 667-6100
matthewscheck@quinnemanuel.com

*Counsel for Inmarsat Global Limited*