IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>LIGADO NETWORKS LLC, *et al.,*<br><br>Debtors. | Chapter 11<br>Bankr. Case No. 25-10006 (TMH)<br><br>(Jointly Administered) |
| INMARSAT GLOBAL LIMITED,<br><br>Appellant,<br><br>v.<br><br>AST & SCIENCE LLC and LIGADO NETWORKS LLC<br><br>Appellees. | Civil Action No. 26-cv-00118-(GBW)<br><br>Appeal from the Bankruptcy Court |

**DECLARATION OF JENNIFER A. MANNER IN SUPPORT OF OBJECTION OF
AST & SCIENCE LLC TO MOTION FOR STAY PENDING APPEAL**

I, Jennifer A. Manner, do hereby declare as follows:

1. I am the Senior Vice President of Regulatory Affairs and International Strategy at AST & Science LLC ("**AST**"). I submit this declaration in support of AST's objection, filed contemporaneously herewith, to the *Emergency Motion for Stay Pending Appeal* (the "**Stay Motion**") filed by Inmarsat Global Limited ("**Inmarsat**"). As explained below, AST will be irreparably harmed if the Stay Motion is granted. Conversely, Inmarsat will suffer no harm if the Stay Motion is denied.

2. I also submit this declaration to respond to certain statements that were included in the Declaration of John P. Janka (the "**Janka Declaration**"), which Inmarsat submitted in support of the Stay Motion. Contrary to Mr. Janka's suggestion otherwise, *see* Janka Decl. ¶ 30, there will be no risk to the operations of Inmarsat's satellite services if the Stay Motion is denied. The

Proposed NGSO System (as defined below) is not yet approved by the United States and Canadian regulatory authorities—*i.e.*, the Federal Communications Commission ("**FCC**") and the Innovation, Science and Economic Development Canada ("**ISED**")—and therefore is not operational, much less constructed or deployed. Inmarsat is fully protected in any event because, at the time the Proposed NGSO System is operational, Inmarsat has the right to avail itself of the Coordination Breach Procedures (as defined below) and seek highly expedited injunctive relief. I explain all this further below.

3. I have more than 30 years of experience in telecommunications and spectrum management issues in private industry, the government and academia. Prior to joining AST, I served as a senior advisor at the U.S. Department of Commerce's National Telecommunications and Information Administration, and as Senior Vice President of Regulatory Affairs at EchoStar Corp., a global satellite operator, where I was responsible for all policy and spectrum-related issues for the company. Prior to EchoStar, I served at the FCC as the Deputy Chief of the Office of Engineering and Technology and the Deputy Chief of the Public Safety and Homeland Security Bureau. I have also held senior positions at Skyterra, Inc. (now Ligado) and MCI/Worldcom (now Verizon) and was Senior Counsel to FCC Commissioner Abernathy, as well as an adjunct professor of global communications regulation and policy at Georgetown University Law Center and the American University George Washington Law School. I have also authored three books and numerous scholarly articles on spectrum and space-related issues.

4. I am responsible at AST for obtaining governmental regulatory approval of the proposed non-geostationary satellite orbit system that, through payloads operated and controlled by Ligado Networks LLC (together with its affiliates, "**Ligado**"), will operate in the L-band electromagnetic frequency spectrum (the "**L-Band Spectrum**") in North America (the "**Proposed**

**NGSO System**").  I was also involved in negotiating some of the extensive agreements described below, or have knowledge of these agreements, through which Ligado, Inmarsat and AST have coordinated the use of the Proposed NGSO System with Inmarsat's satellites.

5. Unless stated otherwise, the statements in this declaration are based on my personal knowledge and the exhibits are true and correct copies.

**The AST Transaction, the Mediated Agreement and the Coordination of the Proposed NGSO System**

6. Ligado is a mobile communications company that provides mobile satellite services and is licensed by the FCC and ISED the ("**Regulatory Authorities**") to operate satellites in the L-Band Spectrum in North America.

7. Like Ligado, Inmarsat also provides mobile satellite services to its customers and is licensed to operate satellites in the L-Band Spectrum in North America.  To coordinate the use of their FCC-licensed L-Band Spectrum and to avoid harmful interference, Ligado and Inmarsat entered into a longstanding cooperation agreement (as amended and restated from time to time, the "**Cooperation Agreement**") which, among other things, coordinates the use by Inmarsat and Ligado of the L-Band Spectrum.  The Cooperation Agreement contains dozens of pages concerning the geographic, technical, power and other parameters which Inmarsat and Ligado must meet to limit harmful interference to one another's operations.  I know this based on my familiarity with the present version of the Cooperation Agreement, and also because I helped to negotiate the Cooperation Agreement during my employment with Skyterra, Inc. (now Ligado).

8. On information and belief, I understand that, on or about January 5, 2025, Ligado and certain of its affiliates commenced Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The cornerstone of Ligado's Chapter 11 cases and its confirmed Chapter 11 plan of reorganization (the "**Plan**") is a long-term commercial

transaction between Ligado and AST (the "**AST Transaction**").  Pursuant to the AST Transaction, Ligado will provide AST with rights to use certain of its licensed L-Band Spectrum that will be used to provide direct-to-device services, including voice, data and broadband. In exchange, AST will provide Ligado with $550 million plus certain warrants and a substantial revenue stream to fund Ligado's business following its emergence from Chapter 11.

9. On information and belief, I understand that, on March 22, 2025, Ligado filed a motion with the Bankruptcy Court seeking approval of the AST Transaction.  Inmarsat was the sole party that objected to the AST Transaction. I understand that Inmarsat wanted to obtain so-called "cure" payments that it alleged were owed by Ligado under the Cooperation Agreement. Inmarsat did not want to wait as many as "three years" for AST to "obtain[] all requisite regulatory approvals" and did not want to bear the risk that the AST Transaction would not be approved by regulators before receiving those cure payments. *See* Bankr. Dkt. No. 462 ¶¶ 1, 5.

10. I understand that, thereafter, AST, Ligado and Inmarsat, among others, engaged in months of hard-fought, arms'-length mediation before former Bankruptcy Court Judge Robert Drain.  This mediation resulted in an agreement (the "**Mediated Agreement**") between the parties. The Bankruptcy Court presided over the proceedings necessary for approval of the Mediated Agreement and, indeed, approved the Mediated Agreement in its entirety on June 23, 2025 pursuant to an order (the "**Mediation Order**"). *See* Bankr. Dkt. No. 692 ¶ 6.[1]

11. The Mediated Agreement broadly: (i) provides for AST to fund payment of $535 million to Inmarsat on an accelerated time frame and well before final regulatory approval of the AST Transaction; (ii) requires AST to make an enforceable promise that the operations of the

---

[1] A copy of the Mediation Order, which attaches the Mediated Agreement thereto, is attached hereto as composite **Exhibit 1**.

4

Proposed NGSO System will comply with the extensive technical, geographic and other limitations in the Cooperation Agreement and (iii) provides procedures (the "**Coordination Breach Procedures**"), pursuant to which Inmarsat can obtain highly expedited injunctive relief addressing any alleged interference caused by any eventual operations of the Proposed NGSO System that are in excess of the technical, geographic or other limits imposed by the Cooperation Agreement, as amended on September 21, 2025 (the "**Amended Inmarsat Cooperation Agreement**"). In addition, AST and Inmarsat committed to execute a direct agreement (the "**Inmarsat-AST Agreement**") to enforce the commitments made to each under the Mediated Agreement.

12. AST has already funded the payment of $420 million to Inmarsat, which Inmarsat received "indefeasibly" on or about October 31, 2025. *See* Ex. 1 (Mediated Agreement) § 4. AST is contractually obligated to fund an additional $100 million for payment to Inmarsat on or about March 31, 2026. If Ligado does not obtain the requisite regulatory approvals, Inmarsat will contend that the Mediated Agreement does not require Inmarsat to return the funds to AST (or Ligado).

13. The fundamental bargain under the Mediated Agreement is that AST will fund the payment of $535 million to Inmarsat, bear the risk of whether regulatory approval will be obtained, and promise that the Proposed NGSO System will comply with all the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement. In exchange, Inmarsat is required to support the applications the ("**Regulatory Applications**") for the Proposed NGSO System filed by Ligado with the Regulatory Authorities and has agreed to coordination consistent with the Mediated Agreement. In negotiating the Mediated Agreement, the parties specified precisely what the conditions were to trigger Inmarsat's regulatory support obligations (the

5

"**Regulatory Support Obligations**") and specifically identified the coordination commitments that would trigger these Obligations. *See* Ex. 1 (Mediated Agreement) § 2.

14. In particular, Section 2 of the Mediated Agreement requires that the Regulatory Applications include two specific statements, and nothing more, in order to trigger Inmarsat's Regulatory Support Obligations. *See id.* These two statements are reproduced at paragraph 17 below. *Id.* If the Regulatory Applications contain the two statements set forth at paragraph 17 below, Inmarsat must honor its affirmative Regulatory Support Obligations. *Id.*

15. Following approval of the Mediated Agreement, AST, Ligado and Inmarsat engaged in further negotiations to finalize the Inmarsat-AST Agreement, as well as the Amended Inmarsat Cooperation Agreement.[2] These negotiations continued until Inmarsat attempted to introduce anti-competitive language into the Inmarsat-AST Agreement that purported to prevent AST from operating in the L-Band Spectrum globally outside of North America. AST had previously rejected Inmarsat's attempts to insert these and other anti-competitive terms into the Mediated Agreement. Naturally, AST struck this language from the Inmarsat-AST Agreement, and then the parties reached an impasse. On August 14, 2025, Inmarsat filed a motion with the Bankruptcy Court, seeking to incorporate this new, anti-competitive language into the Inmarsat-AST Agreement (and its direct agreement with Ligado). *See* Bankr. Dkt. No. 825.

16. I understand that, after a hearing on August 29, 2025, the Bankruptcy Court resolved this impasse and thereafter entered an order on September 2, 2025, requiring Inmarsat and AST to incorporate the exact language from the Mediated Agreement verbatim into the Inmarsat-AST Agreement and the Amended Inmarsat Cooperation Agreement. *See* Bankr. Dkt.

---

[2] The Mediated Agreement does not require any additional commitments regarding coordination beyond those that are already reflected in the Mediated Agreement. *See* Ex. 1 (Mediated Agreement) at nn. 5-6.

No. 940 ¶ 3. The parties complied with this order and, on September 21, 2025, AST and Inmarsat executed the Inmarsat-AST Agreement and Ligado and Inmarsat executed the Amended Inmarsat Cooperation Agreement. As contemplated by the Mediated Agreement, the Inmarsat-AST Agreement incorporates verbatim Sections 2 and 3 of the Mediated Agreement and the Amended Inmarsat Cooperation Agreement incorporates verbatim Sections 2, 3 and 4 of the Mediated Agreement.

17.     As previewed at paragraph 14 above, the coordination arrangements among Inmarsat, Ligado and AST are incorporated in Section 2 of the Mediated Agreement, which provides that the Regulatory Applications must:

> (i) state that the operations of all AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement and Ligado's other coordination agreements with various parties; and
>
> (ii) request that the FCC and ISED recognize that the operations of the Proposed NGSO System have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and Inmarsat-AST Agreement, and give effect to such agreements by licensing the Proposed NGSO System to operate in accordance with the terms of such agreements.

Ex. 1 (Mediated Agreement) § 2.  By virtue of Section 2(i) of the Mediated Agreement, the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, Ligado and AST have thus committed that "the operations of all AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement." *Id.*  This commitment in Section 2(i) constitutes coordination of the Proposed NGSO System.  Indeed, based on the express commitment of AST and Ligado in Section 2(i) of the Mediated Agreement, Inmarsat agreed in Section 2(ii) of the Mediated Agreement that the applications to the FCC and ISED will request that these Regulatory Authorities "recognize that the operations of the Proposed

NGSO System **have been coordinated** subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." *Id.* (emphasis added). This is all the coordination that is required.

18.    In other words, because the Inmarsat-AST Agreement and the Amended Inmarsat Cooperation Agreement both specifically incorporate and include Sections 2 and 3 of the Mediated Agreement, the entry into those two agreements, together with the Mediated Agreement, constituted coordination of the Proposed NGSO System, and allowed Ligado to accurately represent to the FCC that "the operations of the Proposed NGSO System have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." *Id.*  I understand that the Bankruptcy Court agreed, holding that the language of Section 2 of the Mediated Agreement "requires a statement that coordination exists pursuant to" the Amended Inmarsat Cooperation Agreement and Inmarsat-AST Agreement "but not that some additional coordination process beyond the[se] agreements' terms has been completed." *See* Jan. 2027 Hearing Tr. (the "**Decision**") at 18:20-19:21.[3]

19.    Notably, Section 3 of the Mediated Agreement makes AST and Ligado's promise to operate the Proposed NGSO System within the metes and bounds of the Amended Inmarsat Cooperation Agreement enforceable through the Coordination Breach Procedures, which allow Inmarsat to obtain highly expedited corrective relief if Inmarsat alleges, once the satellites are operational, that the **operations** of the Proposed NGSO System breach the "technical, geographic or other limitations of the Amended Inmarsat Cooperation Agreement." Ex. 1 (Mediated Agreement) at § 3.

---

[3]    A copy of the Decision is attached hereto as **Exhibit 2**.

20. On November 6, 2025, just one week after accepting the $420 million funded by AST, Inmarsat informed AST and Ligado that Inmarsat did not believe that AST and Ligado had satisfied their obligations to coordinate. Even though AST and Ligado have agreed to operate the Proposed NGSO System within the metes and bounds of the Amended Inmarsat Cooperation Agreement, and even though *Inmarsat itself* agreed, on that basis, that Ligado would represent to the FCC that the operations of the Proposed NGSO System have been coordinated subject to the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, Inmarsat contends that it is not required to support Ligado's Regulatory Applications or consider the Proposed NGSO System coordinated unless Ligado and AST agree now to *further* coordination restrictions to be evaluated based on *Inmarsat's subjective satisfaction*.

**The Regulatory Applications and the Regulatory Process**

21. On December 8, 2025, Ligado filed its application with the FCC (the "**FCC Application**"), seeking to modify its existing license so that Ligado could operate its payloads in the L-Band Spectrum on the Proposed NGSO System. *See* Ex. 3 (FCC Application) at i, 4.[4] I submitted a letter on behalf of AST to the FCC in support of the FCC Application. The FCC Application contains the two statements required to trigger Inmarsat's Regulatory Support Obligations. *See id.* at 12. And, for the reasons stated above, the statement in the FCC Application that "the operations of the [Proposed NGSO System] have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement," *id.*, is objectively true, as I understand the Bankruptcy Court found as well.

22. After a party submits an application to the FCC, the FCC will open a comment period, in which the public has an opportunity to provide feedback to the FCC about the application

---

[4] A copy of the FCC Application is attached hereto as **Exhibit 3**.

and support or oppose such application. The initial comment period is open for a period of 30 days. *See* 47 C.F.R. § 25.154(a)(2). It is in this period that Inmarsat must submit its initial "Comments" in support of the FCC Application. Ex. 1 (Mediated Agreement) § 2. There will be a ten-day window afterwards for Ligado to submit its opposition responsive to any objections to the FCC Application. *See* 47 C.F.R. § 25.154(c). Thereafter, Inmarsat will have five days to submit "Reply Comments in support of" the FCC Application. Ex. 1 (Mediated Agreement) § 2. The FCC opened the comment period with respect to the FCC Application on January 30, 2026,[5] meaning that Inmarsat has only until March 2, 2026 to honor its Regulatory Support Obligation to file initial "Comments" in "support of the" FCC Application. *Id.* at § 2.

23. Even though the FCC Application contains the required language to trigger Inmarsat's Regulatory Support Obligations and accurately reflects that the Proposed NGSO System is coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement, Inmarsat has refused to support, and stated publicly that it intends to oppose, the FCC Application. Ex. 4 (NY Action Complaint) ¶¶ 7, 59. Inmarsat has sued AST and Ligado in New York State Court (the "**NY Action**"),[6] seeking to avoid its Regulatory Support Obligations and now wants to avoid complying with the Bankruptcy Court's January 30, 2026 order (the "**Order**") requiring Inmarsat to uphold its contractual agreement to support the FCC Application.

24. In response to the NY Action and Inmarsat's breach of its Regulatory Support Obligations, on January 2, 2026, AST and Ligado filed motions (the "**Emergency Motions**") with

---

[5] *See* Fed. Commc'ns, Application Summary for SAT-MOD-20251206-00374, FCC Int'l Bureau Filing Sys. (Last Accessed Feb. 03, 2026) https://fccprod.servicenowservices.com/icfs?id=ibfs_application_summary&number=SAT-MOD--20251206-00374.

[6] A copy of the complaint ("**Complaint**") filed by Inmarsat in the NY Action is attached hereto as **Exhibit 4**.

the Bankruptcy Court seeking to enforce the automatic stay under Section 362 of the Bankruptcy Code and to compel Inmarsat to perform its Regulatory Support Obligations. Inmarsat filed an objection to the Emergency Motions. The Bankruptcy Court conducted a hearing and status conference on January 6, 2026, and conducted a hearing on the merits of the Emergency Motions on January 14, 2026. On January 27, 2026, the Bankruptcy Court read its thorough and well-reasoned Decision into the record, rejecting each of Inmarsat's arguments. On January 30, 2026, the Bankruptcy Court entered the Order granting the Emergency Motions and denying Inmarsat's oral motion for a stay pending appeal.

### AST Will Be Irreparably Harmed if Inmarsat Can Continue To Withhold Its Support, or Oppose the Application, During Inmarsat's Appeal

25. AST will be irreparably harmed if the Stay Motion is granted. If Inmarsat is allowed to oppose the FCC Application, as it clearly indicated it intends to do, *see* Janka Decl. ¶¶ 29-30, or if Inmarsat is not compelled to support the FCC Application by filing initial comments before the initial comment period ends on March 2, 2026, substantial and irreparable harm will result.

26. Based on my substantial experience with the FCC approval process, including my time employed by the FCC, I believe that Inmarsat's opposition to the FCC Application will significantly disrupt the approval process for the FCC Application, which may threaten to materially delay, impede or endanger FCC approval. Inmarsat's failure to provide its bargained-for support will inject substantial uncertainty into the regulatory approval process even though AST has committed to pay Inmarsat $535 million to avoid such uncertainty ($420 million of which has already been paid). This could potentially jeopardize the ability of AST and Ligado to timely consummate the AST Transaction (not to mention the Plan).

27. If AST cannot consummate the AST Transaction, AST will lose the unique opportunity to obtain access to the highly valuable L-Band Spectrum rights it has bargained for.

As Inmarsat admits, *see* Janka Decl. ¶ 5, electromagnetic spectrum in which satellites can operate and provide services is a scarce, finite government-allocated resource. The L-Band Spectrum to be used by AST through the AST Transaction is the largest available block of high-quality nationwide spectrum in the United States and Canada. Access to the L-Band Spectrum is especially critical for AST because the L-Band Spectrum will provide additional capabilities to AST's existing technology and space-based network, pairing well with AST's rights to low-band and other mid-band spectrum. The AST Transaction will enable AST to deliver its goal of peak data transmission speeds of up to 120 Mbps and enhance AST's direct-to-device broadband offerings to users across the United States and North America. The AST Transaction is a unique opportunity for AST to acquire access to limited and scarce L-Band Spectrum in North America that is not otherwise available in the marketplace given that it is a finite, government-allocated scarce resource. Therefore, financial redress cannot adequately compensate AST for the lost business opportunity in the L-Band Spectrum.

28. Moreover, AST will have paid $420 million to Inmarsat in exchange for no consideration. AST specifically bargained for Inmarsat's regulatory support as the key piece of consideration Inmarsat was providing in exchange for payment of $535 million by AST. Inmarsat's Regulatory Support Obligations were designed to provide AST with certainty and mitigate the doubt that would accompany the regulatory approval process if Inmarsat were allowed to oppose, or declined to support, the AST Transaction. Allowing Inmarsat to take AST's money without providing the regulatory support it agreed to furnish is particularly detrimental to AST because it enables Inmarsat, a direct competitor of AST, to take a gamble on barring AST from access to the L-Band Spectrum and to use the threat of regulatory failure as improper leverage concerning the dispute about AST's right to use the L-Band Spectrum outside of North America. The Bankruptcy

Court agreed with this and recognized explicitly that Inmarsat is attempting to exert improper leverage. Ex. 2 (Decision) at 22:25-23:1.

**Inmarsat Will Suffer No Harm If It Must Support the FCC Application, and Refrain From Opposing the FCC Application, During Its Appeal**

29. Inmarsat will not suffer any harm if the Stay Motion is denied.

30. As an initial matter, any potential for harmful interference with Inmarsat's satellite services is in no way imminent, is temporally remote and is entirely speculative at this time. The Proposed NGSO System is not operational. The Proposed NGSO System has not yet been approved by either the FCC or ISED and no satellites that comprise the Proposed NGSO System have been launched. There is therefore no risk that harmful interference with Inmarsat's L-Band services occurs at any time in the near term even if Inmarsat were required to honor its obligation to support the FCC Application. In fact, Inmarsat agreed in the Mediated Agreement that, with AST's promise that the Proposed NGSO System would operate within the limitations of the Amended Inmarsat Cooperation Agreement, Ligado could represent to the FCC that the operations of the Proposed NGSO System have been coordinated subject to the terms of that Agreement. *See* Ex. 1 (Mediated Agreement) § 2. If Inmarsat was concerned that these limitations (to which it has already agreed) were not sufficient, the time to ask for further restrictions on the operations of the Proposed NGSO System was before Inmarsat executed the Mediated Agreement and was paid $420 million, not after the filing of the FCC Application.

31. In any event, there are protections built into the Mediated Agreement that squarely address Inmarsat's concern that approval of the FCC Application risks "AST operating [the Proposed] NGSO [S]ystem in ways that could severely disrupt Inmarsat's business and operations." *See* Janka Decl. ¶ 30. Such concerns are illusory and meritless because Inmarsat has access to the Coordination Breach Procedures, an extremely expedited process to obtain injunctive

relief if the Proposed NGSO System's operations are alleged "to have breached the technical and/or geographic limitations of the Amended Inmarsat Cooperation Agreement." *See* Ex. 1 (Mediated Agreement) § 3. If the alleged breach is not cured within 24 hours of Inmarsat notifying Ligado or AST of such alleged breach, Inmarsat may file a "Coordination Breach Complaint" with a neutral arbitrator, who must hold a hearing within five days, and issue a ruling within seven days. *Id.* If there were a breach, this ruling must include a corrective injunction that must be implemented within 24 hours. *See id.* These highly expedited time periods "may be reduced" even further for any breach "alleged to impact the availability of Inmarsat safety services." *Id.* Thus, I believe that, even if there could be harmful interference during Inmarsat's appeal, which is extremely unlikely for the reasons above, Inmarsat would have an adequate remedy to redress any alleged breach caused by the operations of the Proposed NGSO System.

32.    Finally, and contrary to the assertions in the Janka Declaration, *see* Janka Decl. ¶ 31, Inmarsat does not need to "lie" to the FCC in order to provide its affirmative support of the FCC Application. As shown above, Section 2 of the Mediated Agreement, the Inmarsat-AST Agreement and the Amended Inmarsat Cooperation Agreement define clearly what coordination is required and also show that, as Inmarsat agreed, the parties have reached agreements coordinating the operations of the Proposed NGSO System. Rather than being conditioned on Inmarsat's subjective satisfaction regarding coordination, as Inmarsat would have this Court believe, the issue of coordination has already been prescribed by the unambigous terms of the Mediated Agreement, and that coordination has already been achieved by AST's enforceable promise to operate the Proposed NGSO System within the existing technical, geographic and other limitations of the Amended Inmarsat Cooperation Agreement. As the Bankruptcy Court

determined, this is precisely the level of coordination that Inmarsat bargained for. *See* Ex. 2 (Decision) at 18:20-20:7.

33. Accordingly, Inmarsat will suffer no harm from supporting the FCC Application.

**Conclusion**

34. It strongly appears that Inmarsat is seeking to impose the risk of failure of regulatory approval on AST and Ligado as leverage to force AST to agree to its anti-competitive demands, including that AST refrain from operating in the L-Band Spectrum outside of North America. Far from "benefit[ing] all parties" to re-negotiate the scope of coordination (which has already been settled), *see* Janka Decl. ¶ 32, Inmarsat's demands seek to impose a global non-compete on AST solely to Inmarsat's benefit.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on: February 11, 2026          _____
                                        Jennifer A. Manner

determined, this is precisely the level of coordination that Inmarsat bargained for. *See* Ex. 2 (Decision) at 18:20-20:7.

33. Accordingly, Inmarsat will suffer no harm from supporting the FCC Application.

## Conclusion

34. It strongly appears that Inmarsat is seeking to impose the risk of failure of regulatory approval on AST and Ligado as leverage to force AST to agree to its anti-competitive demands, including that AST refrain from operating in the L-Band Spectrum outside of North America. Far from "benefit[ing] all parties" to re-negotiate the scope of coordination (which has already been settled), *see* Janka Decl. ¶ 32, Inmarsat's demands seek to impose a global non-compete on AST solely to Inmarsat's benefit.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on: February 11, 2026

Jennifer A. Manner