# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INMARSAT GLOBAL LIMITED,<br><br>     Appellant,<br><br>v.<br><br>AST & SCIENCE, LLC, and LIGADO<br>NETWORKS, LLC,<br><br>     Appellees. | Civ. No. 26-cv-118 (GBW)<br><br><br>Bankruptcy Case No. 25-10006<br>(TMH) |

## LIGADO'S OBJECTION TO INMARSAT GLOBAL LIMITED'S
## <u>EMERGENCY MOTION FOR STAY PENDING APPEAL</u>

## <u>BANKRUPTCY RULE 8012 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, the undersigned counsel for Ligado Networks LLC ("<u>Ligado</u>") submits the following corporate ownership statement:

The following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of Ligado Networks LLC's equity interest:

| Equity Holder | Approximate Percentage of Equity Held | | | | | |
|---|---|---|---|---|---|---|
| | Common Equity | Preferred Equity | | | | |
| | | A-0 | A-1 | A-2 | B | C |
| HGW US HOLDING COMPANY LP | 42.51% | 0.00% | 30.63% | 0.00% | 0.00% | 0.59% |
| LSQ ACQUISITION CO LLC (SERIES I) | 26.20% | 0.00% | 0.00% | 14.20% | 52.41% | 0.25% |
| GREAT ELM GROUP INC | 21.25% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| CERBERUS LIGADO HOLDINGS LLC | 8.10% | 32.46% | 0.31% | 27.29% | 16.18% | 0.25% |
| LSQ ACQUISITION CO LLC SERIES IV | 0.00% | 33.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| PORTMAN LIMITED | 0.16% | 2.68% | 0.30% | 0.00% | 0.00% | 28.54% |
| CREDIT MARKETS HOLDINGS LLC | 0.00% | 0.84% | 53.56% | 14.20% | 31.42% | 25.68% |

| Equity Holder | Approximate Percentage of Equity Held | | | | | |
| | Common Equity | Preferred Equity | | | | |
| | | A-0 | A-1 | A-2 | B | C |
| CENTAURUS CAPITAL LP | 0.45% | 0.79% | 0.92% | 28.41% | 0.00% | 0.00% |
| LSQ ACQUISITION CO LLC SERIES III | 0.00% | 0.00% | 0.31% | 12.92% | 0.00% | 0.00% |
| CF LSQ C HOLDINGS LLC | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 43.10% |

Debtor Ligado Networks LLC holds 100% of the equity interests of each of Debtor ATC Technologies, LLC; Debtor Ligado Networks Build LLC; Debtor Ligado Networks Corp.; Debtor Ligado Networks Finance LLC; Debtor Ligado Networks Holdings (Canada) Inc.; Debtor Ligado Networks Inc. of Virginia; Debtor Ligado Networks Subsidiary LLC; and Debtor One Dot Six LLC.

Debtor Ligado Networks Holdings (Canada) Inc. holds 80% of the equity interests of Debtor Ligado Networks (Canada) Inc.  Debtor Ligado Networks LLC holds 20% of the equity interests of Debtor Ligado Networks (Canada) Inc.

Debtor One Dot Six LLC holds 100% of the equity interests of Debtor One Dot Six TVCC LLC.

Ligado Networks LLC ("Ligado") submits this objection ("Objection") to the *Emergency Motion for Stay Pending Appeal* [D.I. 3] (the "Motion")[1] filed by Inmarsat.  In support of this Objection, Ligado respectfully states as follows:

## PRELIMINARY STATEMENT

1.    This case involves nothing more than a meritless appeal of a Bankruptcy Court order enforcing the Bankruptcy Code's automatic stay under 11 U.S.C. § 362 and the Bankruptcy Court's own prior orders.  It does not warrant a stay pending appeal.  Indeed, a stay would inflict irreparable harm on Ligado, depriving it of the critical benefit for which it (and AST) paid Inmarsat hundreds of millions of dollars and jeopardizing Ligado's emergence from bankruptcy.  The request for a stay pending appeal should be denied.

2.    The underlying Bankruptcy Court order arises from Ligado's chapter 11 cases, in which the Bankruptcy Court issued a confirmation order on September 29, 2025, confirming Ligado's plan of reorganization (the "Plan").[2]  Ligado's most significant estate property are its FCC and ISED licenses, which permit Ligado to operate within L-band spectrum in North America.  And at the core of Ligado's Plan is an agreement with AST to monetize that spectrum through the AST Transaction.

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

[2]    D.I. 1007; Ex. F.  Citations to exhibits refer to those accompanying the Declaration of Melanie Westover Yanez.

3.      Inmarsat jeopardized that Transaction by reneging on its promise to support the relevant FCC and ISED applications to effectuate the AST Transaction, even though Inmarsat agreed to provide that support in the Mediated Agreement, approved and enforced by the Bankruptcy Court, and even though Ligado and AST already paid Inmarsat $420 million for that support.

4.      If the Bankruptcy Court order is stayed, Ligado and AST are likely to lose the benefits they bargained and paid for under the Mediated Agreement. Inmarsat must submit its affirmative support for Ligado's FCC application (the "Application")[3] by March 2, 2026.  If Inmarsat does not support the Application— or, even worse, opposes it—the Application may be denied or enmired in a lengthy FCC process.  Without FCC approval, the AST Transaction and Ligado's ability to exit bankruptcy fall into doubt.

5.      That is precisely what Ligado and AST sought to avoid when they entered into the Mediated Agreement with Inmarsat, and it is precisely what the Bankruptcy Court sought to prevent when it approved and enforced the Mediated Agreement.  This Court should deny the Motion and hold Inmarsat to its own prior promises.

---

[3]      Ex. G.

## BACKGROUND

6.      For more than 25 years, Ligado has operated a satellite network across North America, providing mobile satellite services to government and commercial customers as an FCC-licensed operator in the L-Band spectrum.

7.      On January 5, 2025, Ligado and its affiliates commenced chapter 11 bankruptcy cases in the Bankruptcy Court.  A critical component of Ligado's restructuring is a long-term commercial transaction between Ligado and AST (the "AST Transaction"), pursuant to which Ligado, among other things, will provide AST with rights to use certain of its licensed L-Band spectrum and collaborate with AST to commercialize that spectrum with a non-geostationary orbit satellite system (the "Proposed NGSO System").

8.      Inmarsat holds an FCC license to use the same L-Band spectrum as Ligado.  Accordingly, the parties have long coordinated their spectrum use under a 2007 cooperation agreement (the "Cooperation Agreement").

9.      When Ligado sought Bankruptcy Court approval of the AST Transaction, Inmarsat objected.  To resolve the objection and other pending disputes between the parties, the parties entered into the "Mediated Agreement."[4]  By the Mediated Agreement, Ligado and AST agreed:  that the Proposed NGSO System will operate within the technical, geographic and other limits of the Cooperation

---

[4]   Ex. C.

Agreement; to make hundreds of millions of dollars in payments to Inmarsat; and to dismiss Ligado's lawsuit against Inmarsat for breaches of the Cooperation Agreement. In exchange for that consideration, including more than $500 million, Inmarsat (crucially for Ligado and AST) would support Ligado's Application so long as it:

> expressly: (i) state[s] that the operations of all AST and Ligado spacecraft, individually and taken as a whole, and regardless of orbit, will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement and Ligado's other coordination agreements with various parties; and (ii) request[s] that the FCC and ISED recognize that the operations of the Proposed NGSO System **have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement**, and give effect to such agreements by licensing the Proposed NGSO System to operate in accordance with the terms of such agreements.[5]

10.    In June 2025, the Bankruptcy Court approved the Mediated Agreement and permitted Ligado to enter into the AST Transaction (the "AST Order").[6] The Bankruptcy Court expressly retained jurisdiction to interpret and enforce the AST Order and the Mediated Agreement.[7]

11.    The parties returned to the Bankruptcy Court in August, unable to agree on how to amend the terms of the Cooperation Agreement and adopt an Inmarsat-

---

[5]    *Id.* § 2 (emphasis added).

[6]    Ex. D.

[7]    *Id.* ¶ 13.

AST agreement in accordance with the Mediated Agreement.  The Bankruptcy Court denied the parties' cross-motions and instead entered the "Enforcement Order" requiring the parties "to incorporate the specific language of the [Mediated Agreement] into the [Cooperation Agreement] and the Inmarsat-AST Agreement, as applicable, unless otherwise mutually agreed by the parties."[8]  At the hearing, the Bankruptcy Court acknowledged that, in the future, there may be questions about the meaning of the  Cooperation Agreement, but it recognized that should such a dispute crystallize after the proposed system is operational, that dispute can be resolved through the Cooperation Agreement's state court dispute resolution process.[9]  The Bankruptcy Court again expressly "retain[ed] jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of" the Enforcement Order.[10]

12.    In accordance with the Enforcement Order, the parties entered into the Amended Inmarsat Cooperation Agreement and the AST-Inmarsat Agreement, both of which expressly incorporated the terms of the Mediated Agreement.[11]

---

[8]    Ex. E ¶ 3.  Indeed, Inmarsat argued for that outcome, urging the Bankruptcy Court only to "make clear that, under the plain language of the Mediated Agreement, both Ligado and AST are bound to honor the **existing** geographic and other limits of the Cooperation Agreement" that "**do not** need to change."  D.I. 895 ¶ 4 (emphasis added).

[9]    Ex. B at 30:7-14.

[10]    Ex. E ¶ 4.

[11]    *Id.* ¶ 3.

13.     On September 29, 2025, the Bankruptcy Court issued the confirmation order confirming Ligado's Plan, which expressly recognizes the ongoing validity and enforceability of the Mediated Agreement and the AST Order.[12]

14.     After the Plan was confirmed, Ligado and AST began performing under the Mediated Agreement.  In particular, on or about October 31, 2025, Ligado and AST paid Inmarsat the first **$420 million** of the over $500 million it agreed to pay Inmarsat in exchange for Inmarsat's support for the Application.  And on December 8, 2025,[13] Ligado submitted the Application, satisfying the requirements of the Mediated Agreement.  Specifically, the Application "state[d]" that AST and Ligado would operate the Proposed NGSO System in accordance with the Cooperation Agreement *and* the Application "request[ed]" that FCC recognize that the Proposed NGSO System's operations "have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement." Mediated Agreement § 2.

15.     But instead of upholding its obligations under the Mediated Agreement, Inmarsat—despite having received hundreds of millions of dollars—reneged by filing a complaint (the "Complaint") in New York state court asserting that Ligado and AST had breached the Mediated Agreement by failing to engage with Inmarsat

---

[12]   Plan art. V.C.3.

[13]   Smith Decl. ¶¶ 18-19.

in additional coordination efforts before filing the Application. Inmarsat's Complaint did not point to *any* language in the Mediated Agreement requiring such additional coordination. Instead, Inmarsat relied on the same argument it makes here—that the parties *must* have anticipated that there would be additional coordination before the Application was submitted because, as things stand, and solely in Inmarsat's view, the Proposed NGSO System has not been coordinated under the Cooperation Agreement.

16. The premise of that argument, however, is flatly wrong. The Proposed NGSO System's operations *have* been "coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement" because—under the Mediated Agreement—the parties agreed that the Cooperation Agreement covers the coordination of "all AST and Ligado spacecraft," including the Proposed NGSO System. Mediated Agreement § 2. Moreover, the Mediated Agreement expressly provides that the Applications "will not be more granular in respect of" coordination. *Id*. § 2 n.8.

17. Inmarsat now unilaterally contends that the operations of the Proposed NGSO system are not actually coordinated, apparently because it wants Ligado and AST to *further* amend the Cooperation Agreement. But that is precisely the dispute the Bankruptcy Court resolved through its Enforcement Order. The Enforcement Order directed the parties to incorporate the language of the Mediated Agreement

into the Cooperation Agreement, with the understanding that the parties had already negotiated sufficient protection (in the Cooperation and Mediated Agreements) against interference and if, once the Proposed NGSO System was operational, there was actual interference, the parties would resolve that dispute through the Cooperation Agreement's expedited dispute resolution process.

18.    Because Inmarsat's Complaint was an obvious attempt to relitigate the Bankruptcy Court's orders approving and enforcing the Mediated Agreement, and because it sought to exercise control over valuable estate property, Ligado and AST quickly moved to enforce the automatic stay, which bars a party from "exercis[ing] control" over the property of the bankruptcy estate.  11 U.S.C. § 362(a)(3).  Ligado and AST also asked the Bankruptcy Court to enforce its prior orders requiring Inmarsat to support Ligado's Application.

19.    The Bankruptcy Court granted Ligado's requested relief, recognizing that if Inmarsat was permitted to proceed with its state court action, it would deprive Ligado and AST of the support for the Application that they bargained for, thereby endangering regulatory approval and Ligado's emergence from bankruptcy.

20.    The Bankruptcy Court held that Inmarsat's Complaint clearly violated the automatic stay because—by seeking an order excusing Inmarsat from its obligation to support Ligado's Application—Inmarsat sought to exercise control over two forms of valuable estate property:  Ligado's FCC license and the Mediated

Agreement. And the Bankruptcy Court recognized that it was appropriate to remedy the automatic stay violation by requiring the dismissal of the state court action with prejudice.

21.    The Bankruptcy Court also found that an adversary proceeding was not required under Bankruptcy Rule 7001(g) because the relief sought is provided in the Plan and the Bankruptcy Court's underlying orders. The Court also recognized that Inmarsat's refusal to support Ligado's Application was a clear violation of the Mediated Agreement and the Bankruptcy Court's orders approving and enforcing it, such that it was appropriate to order Inmarsat to support the Application.[14]

22.    On January 30, 2026, the Bankruptcy Court issued an order confirming the oral ruling and denying Inmarsat's stay application.[15]

## ARGUMENT

23.    A stay pending appeal is an "extraordinary remedy" that is rarely granted. *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018). The movant bears the heavy "burden of establishing that imposition of a stay is warranted." *David v. Weinstein Co. Holdings LLC*, 2021 WL 979603, at *2 (D. Del. Mar. 16, 2021). Four factors govern whether to grant a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that
> [it] is likely to succeed on the merits; (2) whether the applicant

---

[14]    Ex. A at 20:21-22:22.

[15]    D.I. 1304.

> will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (alteration in original). While the Court is required to "balance [each factor] and consider their relative strength," *S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019) (cleaned up), the first two—likelihood of success and irreparable harm— are the "most critical" and serve as threshold requirements, *id.*

24.    The first factor requires the movant to demonstrate "a reasonable chance, or probability, of winning," *id.* (quotation omitted), while the second requires a showing that irreparable injury "is likely [not merely possible] in the absence of [a] [stay]," *Revel*, 802 F.3d at 569 (quotation omitted; alterations in original).  If the movant does not satisfy both factors, a stay must be denied.  *Id.* at 568.  Only if the movant establishes the first two factors must a court proceed to "balance the relative harms considering all four factors using a sliding-scale approach."  *In re MTE Holdings, LLC*, 2021 WL 4203339, at *3 (Bankr. D. Del. Sept. 15, 2021) (quotation omitted).

## I.    Inmarsat Is Not Likely to Succeed on Appeal

25.    Inmarsat rehashes here the same basic arguments that failed before the Bankruptcy Court—wrongly asserting that the Bankruptcy Court could not grant the relief it did without an adversary proceeding, and contending that it did not violate

10

the automatic stay, the Mediated Agreement, or the Bankruptcy Court's orders approving and enforcing that Agreement. Inmarsat cannot demonstrate a likelihood of success with respect to any of those arguments.

### A.    The Bankruptcy Court Did Not Violate Rule 7001(g)

26.    Inmarsat bases its Rule 7001(g) argument on a faulty premise that the Bankruptcy Court's order granted Ligado new equitable relief and imposed on Inmarsat new obligations that did not exist under the AST Order and the Plan. In reality, the opposite is true. The Bankruptcy Court merely enforced the AST Order and Plan that require Inmarsat to support the Application. Ligado does not have to initiate an adversary proceeding to enforce relief the Bankruptcy Court already ordered. For that reason, Rule 7001(g) is inapplicable.

27.    Rule 7001(g) requires an adversary proceeding "to obtain an injunction or other equitable relief—except when the relief is provided in a Chapter 9, 11, 12, or 13 plan." It does not require an adversary proceeding to enforce relief already granted. Rather, "an adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained." *In re WorldCorp, Inc.*, 252 B.R. 890, 895 (Bankr. D. Del. 2000); *accord In re Lazy Days' RV Ctr., Inc.*, 724 F.3d 418, 426 (3d Cir. 2013) (an adversary proceeding is unnecessary to enforce a prior order). Thus, Rule 7001(g) requires an adversary proceeding only when a party seeks "*new* injunctive [or equitable] relief," but not when a party merely seeks "to

enforce the terms of" a previously entered order. *In re Kalikow*, 602 F.3d 82, 93-94 (2d Cir. 2010) (emphasis added); *see also In re Cont'l Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999) (Rule 7001 "requires the commencement of an adversary proceeding '*to obtain*'" equitable relief, so an adversary proceeding is not required to enforce relief "*previously obtained*").

28.    There is nothing "new" about the Bankruptcy Court's order. Quite the opposite. The Bankruptcy Court simply recognized what the AST Order and Plan say: that "Inmarsat is required to comply with its obligations under the Mediated Agreement, including by supporting the Debtors' FCC application." Order ¶ 3; *accord* Plan art. V.C.3; AST Order ¶ 6. The Bankruptcy Court's Order does nothing more than reaffirm its prior orders and hold Inmarsat to the Mediated Agreement that it freely entered, which is incorporated into the Plan. Thus, Ligado's request to enforce the Mediated Agreement fell within the Bankruptcy Court's retained "jurisdiction to interpret and enforce its own prior orders," *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 151 (2009), and the Bankruptcy Court ordered nothing more than the relief that was "previously obtained," making Rule 7001(g) inapposite, *Cont'l Airlines*, 236 B.R. at 327 (emphasis omitted).

29.    Moreover, even if Rule 7001(g) applies, it expressly carves out equitable relief when it "is provided in a … plan." That describes this case to a tee. The Plan unambiguously incorporates the AST Order and Mediated Agreement and

provides that they "shall survive entry of the Confirmation Order." Plan art. V.C.3. So, by its own terms, Rule 7001(g) does not require an adversary proceeding because the Plan provides for the very relief Ligado sought to enforce.

30.    In any event, even if Rule 7001 required Ligado to initiate an adversary proceeding, that defect alone does not warrant reversal. Instead, "where there is no prejudice to the nonmoving party, courts will not elevate form over substance and require an adversary proceeding when a motion will suffice." *In re Rite Aid Corp.*, 2024 WL 3165950, at *3 (Bankr. D.N.J. June 25, 2024) (quotation omitted). Here, Inmarsat suffered no prejudice from resolving this dispute without an adversary proceeding. The *only* dispute between the parties concerns the meaning of Section 2 of the Mediated Agreement as it relates to Ligado's Application. Interpretation of that contractual provision is a pure question of law, just like the myriad pure questions of law that bankruptcy courts resolve in contested matters every day. Indeed, Inmarsat does not identify *any* factual issues it would have developed had the Bankruptcy Court held an evidentiary hearing.[16] So, even if the Bankruptcy Court had indulged Inmarsat with the process it maintains is necessary, Inmarsat

---

[16]    Inmarsat insists that the Bankruptcy Court impermissibly found that the Application accurately states that operations of the Proposed NGSO System will be consistent with and remain within the technical, geographical, or other limitations of the Cooperation Agreement. Motion at 13. But that finding is a recitation of the Application's plain words. Ex. A at 20:1-7; Ex. G at 12.

would still have a position "contrary to the [M]ediated [A]greement's plain language."[17]  No adversary proceeding can change that.

### B.    Inmarsat Violated The Automatic Stay

31.    Inmarsat is also unlikely to succeed in its argument that it did not violate Section 362(a)(3), which bars "exercise[ing] control" over property of the bankruptcy estate.  By filing the Complaint and declaring its intent to oppose the Application, Inmarsat clearly attempted to exercise control over Ligado's FCC license, which is valuable estate property.  Moreover, by filing the Complaint, Inmarsat sought a declaration regarding the parties' rights and obligations under the Mediated Agreement—an estate asset that is integral to the Plan and the administration of the estate.

32.    Inmarsat's contrary argument rests primarily on its assertion that the Bankruptcy Court "instructed" the parties to resolve any future disputes under the Mediated Agreement in New York state court.  Motion at 13.  But that is wrong.  In the relevant exchange, the Bankruptcy Court merely assured Inmarsat that if future disputes arise regarding the application of the Cooperation Agreement to the Proposed NGSO System, "a way to handle it"[18] would be for the Court to grant Inmarsat stay relief to pursue the Cooperation Agreement's expedited resolution

---

[17]  Ex. A at 22:24-25.

[18]  Ex. B at 28:22-23.

process for "disputes about compliance with [the Cooperation Agreement's] technical, geographic and other limitations, or any claims of interference." Mediated Agreement § 3.

33.    In other words, the Bankruptcy Court informed Inmarsat that if future disputes arise during the operation of the Proposed NGSO, Inmarsat can *ask* for the stay to be lifted and seek resolution of that dispute in state court.  The Bankruptcy Court did not say that Inmarsat could go to state court *without* seeking stay relief, nor did it say that Inmarsat could ask the state court to decide whether Inmarsat was required to satisfy its obligations to support Ligado's Application under the Mediated Agreement.  To the contrary, the Bankruptcy Court "expressly retained jurisdiction in various orders with respect to all matters arising from or relating to the implementation, interpretation and enforcement of those orders, including enforcement of the [M]ediated [A]greement" and the Bankruptcy Court found the dispute "concern[ed] interpretation and enforcement of the [M]ediated [A]greement."[19]

34.    Finally, Inmarsat argues the Bankruptcy Court erred by ignoring 28 U.S.C. § 959, which provides that debtors-in-possession can be sued for actions involving the continuation of their business.  But rather than ignoring § 959,  the Bankruptcy Court expressly found that "where, as here, a bankruptcy court is

---

[19]    Ex. A at 13:20-24, 14:1-2.

expressly provided jurisdiction to enforce an agreement, [§] 959 does not provide an independent basis for parallel litigation in another forum" and "[§] 959 doesn't displace [§] 362(a)(3)'s prohibition on acts to exercise control over [e]state property."[20]  The Bankruptcy Court also recognized that "even if the automatic stay did not apply and 959 applied," § 959 is subject to the equitable power of bankruptcy courts and ruled that it "would exercise that discretion under 959 to bar the New York action from going forward."[21]  And the Bankruptcy Court also considered that "Section 959 was intended to permit suits concerning ordinary business operations" but found the Complaint did "not concern ordinary business operations," making § 959 inapplicable.[22]  All of that is correct, *In re VistaCare Grp., LLC*, 678 F.3d 218, 226 (3d Cir. 2012) (section 959 applies where the debtor is "continuing [its] business," not when it is "administering the estate" (cleaned up)), and Inmarsat offers no reason to excuse its automatic stay violation.

### C.    Inmarsat Is Not Likely to Prevail on Its Contract Arguments

35.    Inmarsat also cannot show any likelihood of success with respect to its claim that the Bankruptcy Court misinterpreted Inmarsat's obligations under the Mediated Agreement and the Bankruptcy Court orders approving and enforcing it.

---

[20]    *Id.* at 16:6-12.

[21]    *Id.* at 16:21-22.

[22]    *Id.* at 15:24-16:2.

By its plain terms, the Mediated Agreement provides that Ligado will pay Inmarsat over $500 million in cure payments and release claims against Inmarsat in exchange for Inmarsat's agreement to support Ligado's Application so long as it contains a specific statement about coordination "subject to" the specific terms of the Cooperation Agreement. Ligado has already paid Inmarsat $420 million of the cure costs it agreed to pay, and Ligado has submitted the Application making the stipulated statement. Accordingly, the Bankruptcy Court correctly found that Ligado and AST have complied with the Mediated Agreement and that Inmarsat must do the same by supporting the Application.

36.     Inmarsat's only real response is that—although the Mediated Agreement does not say it—the parties must have *also* agreed to undertake additional coordination with respect to the Proposed NGSO System's operations because otherwise the statement that the operations of that system have been coordinated under the Cooperation Agreement would be a lie. That is flatly wrong. The Proposed NGSO System *has been coordinated* subject to the Cooperation Agreement because the parties have agreed that the Proposed NGSO System will operate in accordance with the Cooperation Agreement's geographic, technical and other limitations.[23] Inmarsat's desire to modify the Cooperation Agreement further does not mean the Proposed NGSO System is not coordinated under the Cooperation

---

[23]    Smith Decl. ¶¶ 5-10.

Agreement. And if Inmarsat believed otherwise, it needed to have negotiated for such language in the Mediated Agreement. It did not.[24]

37.    To the contrary, the Mediated Agreement prohibits Ligado from providing further detail with respect to coordination in the Application by stating: "The applications will not be more granular in respect of prong (ii) and the Amended Inmarsat Cooperation Agreement shall not be submitted to the FCC with the initial applications or comments, and Inmarsat/Viasat shall promptly refer any specific request by the FCC for the Agreement or any portion thereof to Ligado." Mediated Agreement § 2 n.8. Thus, with respect to the representation that the Proposed NGSO System had been coordinated—the very representation that Inmarsat accuses Ligado of falsely making—the parties agreed that the applications ***would not be more granular*** than the language agreed in the Mediated Agreement.

### D.    The Relief Imposed Was Legally Proper

38.    Finally, Inmarsat is unlikely to succeed in its argument that the Bankruptcy Court lacked the authority to require it to dismiss the Complaint with prejudice.

---

[24] Inmarsat insists that the parties' continuing discussions to streamline and update the Cooperation Agreement after execution of the Mediated Agreement indicate that further technical coordination was *necessary* prior to the Application's submission. Not so. The parties can always try to reach agreement on changes to the Cooperation Agreement, but the Mediated Agreement does not require it. *See* Smith Decl. ¶¶ 11-16.

39.     Dismissal with prejudice of a complaint that violates the automatic stay is an appropriate legal remedy. *Armstrong v. Bailey*, 2000 WL 33363300, at *2 (D. Utah May 18, 2000) (affirming dismissal with prejudice because the "automatic stay is equivalent to a court order" and "[f]ailure to comply with a court order results in dismissal of the motion and such dismissal operates as a dismissal on the merits"). And in any event, bankruptcy courts wield broad discretion "to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc).

40.     Similarly, directing Inmarsat to comply with its obligations under the Mediated Agreement was far from an abuse of equitable discretion. The Bankruptcy Court simply ordered Inmarsat to uphold its agreed bargain; that is relief bankruptcy courts are fully equipped to order. *In re Protarga, Inc.*, 329 B.R. 451, 479 (Bankr. D. Del. 2005).

## II.     Inmarsat Will Not Suffer Irreparable Harm Absent a Stay

41.     Inmarsat faces no irreparable harm absent a stay.

42.     First, Inmarsat's assertion that "if the Order is not stayed, Inmarsat will immediately be forced to take a position before its primary U.S. regulator that it believes is false" (Motion at 9) is both disingenuous and insufficient to establish any irreparable harm. When Inmarsat entered the Mediated Agreement, it agreed to

support the Application so long as the Application included the language the parties negotiated.  Mediated Agreement § 2.  The Application included that language verbatim.

43.     Inmarsat is now trying to renegotiate its deal, but if Inmarsat believed that making such statements would involve lying to the FCC absent further coordination, then it needed to have made that clear and included that further coordination as a condition of its support.  It did not.  Again, the Proposed NGSO system—which is not even built yet—*has been coordinated* because the parties agreed that it would operate within the limits of the existing Cooperation Agreement.  If the eventual operation creates interference, then Inmarsat can invoke the Cooperation Agreement's expedited dispute resolution procedures, Mediated Agreement § 3, and—failing that—bring its concerns to the FCC.  Providing its support for the Application now does not represent a false statement; it accurately reflects that the Cooperation Agreement will govern the operations of the Proposed NGSO System and future coordination disputes.

44.     For the same reason, Inmarsat will not suffer any irreparable harm even if the FCC approves the Application.  Inmarsat argues that absent a stay "victory on appeal would come too late" because, if the FCC grants the Application, AST and Ligado may operate the Proposed NGSO System in ways that could disrupt Inmarsat's business.  Motion at 10.  Wrong again.  Ligado and AST agreed in the

Application that the Proposed NGSO System will comply with the limits of the Cooperation Agreement. If interference actually occurs, Inmarsat already has remedies under the Cooperation Agreement.[25]

45. Second, requiring Inmarsat to dismiss the Complaint with prejudice does not cause irreparable harm. In the unlikely event that Inmarsat is successful on appeal, the *res judicata* effect of dismissing the Complaint with prejudice would be eliminated. *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 187 n.7 (3d Cir. 2006). Accordingly, Inmarsat's purported irreparable harm can be remedied through the ordinary appellate process, and no stay is needed.

## III.   A Stay Would Significantly Harm Ligado and AST

46. A stay would gravely harm Ligado and AST because Inmarsat would effectively evade its obligation to support Ligado's Application. Without Inmarsat's support, it will be harder—and will certainly take longer—for Ligado's application to be approved.[26] As a result, the AST Transaction would be thrown into jeopardy, and Ligado will be severely harmed because FCC approval of the Application is a condition precedent to the Debtors' emergence. And the suggestion that Ligado can simply delay or withdraw the Application to resubmit it at a later date defies credulity. Ligado's successful emergence depends on receiving regulatory approval

---

[25]   Smith Decl. ¶¶ 23-24.

[26]   *Id.* ¶¶ 21-22.

as soon as practicable, and any delay only further jeopardizes reorganization. Such harm benefits Inmarsat, as Ligado's competitor, and belies Inmarsat's true motivation in evading its support obligations.

47.    Moreover, Inmarsat has suggested that it intends to falsely accuse Ligado and AST of non-coordination before the FCC, which could further endanger and delay FCC approval and damage Ligado and AST's regulatory relationships. The need to avoid these harms provides further reason to deny the Motion.

## IV.    The Public Interest Weighs Against a Stay

48.    "In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgments." *In re W.R. Grace & Co.*, 475 B.R. 34, 209 (D. Del. 2012). Critically, "promoting a successful reorganization is one of the most important public interests." *In re Integrated Health Servs., Inc.*, 258 B.R. 96, 108 (Bankr. D. Del. 2000); *In re Genesis Health Ventures, Inc.*, 280 B.R. 339, 346 (D. Del. 2002) ("Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies.").

49.    Inmarsat's assertion that the public interest favors a stay depends on its erroneous assertion that Ligado is somehow lying to the FCC, which it is not. And Inmarsat improperly ignores the strong public interest in a debtor's expeditious emergence from reorganization. Ligado's path to emergence is directly tied to the Application's approval—a condition precedent to the Effective Date—and

Inmarsat's groundless attempts to force Ligado to coordinate further do nothing but delay Ligado's emergence.

## V.    If a Stay is Granted, a Bond is Appropriate and Necessary

50.    If the Court is inclined to grant a stay, it should require Inmarsat to post a $535 million bond.  Absent "exceptional circumstances," courts routinely require a bond "to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal."  *In re Tribune Co.*, 477 B.R. 465, 478 (Bankr. D. Del. 2012) (quotation omitted).  Inmarsat bears the burden of demonstrating that a bond is unnecessary, and its failure to do so "weigh[s] against the imposition of a stay." *W.R. Grace*, 475 B.R. at 209.

51.    In the Mediated Agreement, Ligado and AST agreed to pay Inmarsat $535 million to settle the parties' disputes and avoid further delay and uncertainty in seeking regulatory approval in exchange for Inmarsat's commitment to support the AST Transaction and the Application.  Ligado and AST already have paid Inmarsat $420 million and are due to pay an additional $100 million in March.  If Inmarsat obtains a stay and evades its obligation to support the Application by March 2, 2026 (and share a draft submission with Ligado by February 23),[27] it should post a $535 million bond to protect Ligado and AST from the damages suffered from the loss of their bargained-for peace.

---

[27]    Smith Decl. ¶ 20.

## **CONCLUSION**

52.    For the reasons set forth above, the Court should deny the Motion.

Dated: February 11, 2026
Wilmington, DE

_/s/ Michael J. Merchant_
Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
Zachary J. Javorsky, Esq. (Bar No. 7069)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:      collins@rlf.com
            merchant@rlf.com
            steele@rlf.com
            javorsky@rlf.com

Dennis F. Dunne, Esq. (_pro hac vice_ pending)
Matthew L. Brod, Esq. (admitted _pro hac vice_)
Lauren C. Doyle, Esq. (_pro hac vice_ pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Email:      ddunne@milbank.com
            mbrod@milbank.com
            ldoyle@milbank.com

Andrew M. Leblanc, Esq. (admitted _pro hac vice_)
Colleen Roh Sinzdak, Esq. (admitted _pro hac vice_)
Melanie Westover Yanez, Esq. (admitted _pro hac vice_)
**MILBANK LLP**
1101 New York Avenue, NW
Washington DC 20005
Telephone:  (202) 835-7500
Facsimile:  (202) 263-7586
Email:      aleblanc@milbank.com
            crohsinzdak@milbank.com
            mwyanez@milbank.com

_Counsel to Ligado Networks LLC_

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) because it contains 5,186 words, excluding the parts exempted by Federal Rule of Bankruptcy Procedure 8015(g).

This document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Michael J. Merchant*
Michael J. Merchant