IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INMARSAT GLOBAL LIMITED,<br><br>　　　　　　　　Appellant,<br><br>v.<br><br>AST & SCIENCE, LLC, and LIGADO NETWORKS, LLC,<br><br>　　　　　　　　Appellees. | Docket No. 1:26-cv-00118<br>Bankruptcy Case No. 25-10006 (TMH) |

**REPLY DECLARATION OF JOHN P. JANKA**

1. I am the Chief Officer, Global Government Affairs & Regulatory at Viasat, Inc. ("Viasat"), the parent company of Inmarsat Global Limited ("Inmarsat"). I submitted a Declaration, dated February 3, 2026 (the "Original Janka Decl."), in support of Inmarsat's Emergency Motion to Stay Pending Appeal of the Bankruptcy Court's January 30, 2026 Order that, among other things, requires Inmarsat to support one of Ligado's Federal Communications Commission ("FCC") applications.

2. I now submit this Reply Declaration in further support of Inmarsat's motion. In particular, this Declaration responds to certain statements in the Declaration of Jennifer Manner, dated February 11, 2026 ("Manner Decl.") and in the Declaration of Douglas Smith, dated February 11, 2026 ("Smith Decl."), that were submitted in opposition to Inmarsat's motion.

**Coordination Obligations**

3. Ms. Manner states that the parties' Term Sheet, dated June 10, 2025 (the "Term Sheet") "does not require any additional commitments regarding coordination beyond those that

are already reflected in the" Term Sheet. Manner Decl. ¶ 15 n.2. I disagree. Ms. Manner ignores that the Term Sheet itself contemplates that the parties would engage in and effectuate further coordination. Indeed, the Term Sheet defines the "Amended Inmarsat Cooperation Agreement" as "the Amendment and Restatement to the Inmarsat Cooperation Agreement contemplated by this Term Sheet." Term Sheet n. 4.[1] The reason the Cooperation Agreement was to be "Restate[d]" was to include coordination terms adapted to non-geostationary ("NGSO") satellite systems. That the Term Sheet anticipates the prospective negotiation of suitable coordination terms for NGSO operations is reflected in, among other things, the provisions in the Term Sheet providing that the restated agreement "shall not require" certain changes,[2] thus contemplating that other terms *would* change in order to account for the differential impact of NGSO satellites (whether individually or in the aggregate).

4.  Ms. Manner's suggestion that the Term Sheet itself coordinated the Proposed NGSO System is belied not just by the plain text of the Term Sheet, but also by the parties' extensive course of dealing. Ms. Manner does not explain why the parties, including Ms. Manner herself, spent months last year exchanging drafts of documents to effectuate the

---

[1] The "Inmarsat Cooperation Agreement" is the 2010 Cooperation Agreement that is still in effect today because the parties could not agree on an "Amendment and Restatement to the Inmarsat Cooperation Agreement" as "contemplated by th[e] Term Sheet." Term Sheet n. 4. The 2010 Cooperation Agreement was itself an amendment and restatement of the original 2007 Cooperation Agreement. I was the lead external counsel to Inmarsat for negotiation of both the original 2007 Cooperation Agreement and the 2010 "Inmarsat Cooperation Agreement."

[2] "For the avoidance of doubt, the Amended Inmarsat Cooperation Agreement *shall not require* (1) Inmarsat to constrain its user terminal emissions below the level otherwise provided in Exhibit L with respect to Ligado GSO satellites; (2) Ligado or AST to constrain their user terminal emissions below the level otherwise provided in Exhibit L with respect to Inmarsat GSO satellites or (3) Inmarsat, or AST and Ligado, to constrain their satellite emissions (*individually or in the aggre*gate) below the level otherwise provided in Exhibit L." Term Sheet §2 (emphasis supplied).

necessary coordination if, as she now contends, the Term Sheet had already effectuated that coordination. *Id*. ¶¶ 15-19.

5. In fact, it was Ligado itself that first drafted a "Second Amended and Restated Cooperation Agreement," to which Inmarsat would later provide detailed comments. Original Janka Decl. Exs. 4, 5. Ligado's draft Restatement referred to "NGSOs" **46 times**, whereas the 2010 Cooperation Agreement did not mention "NGSOs" even once. As explained in my original Declaration, the Term Sheet expressly contemplated the negotiation and adoption of suitable changes to the original coordination terms that were designed only for geostationary ("GSO") satellites. The modified terms of coordination the parties actively tried to negotiate would thereby have encompassed both GSO satellites *and* the new NGSO satellites that AST aspires to deploy. Original Janka Decl. ¶¶ 13-14.

6. In contending that no further coordination is needed, Ms. Manner also asserts that the "coordination of the Proposed NGSO System" required only the "commitment" made in the FCC application that the Proposed NGSO System "will be consistent with and remain within the technical, geographic and other limitations in the Amended Inmarsat Cooperation Agreement." Manner Decl. ¶ 17. I disagree. Notably, the "commitment" in Ligado's FCC application requires compliance with the **Amended Inmarsat Cooperation Agreement**. The parties spent months trying to reach agreement on amendments to the Cooperation Agreement that would coordinate the new NGSO satellites. But no agreement was reached. It is undisputed that the provisions on the "Coordination of L-Band Spectrum" (Article 3) and the L-Band Spectrum Plan (Exhibit L) currently in effect are exactly the same as they were in 2010.

7. If there were not going to be a restated agreement, and if the existing coordination terms from the 2010 Cooperation Agreement sufficed for the NGSO context, then the Term

Sheet would have simply referred to the terms of the existing agreement, rather than requiring a new Amended and Restated Agreement. The Term Sheet did not. Instead, the parties spent months trying to amend the Cooperation Agreement precisely as required by the Term Sheet, negotiating terms to coordinate new NGSO operations not previously addressed. Again, Ms. Manner does not discuss these coordination negotiations, or the multiple draft Restatements exchanged by the parties that sought to coordinate the NGSO satellites.

**The Parties' Prior, Incomplete Coordination Work**

8.  For his part, Mr. Smith acknowledges the parties' extensive negotiations, but characterizes them as "focused on administrative and procedural terms (such as streamlining spectrum exhibits and listing additional satellites)" that are not essential to coordination. Smith Decl. ¶ 15. He claims that the pre-existing terms "are sufficient." *Id.* ¶ 16. I disagree. The negotiations last year covered far more than mere administrative and procedural formalities. There were numerous substantive revisions proposed that are essential to coordinating the Proposed NGSO System.

9.  For example, on July 11, 2025, Inmarsat sent a markup of Exhibit L, the "L-Band Coordination Plan," which was heavily edited to adapt and extend the Inmarsat-Ligado coordination for GSOs to reflect the new NGSO systems. Original Janka Decl. Ex. 6. To take one example in that markup, Inmarsat proposed to modify Section 1.1(d)(ii)(B) as follows:

[redacted]

Inmarsat proposed these changes to protect its operations from interference from the Proposed NGSO system. For example, since AST proposes to have 96 NGSO satellites provide L-band service in the United States, compared with only one operational Ligado GSO satellite, "aggregate" was added to make clear that the combined downlink emissions from all the NGSO satellites in the constellation will not exceed the current limit that protects Inmarsat's operations from interference.

10. The limit at issue here in the 2010 agreement is akin to a restriction on Ligado playing music above a certain decibel level (say 80 decibels ("dB")[3]) that would disrupt a neighbor in her home. Where Ligado uses only one loudspeaker to play music, the 80 dB level can be maintained by controlling just the volume of that single loudspeaker. But if Ligado uses 96 separate speakers, each playing music at 80 dB, the total amount of noise the neighbor would be subject to would far exceed the decibel limit. This is why it is essential to clarify that when Ligado is allowed to add NGSO satellites to the terms of coordination, the aggregate interference of all 96 satellites cannot exceed the previously agreed interference limit.

11. A second example is Section 1.1(d)(ii)(A)(2) of the L-Band Coordination Plan (Exhibit L), which also limits the downlink interference from the Ligado satellites. The original text of this Section was based on "path loss" for GSO satellites—the reduction in signal power as a radio wave propagates through space. Path loss is substantially greater for GSO satellites than for NGSO satellites because GSO satellites are much further from Earth. Specifically, because GSO satellites are 50 times further away from Earth than the AST satellites will be, a GSO signal

---

[3] The 80 dB value here is used as an illustrative example, and is unrelated to any specific value in Ex. L.

generated with a certain amount of power will reach the Earth with significantly less power than an identical signal generated by a much closer AST NGSO satellite.

12. Again, consider a restriction on the amount of audible noise Ligado is allowed to make. If the restriction provided that Ligado could only make 80 dB of noise as measured at Inmarsat's house, and if Ligado were standing 1,000 feet away from Inmarsat's home, Ligado could generate sound at least somewhat in excess of 80 dB because "path loss" would lead to a reduction in the volume level by the time the noise reached Inmarsat. But if Ligado then moved only 20 feet away from Inmarsat, and generated the same level of sound, the amount of noise Inmarsat would hear would be significantly greater and likely would violate the noise limitation because there would be much less pass loss. The point of the proposed amendments was to make sure that the actual noise received by Inmarsat remains constant (under this analogy, no more than 80 dB) regardless of where the Ligado or AST satellites are located in orbit.

13. Inmarsat proposed substantively important new text to coordinate the Proposed NGSO system by tailoring the preexisting provisions to include a clear limit that would apply to both GSO and NGSO satellites, *see* Original Janka Decl. Ex. 6, at L-5 - L-6, and in doing so removed the references to a GSO-specific path loss value:

[redacted]

███████████████████████████████

14. Put simply, these examples of proposed amendments were not, as Mr. Smith contends, "focused on administrative and procedural terms (such as streamlining spectrum exhibits and listing additional satellites)" but were among those essential to coordinate the Proposed NGSO System.

15. Mr. Smith points to two particular aspects of the parties' negotiations that he characterizes as "administrative" and not necessary for coordination. Smith Decl. ¶ 12 (referencing Cooperation Agreement Ex. I); ¶ 14 (discussing proposed Ex. M). I disagree with both characterizations.

16. First, the parties last year exchanged revisions to "Exhibit I," which is the schedule of coordinated satellites. This schedule precisely identifies those satellites that have been coordinated by reference to publicly available information that specifies salient technical and operational parameters of those satellites.[4] Defining which satellites have been coordinated is, to state the obvious, a fundamental precondition to achieving coordination. Original Janka Decl. Ex. 7.

17. Mr. Smith claims that Exhibit I merely "serves as a useful administrative tool," but is not necessary for coordination, alleging that "Exhibit I is meant to add satellite networks that have been submitted to the International Telecommunications (sic) Union ('ITU')." As an initial matter, that is incorrect. True to its name, Exhibit I (entitled "Newly Coordinated

---

[4] In this way, Exhibit I would be akin to a list of motor vehicles allowed to use a particular parking lot, where the list specifies both the owner of the vehicle (e.g., Ligado) and the vehicle's license plate number (with the latter providing a source for identifying how much space the vehicle will require in the lot—big rig, bus, RV, sedan, motorcycle, etc.).

Satellites") is meant to reference satellite operations that the parties have ***actually coordinated*** under the Cooperation Agreement. Cooperation Agreement (Original Janka Decl. Ex. 1), §3.3(a). Nothing in the Cooperation Agreement requires that Exhibit I be amended simply because a party has made an ITU filing.

18. Notably, with respect to the Proposed NGSO System, there has never been an agreement to coordinate its operations with Inmarsat. A core element of international satellite coordination involves identifying the specific satellites at issue with reference to the filings with the International Telecommunication Union ("ITU") that provide salient operational and technical details, so the scope of the coordination is clearly defined. That information is then conveyed to regulators like the FCC, so they know exactly what has been coordinated. Ligado and AST have never even taken this necessary step toward achieving coordination. *See* Original Janka Decl. Ex. 7 at 4 (Ligado draft Exhibit I stating that the Proposed NGSO System ITU filings were "under preparation"). In contrast, Inmarsat added the relevant ITU filings for its forthcoming L-band NGSO operations to the markup of Exhibit I when the parties were seeking to coordinate the Proposed NGSO System. Original Janka Decl. Ex. 7, at 3-4.

19. Second, Mr. Smith refers to a proposed Exhibit M to the Amended and Restated Cooperation Agreement, which was never finalized, but which would "add a summary of NGSO operational requirements." Smith Decl. ¶ 14. During later stages of the negotiation, that document was referred to as "Exhibit O." This exhibit was important because it established additional operational limits on any NGSO satellites and the user terminals that communicate with those satellites, and therefore mitigated the potential for interference, *see* Original Janka Decl. Ex. 7 at 29:



By specifying outer limits on permissible "downlink" and "uplink" radio frequency emissions, those requirements, tailored for NGSO systems, *supplemented* the existing terms of coordination in Exhibit L that previously applied only to GSO operations.

20.    Mr. Smith states that this document is not necessary because Inmarsat has known since last year that these requirements are reflected in the "Collaboration Agreement" between Ligado and AST. Smith Decl. ¶ 14. However, Inmarsat is not a party to that Agreement. A critical reason the Term Sheet contemplated an Amended and Restated Cooperation Agreement was to ensure that the parties' NGSO operations with respect to one another are clearly defined, and that Inmarsat can directly enforce those limits against both Ligado and AST, including commitments that AST made solely to Ligado in the Collaboration Agreement. These obligations are not in the 2010 Cooperation Agreement (which again does not cover NGSO operations) but were to be included in the Amended and Restated Cooperation Agreement that was never completed.

**The 2025 Impasse**

21. Ms. Manner states that the parties' discussion ended last year because "Inmarsat attempted to introduce anti-competitive language." Manner Decl. ¶ 15. I disagree. A core element of the bargain reached under the original Cooperation Agreement in 2007 was that in exchange for the valuable L-band spectrum rights that Inmarsat provided to Ligado over North America, Inmarsat would have "Exclusive Use" (a defined term in the L-Band Coordination Plan, Exhibit L) of the L-band spectrum outside North America. Inmarsat has consistently argued that by agreeing to comply with all the existing limits in the Cooperation Agreement, including "geographic limitations," AST bound itself to this provision just as Ligado has been bound since 2007.



22. AST's attempt to change the geographic limitations in the Cooperation Agreement for its own benefit is what brought the coordination discussions to an end, not anything Inmarsat proposed. And there is nothing anticompetitive about enforcing the original bargain of the Cooperation Agreement, nor enforcing AST's agreement to honor the same limits long-ago agreed by Ligado. This is particularly true where AST intends to use ample spectrum

other than the L band to operate outside of North America, enabling AST to compete with Inmarsat outside of North America.

23. Ms. Manner states that Inmarsat is trying to gain "leverage to force AST to agree to its anti-competitive demands," Decl. ¶ 34. That is simply not true. As I explained in my original Declaration, and again in this one, there is important work that needs to be done so that the Proposed NGSO Network is coordinated, entirely separate and apart from the parties' dispute about exclusivity outside North America.

24. Relatedly, I understand that AST's opposition papers have relied on this dispute over Exclusive Use as support for the claim that no further coordination is needed. Specifically, as I understand it, AST has pointed to statements in Inmarsat's briefing to the bankruptcy court in August 2025 that certain limits in the Cooperation Agreement should apply equally to Ligado and AST, but that those limits themselves need not change. Understanding the context of those statements shows why AST is greatly misreading them.

25. The dispute in August 2025 arose because, as discussed, AST tried to carve itself out of the Exclusive Use provision that has always been in Exhibit L and that provides Inmarsat with exclusivity in the L band outside North America. When Inmarsat argued that AST's special carve-out was nowhere in the Term Sheet, Ligado and AST pivoted, and advanced a novel reading of Exhibit L: According to them, the Exclusive Use provision simply did not apply outside North America—meaning Inmarsat supposedly never had exclusivity rights vis-à-vis Ligado in the first place, much less AST. Inmarsat disagreed, but was willing to defer that issue, so long as it was clear that AST was bound to Exhibit L without the special carve-out that Ms. Manner had proposed. As Inmarsat told the Bankruptcy Court at the time, the "key interpretive

issue that is before the Court" was simply "*whether* AST is bound to the Cooperation Agreement limits." Hutton Decl. Ex. J ¶ 5 (emphasis added).

26. In making that point, Inmarsat did not believe or suggest that the important NGSO coordination work was already completed. It remains true, as Inmarsat said at the time, that certain "limits" did not need to change in Exhibit L (such as the geographic limits granting Inmarsat Exclusive Use of the L band outside North America). But that does not mean that the other existing GSO coordination provisions were adequate to coordinate an NGSO system. At a minimum, the *means* for applying those limits needed to be modified to ensure interference could be accurately measured and appropriately managed, as the examples above regarding aggregate emissions and path loss illustrate.

**Irreparable Harm**

27. In my original Declaration, I explained that Inmarsat faces the risk of irreparable harm because the comment period for the FCC application closes on March 2, 2026, and the FCC could grant the application at any time after that date. Inmarsat needs to make the FCC aware of the absence of coordination, consistent with the two FCC filings Inmarsat has already made explaining that the Proposed NGSO System has not been coordinated, so that the FCC can consider this critical fact when evaluating the Ligado application.

28. Ms. Manner responds that Inmarsat is "fully protected" because under the Term Sheet it can "seek highly expedited injunctive relief" for any "Coordination Breach" that occurs in the future. Manner Decl. ¶ 2; *see also id.* ¶ 31 (similar). I disagree. In order to allege a "Coordination Breach," Inmarsat must identify the Cooperation Agreement limit that Ligado or AST allegedly violated. But those are precisely the limits that, in Inmarsat's view, were never clarified or amended to apply in the NGSO context. A court cannot find AST guilty of speeding if the speed limit was never expressly set or if ambiguity existed over what the speed limit

12

actually was. Put simply, the coordination terms for NGSOs need to be established and clearly specified *before* AST starts operating an NGSO network that poses harmful interference risks to Inmarsat's business, including its critical emergency services. As the parties agreed in the Term Sheet, the time to establish the proper ground rules for AST's NGSO operations is before the FCC gives AST the green light to proceed based on false representations by Ligado.

29. If Inmarsat is forced, at the risk of contempt of Court, to support the pending application, and if the Ligado application is approved, Inmarsat will have minimal realistic recourse. The 2010 coordination terms for GSOs will define what constitutes "interference," and Ligado and AST will be under no obligation to amend those coordination terms to cover NGSO satellites. If Inmarsat suffers interference, Inmarsat will not be able to obtain swift or meaningful relief from the FCC, particularly if Inmarsat supported the FCC application when it was well aware coordination of the Proposed NGSO system had not occurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Berlin, Germany
         February 15, 2026

_____
John P. Janka